**In re PARAGON TRADE BRANDS, INC., Debtor.**

**Randall Lambert, the Litigation Claims Representative for the Chapter 11 Bankruptcy Estate of Paragon Trade Brands, Inc., Plaintiff,**

v.

**Weyerhaeuser Company, Defendant.**

**Bankruptcy No. 98–60930.
Adversary No. 99–6470.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

April 13, 2005.

---

44. *See, e.g., Bunge,* 191 Ill.Dec. 195, 623 N.E.2d at 794 ("Bunge is ... entitled to a purchase price adjustment if warranty (*l*) was breached").

John A. Lee, W. Scott Locher, Andrews Kurth LLP, Houston, TX, for Plaintiff Randall Lambert, The Litigation Claims Representative.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARGARET H. MURPHY,
Bankruptcy Judge.

### TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 841 |
| II. | FINDINGS OF FACT | 842 |
| | A. Background of the Private–Label Baby Diaper Business Weyerhaeuser Transferred to Paragon in the IPO | 842 |
| | B. The IPO | 850 |
| | C. Paragon After The IPO | 852 |
| | D. Paragon Is Driven To Bankruptcy By Intellectual Property Inadequacies | 854 |
| | E. Paragon's Losses For Which Plaintiff Seeks Damages | 855 |
| | 1. Bankruptcy–Related Costs | 855 |
| | 2. Product Re–Design Costs | 855 |
| | 3. Lost Profits | 855 |
| | 4. Obligations Incurred To PG And KC | 856 |
| | a. PG obligations | 856 |
| | b. KC obligations | 858 |
| | c. Wellspring's purchase of Paragon | 861 |
| | d. Cash payments to PG and KC and remaining liability to them | 863 |
| | e. SAP compliance costs | 863 |
| | 5. Mabesa | 863 |
| | F. Plan Confirmation and Proceedings in This Adversary Proceeding | 864 |
| III. | CONCLUSIONS OF LAW | 866 |
| | A. Washington Law Governs | 866 |
| | B. Prejudgment Interest | 866 |
| | C. Contractual Indemnity Is Not The Exclusive Remedy | 867 |
| | D. Contract Indemnification Remedy | 869 |
| | 1. Actual Liability Defense | 869 |

 2. Failure To Provide Notice Defense ................................871
 a. ATA notice provision .........................................871
 b. Paragon substantially complied with Section 11.03(a)................871
 c. Weyerhaeuser did not suffer actual prejudice ......................872
 3. Weyerhaeuser Defenses And Counterclaim ..........................875
 E. Common Law Measures Of Damages.....................................879
 F. Cost To Cure Measure Of Damages ....................................882
 1. PG–Related Losses Arising From Inadequate Intellectual Property
 To Utilize ILG Feature .........................................883
 a. Cost to cure damages attributable to the PG Royalty ..............883
 (1) "Conversion period" royalties paid ...........................883
 (2) Other royalties paid........................................883
 (3) Loss attributable to post-Plan-confirmation royalty
 obligation .........................................883
 (4) Should the PG royalty-related cost to cure damages be
 reduced for royalties attributable to products not utilizing
 the ILG feature on the IPO date?............................884
 (a) Economy diaper and training pant .........................885
 (b) Supreme diaper........................................886
 (c) Canadian sales ........................................886
 (5) Should the PG royalty-related cost to cure damages be
 reduced based on damages attributable to non-ILG
 patents?.............................................886
 (6) Should the royalty-based damages be reduced to an after-tax
 measure?.............................................886
 b. Cost to cure damages attributable to PG's agreed $158.5 million
 unsecured claim and $5 million administrative claim ..............887
 (1) Cash payment..........................................887
 (2) Promissory note obligations.................................887
 (3) Unpaid portion of PG's unsecured claim ......................888
 (4) Deductions to PG's unsecured claim-related cost to cure
 damages because a portion of damages are attributable to
 Paragon's non-Ultra diaper products? ......................888
 (5) Deductions to PG's unsecured claim-related cost to cure
 damages because a portion of the damages are attribut-
 able to Paragon settling other disputes with PG? .............888
 (a) Canadian sales ........................................889
 (b) Pre-petition and Post-petition sales allegedly infringing
 PG's Aziz, Buell, Robertson and Anderson patents.....889
 (c) PG released its Motion for Contempt ......................889
 2. KC–Related Losses Arising From Inadequate Intellectual Property.....890
 a. The Delaware Judgment was a proximate cause of Paragon
 incurring KC-related losses ...................................890
 b. The *Tyco* decision does not limit Paragon's KC-related losses ........891
 c. KC royalty-related cost to cure losses............................894
 (1) Royalties paid...........................................894
 (2) Loss attributable to KC royalty obligation .....................895
 (3) Should the KC royalty-related cost to cure damages be
 reduced for royalties attributable to products not utilizing
 the ILG feature on the IPO date?............................895
 d. Cost to cure damages attributable to KC's $110 million
 unsecured claim and $5 million administrative claim ..............895
 (1) Cash payment..........................................895
 (2) Promissory note obligations.................................895
 (3) Unpaid portion of KC's unsecured claim ......................896
 (4) Deductions to KC unsecured claim-related cost to cure
 damages attributable to non-Ultra diaper products ............896

| | | | |
|---|---|---|---|
| | e. | Deductions to KC royalty-related and unsecured claim-related cost to cure damages attributable to settlement of KC's SAP patent infringement claims? | 896 |
| | f. | Deductions to KC royalty-related and unsecured claim-related cost to cure damages because the Enloe II and III patents issued post-IPO | 897 |
| | g. | SAP compliance costs | 897 |
| | 3. | The Cost To Cure Damages Were Foreseeable | 897 |
| | 4. | Total Cost To Cure Damages | 899 |
| G. | | Difference In Value Measure | 899 |
| H. | | Destructioon of Business Loss Measure | 906 |
| I. | | Consequential Damages | 907 |
| | 1. | Product re-design costs | 907 |
| | 2. | Lost profits | 908 |
| | 3. | Bankruptcy–related costs | 911 |
| | 4. | Prejudgment Interest | 911 |
| J. | | Mitigation | 911 |
| K. | | Attorneys' Fees | 916 |
| L. | | Post–Judgment Interest | 917 |
| IV. | | CONCLUSION | 917 |

## I. INTRODUCTION

1. This adversary proceeding is a breach of contractual warranty case. Plaintiff, Randall Lambert, is the appointed litigation trustee for the bankruptcy estate ("Estate") of Paragon Trade Brands, Inc. ("Paragon"). Plaintiff filed this action on behalf of Paragon's Estate to recover damages for the alleged breach by Weyerhaeuser Company ("Weyerhaeuser") of four warranties in two contracts: an Asset Transfer Agreement ("ATA") and an Intellectual Property Agreement ("IPA"), by which Weyerhaeuser transferred its private-label baby diaper business to its newly-created, wholly-owned subsidiary, Paragon. The transfer was part of Weyerhaeuser's concurrent sale of 100% of Paragon's stock to the public in an initial public offering ("IPO"). The IPO closed February 2, 1993. After the IPO, Paragon was a company independent from Weyerhaeuser. Weyerhaeuser received $214.1 million net cash from the IPO.

2. On December 30, 1997, the United States District Court for the district of Delaware ("Delaware Court") issued its judgment, entered January 6, 1998, against Paragon,[1] permanently enjoining it from selling its primary product, a private-label baby diaper, because it utilized a key "inner leg gather" ("ILG") feature that the Delaware Court held infringed Procter & Gamble's ("PG") patents (the "Delaware Judgment"). The Delaware Judgment prompted Paragon to file a Chapter 11 proceeding January 6, 1998. To further its bankruptcy reorganization, in 1999, Paragon entered into settlement and license agreements with both PG and Kimberly–Clark Corporation ("KC") to obtain licenses to utilize the ILG feature, which Weyerhaeuser had begun using in March 1991, and which Paragon continued to use after the IPO. This court approved those agreements August 6, 1999, after contested, intensive and lengthy hearings. Para-

---

1. The damages judgment for $178 million was entered post petition May 28, 1998, after re-

lief from the automatic stay was granted.

gon's Chapter 11 plan was confirmed January 13, 2000 (the "Plan") and implemented on the effective date of the Plan January 28, 2000. In accordance with the Plan, Plaintiff was appointed as litigation trustee to pursue certain claims of the Estate, including the claims that form the basis of this adversary proceeding.

3. After completing discovery in this adversary proceeding, Plaintiff and Weyerhaeuser submitted cross motions for summary judgment. Plaintiff sought partial summary judgment that Weyerhaeuser was liable for damages as a result of its breach of the warranties in the ATA and IPA. Weyerhaeuser sought complete summary judgment in its favor. On October 30, 2002, an order was entered granting Plaintiff's motion and denying Weyerhaeuser's motion ("Summary Judgment Order" or "SJO"): Weyerhaeuser had breached the four warranties at issue, and Plaintiff was entitled to damages. Weyerhaeuser filed a motion for reconsideration, which was denied after briefing and oral argument by order entered June 24, 2003.

4. Trial was held on the remaining issue: the amount of damages Plaintiff is entitled to recover from Defendant. Additionally, during the trial, Weyerhaeuser presented testimony and argument in support of a counterclaim for indemnity it contends survived the SJO. The evidence presented at trial was considered and accorded its proper weight in accordance with the Federal Rules of Evidence.

## II. FINDINGS OF FACT

### A. Background of the Private–Label Baby Diaper Business Weyerhaeuser Transferred to Paragon in the IPO

5. Weyerhaeuser commenced a baby diaper business in 1972. This business consisted largely of selling a private-label diaper to large retail establishments that placed their store names on the package and sold the diaper on their shelves at lower prices than the branded diapers sold by PG, which sold the "Pampers" and "Luvs" brands, and KC, which sold the "Huggies" brand. The diaper was the primary product in Weyerhaeuser's Personal Care Products ("PCP") Division.

6. In the late 1980s, Weyerhaeuser embarked on a plan to refocus on its core businesses. Because the baby diaper business was not considered one of its core businesses, the diaper business was targeted for divestment. Weyerhaeuser informed the investment community about its refocusing and proceeded to move as quickly as possible to dispose of its baby diaper business (the "Business").

7. The Business had performed well in the early 1980s, earning pre-tax profits for Weyerhaeuser in 1983 and 1984 of $31 to $39 million. A key to Weyerhaeuser's success during these years was a "brand matching" practice, which included utilizing an elastic leg gather feature [2] patented under PG's Buell '003 patent. This strategy gave Weyerhaeuser's private-label diaper an advantage over its competitors' private-label diapers.

8. In 1981, PG sued Weyerhaeuser for infringing the Buell patent, seeking an injunction against use of the patented feature, damages for a reasonable royalty, and enhanced damages for willful infringement. Weyerhaeuser asserted various invalidity defenses to PG's Buell patent, and elected to take the case to trial instead of removing the feature or re-designing its diaper to avoid the infringement claim. The jury found that Weyerhaeuser willful-

---

**2.** Now recognized as the outer, or visible, leg gather in today's baby diaper.

ly infringed PG's Buell patent, and that a reasonable royalty would have been 1% of sales. The trial court rejected Weyerhaeuser's invalidity defenses. On July 2, 1985, the trial court entered judgment against Weyerhaeuser, permanently enjoining it from making its private-label diaper as it was then designed, and awarding PG reasonable royalty damages of $2.3 million, plus prejudgment interest and attorneys' fees.[3]

9. In the year after it was enjoined from selling its main product (1986), the Business's sales volume decreased significantly from 12 million cases to approximately 8.4 million cases, causing it to lose substantial market share. Its profits fell from over $31 million in 1984 to $3 million in 1986. The Buell injunction was a significant factor in this downturn in the Business.

10. In 1987 and 1988, Weyerhaeuser was able to recapture some of its lost market share, but by 1989, Weyerhaeuser was again losing market share to its competitors, its market share going to 11% in 1987, 12% in 1988, then down to 11% in 1989. During 1987 and 1988, the Business either lost money or earned very low profits, recording a $2.2 million loss in 1987, a $9.4 million profit in 1988, and a $2.0 million profit in 1989.

11. As of mid–1990, the Business was expected to lose $5 to 7 million, its sales were declining, and the quality of Weyerhaeuser's private-label diaper product lagged behind the brands' and even private-label competitors' products. In mid–1990, the Business had just abandoned

"Project Epcot," a three-year effort to develop a branded diaper, and Weyerhaeuser suffered a $100 million write-off on the project. At that point in 1990, the Business was considered a financially sick business and it was described as being in a "fight for survival." Confronting the "sick" Business were: a macro United States market for baby diapers that was expected to be flat-to-declining in future years because of lower birth rates and an improved product yielding fewer daily diaper changes; new private-label competitors emerging to challenge Weyerhaeuser for its private-label market share; serious excess diaper manufacturing capacity, which was leading to lower prices and, hence, lower revenues; and the brand manufacturers, PG and KC, engaging in what was described as "fierce battles" for market share, with tactics of (i) accelerating the pace of diaper innovations, (ii) lowering prices, and (iii) aggressively pursuing each other and private-label competitors on claims of infringing their patented innovations. In summary, the competitive environment facing the Business, which was already considered "sick," was intense, and was expected to intensify. For the Business to survive in this intensely competitive market, Weyerhaeuser *had* to improve the quality of its private-label diaper product.

12. The primary means for improvement was the addition of a newer feature known as the inner leg gather, or "ILG." An ILG, in layman's terms, is a second elasticized inner barrier cuff in the diaper that contains or channels effluent, and thus reduces leakage.[4] Because leakage pre-

---

**3.** *Procter & Gamble Co. v. Weyerhaeuser Co.,* 227 U.S.P.Q. 786, 1985 WL 72670 (N.D.Ill. 1985).

**4.** One must open a diaper to see the ILG, as it is not visible when worn.

vention is the primary purpose of a diaper, the ILG was the most important new feature for diapers ever incorporated in disposable diapers. Weyerhaeuser internally concluded that failure to add the ILG would negatively impact its sales volume by one million cases (1% of market share, or 1/12 its sales) in the first year and another 500,000 cases in the second through fourth years. Weyerhaeuser personnel believed that having the ILG on its Ultra diaper was essential for it to compete in the private-label diaper market. KC's ILG was marketed nationally in early 1990, and PG was expected to do so in September, 1990.

13. In June 1990, Weyerhaeuser invested $7 million to install equipment to add the ILG feature to the Ultra diaper. In November 1990, at the annual Private Label Manufacturers' Association meeting, the Business's retail customers were demanding that Weyerhaeuser deliver them a diaper with the ILG as soon as possible. In March 1991, Weyerhaeuser launched its new Ultra private-label diaper with the ILG feature. This new diaper was a huge success for the Business. As anticipated, it reduced leakage in Weyerhaeuser's private-label diaper by up to 40%. Weyerhaeuser's net diaper sales increased strongly from $275 million in 1990 to approximately $396 million in 1991, and then to $484 million in 1992, while operating profits increased from $2 million in 1990 to $33.4 and $34.8 million in 1991 and 1992, respectively. The ILG, while not the sole contributor, was extremely important to the Business's turnaround because it substantially improved leakage containment, the key quality feature of the diaper. The Business's customers were very satisfied with the new ILG Ultra diaper.

14. PG and KC, however, each had patent claims encompassing the ILG feature, under PG's "Lawson" patent and KC's "Enloe" patent. PG's Lawson patent described an ILG that was fluid impermeable or hydrophobic, and KC's Enloe patent described an ILG that was fluid pervious. For each day after March 1991 that Weyerhaeuser earned sales and profits using the ILG technology, its potential liability for patent infringement grew.

15. Weyerhaeuser's increased sales after the ILG diaper launch were largely achieved by taking market share from PG's "Luvs" brand. PG was known as a tenacious competitor that aggressively enforced its patents, as Weyerhaeuser well knew from its prior experience in the Buell lawsuit. Weyerhaeuser knew its ILG, made of a substantially hydrophobic, or impermeable material, fell within the claims made by PG's Lawson ILG patent. Weyerhaeuser also knew its ILG Ultra diaper infringed PG's Dragoo patent, which issued in 1991, after Weyerhaeuser launched its ILG diaper. Weyerhaeuser's only defense to an action by PG for an injunction and damages for infringement was to argue that the Lawson and Dragoo patents were invalid, as it had argued unsuccessfully in the Buell lawsuit.

16. In pursuit of that invalidity defense, Weyerhaeuser obtained patent opinions from outside counsel that the Lawson, Dragoo and Enloe patents were invalid based on certain cited prior art. Weyerhaeuser had received a similar invalidity opinion regarding Buell that was proven wrong at trial. These opinions did not guarantee success in litigation, but would help protect Weyerhaeuser against a willful infringement finding, which carried the threat of enhanced or treble damages. Weyerhaeuser knew that issued patents, such as Lawson, Dragoo and Enloe, are presumed valid, and that a party attacking

validity has the burden of overcoming this presumption by clear and convincing evidence. The patent opinions Weyerhaeuser obtained did not assess the probability or likelihood that a court would find invalid the presumptively valid ILG patents of PG and KC, and Pat Coogan, Weyerhaeuser's in-house patent counsel with oversight responsibilities for the PCP Division, testified he did not request such an assessment from outside counsel. In what appears to have been a lengthy meeting held September 5, 1991, Mr. Coogan advised Weyerhaeuser's General Counsel, Bob Lane, that Weyerhaeuser's chance to succeed on an invalidity defense to PG's Lawson or KC's Enloe patent infringement claims was no better than "50/50."

17. In the year before launching its ILG diaper in March, 1991, Weyerhaeuser negotiated with PG to obtain a license to use its ILG feature, offering on many occasions to pay royalties or to trade licenses to various Weyerhaeuser patents for the right to use the ILG feature. These negotiations failed in May 1991 because PG demanded a 3% royalty to license the ILG feature, an amount Weyerhaeuser stated it could not afford to pay and remain competitive in the diaper market.

18. Also in 1991, PG and KC were litigating with each other in federal district court in Seattle, Washington (the "Seattle litigation" or "Seattle trial") over whose ILG invention was reduced to practice first and which had priority of invention. As issued on September 22, 1987, PG's Lawson patent made claims to both the generic ILG invention and ILGs made of impermeable materials. KC's Enloe patent, issued November 3, 1987, made claims to ILGs made of "fluid pervious" materials (referred to later as "Enloe I"). KC sought to establish Enloe's priority of invention to invalidate Lawson's claims and to establish a right to have Lawson's ILG claims transferred to an amended Enloe application filed with the Patent And Trademark Office ("PTO").

19. Weyerhaeuser expected that the Seattle litigation was of sufficient scope for the winner between PG and KC to be found to have a "likelihood of success" in a later action to enjoin Weyerhaeuser from making and selling its private-label ILG Ultra diaper, and from using the ILG on any other product. In June 1991, trial of the Seattle litigation was conducted. Weyerhaeuser's in-house patent counsel Pat Coogan attended most of the trial.

20. In March 1991, a few months before the Seattle trial started, Weyerhaeuser's Investment Evaluation Department ("IED") commenced efforts to value the Business and determine how to sell it to obtain the best value. Weyerhaeuser also hired the investment banking firm of Morgan Stanley to advise on the Business's likely market value and likely buyers. In a report issued August 28, 1991, Weyerhaeuser's IED concluded that the Business's value was $90 million. Morgan Stanley's base case valuation of the Business was between $75 and $95 million. Neither the valuation of Morgan Stanley nor Weyerhaeuser's IED, however, assumed any royalty payable to KC or PG for the ILG technology, or payment of damages for past infringement. Morgan Stanley also reported to Weyerhaeuser an "unusually limited universe of buyers" for the Business and a significant risk that no transaction would result from a sale process.

21. In its valuation study, the IED reported that (i) each percentage point change in the Business's market share would change the Business's value by

about $30 million; and (ii) a $1 change in the gross profit margin per standard case sold would change the Business value by $80 million. Assuming, however, a combined 5.5% royalty payable by the Business (which equaled PG's and KC's last demands before Weyerhaeuser closed the IPO, as discussed beginning at page 13, ¶ 29), Weyerhaeuser's gross profit margin per case would drop by $1.49, from $5.62 to $4.13. According to Weyerhaeuser's valuation analysis before the 1992–93 IPO, if paying these royalties, the Business would have zero or negative value. Notes prepared by a Weyerhaeuser IED officer of a meeting with Mr. Coogan, Mr. Robert Dowdy,[5] and others August 20, 1991, reflect discussions over possibly putting the diaper division in a separate subsidiary to protect Weyerhaeuser from what was then stated to be a substantial and growing infringement liability. In November 1991, Chemical Bank, a bank with whom Weyerhaeuser had a relationship through its investment banking arm, advised Weyerhaeuser that the Business might not be saleable at anything better than a "fire sale" price. In early 1992, Weyerhaeuser also investigated disposing of the Business through a leveraged management buyout.

22. On September 10, 1991,[6] while Weyerhaeuser was reviewing disposition of the Business, the decision in the Seattle litigation awarded priority of invention to KC's Enloe patent.[7] As a result, Lawson's claims to generic ILGs were held invalid as obvious or anticipated in light of Enloe. The district court, however, held that Lawson's claims to impermeable, or hydrophobic, ILGs remained valid despite Enloe, given that Enloe's "fluid pervious" ILG patent taught away from Lawson's impermeable ILG design. The consequence of this decision was that Weyerhaeuser's largely impermeable ILG diaper stood squarely within Lawson patent claims of PG that did survive the Seattle trial, and Weyerhaeuser knew it. Weyerhaeuser had no solid non-infringement position against the surviving Lawson impermeable ILG patent claims. Mr. Coogan also realized that the Seattle court's decision meant Lawson's generic claims to all ILGs (regardless of permeability) would, in due course, be transferred to Enloe and issue in an amended Enloe patent that would encompass all ILGs, including ILGs used on Weyerhaeuser's Ultra diaper. Mr. Coogan reported this expectation to nine different Weyerhaeuser officers and lawyers, including its CFO and CEO, in his September 13, 1991 memorandum sent three days after the Seattle decision issued.

23. The Seattle trial result put Weyerhaeuser in the predicament of having to license the technology to make and sell its impermeable ILG diaper from not just one, but two competitors: PG, holding Lawson's surviving impermeable ILG patent claims; and KC, which would be granted an amended Enloe patent[8] claiming all

---

5. Weyerhaeuser's then Associate General Counsel, later, the IPO Project Manager, and its current General Counsel.

6. Only five days earlier, Weyerhaeuser's patent counsel informed Weyerhaeuser's general counsel that the chance of success of an invalidity defense to either the PG or KC patent claims was 50/50. See page 844–45, ¶ 16.

7. *Kimberly–Clark Corp. v. The Procter & Gamble Distrib. Co., Inc.*, No. C89–502 WD, 1991 U.S. Dist. LEXIS 19389 (W.D.Wash. Sept. 10, 1991).

8. Enloe I, issued in 1987, requires an inner cuff diaper with a "fluid pervious" ILG. KC sought the generic ILG claim in various proceedings before the PTO that resulted in the Enloe II patent granted in May 1995, but was

ILGs, regardless of hydrophobicity. Weyerhaeuser expected the prevailing party in the Seattle litigation, which was on appeal, would demand royalties from Weyerhaeuser for use of the ILG feature, and if a license and royalty agreement could not be resolved, that one or the other—PG or KC—would sue to enjoin Weyerhaeuser from using the ILG and for damages, including lost profits and/or reasonable royalties. Weyerhaeuser representatives were aware during this period that its potential liability for infringing PG's ILG patents included damages for lost profits on sales Weyerhaeuser was taking from PG, and that such damages could be "enormous" because PG's profit margin on the Weyerhaeuser ILG diaper sales approached 30%.

24. In December 1991, PG formally notified Weyerhaeuser that its Ultra diaper infringed PG's Lawson and Dragoo patents. In a December 1991 meeting, Weyerhaeuser's General Counsel, Bob Lane advised Weyerhaeuser's auditor, Arthur Andersen, that the damages arising from such a PG claim could be "enormous" for Weyerhaeuser. On February 10, 1992, Mr. Lane reported to Weyerhaeuser's auditor, Arthur Andersen, that the PG claim could result in a 3% royalty payable and an injunction.

25. By early 1992, Weyerhaeuser had been unable to sell the Business through traditional means. In March 1992, Weyerhaeuser launched a plan to dispose of the Business through an initial public offering of 100% of stock of a newly-formed Weyerhaeuser subsidiary into which it would transfer the Business. Weyerhaeuser retained Merrill Lynch to be the lead underwriter for this offering. Merrill Lynch retained the Skadden Arps law firm as its counsel. Weyerhaeuser retained the Paul Weiss law firm to be its counsel. The newly-formed company, which became Paragon, had no separate counsel. Weyerhaeuser employees responsible for the Business were expected to become the managers of the newly-formed public company after the IPO. The Business had a successful year (on paper) in 1991, earning over $33 million in operating profit on net sales over $396 million. Its performance was up significantly from its $2 million operating profit in 1990 on net sales of about $286 million, and significantly better than the Business's performance the prior four years, 1986–89. The Business's successful results in 1991 and 1992 positioned Weyerhaeuser to pursue the IPO.

26. Weyerhaeuser incorporated Paragon Trade Brands, Inc. in June 1992 as its wholly-owned subsidiary, to own the business Weyerhaeuser planned to take public. Initially, the IPO was planned to close in late August or September 1992, but it was tabled in early September due to concerns over the effect a PG diaper price reduction would have on the Business's narrow profit margin.

27. In August 1992, two separate events occurred that confirmed the problematic ILG patent predicament facing the Business. First, on August 14, 1992, the PTO decided in Enloe's (KC's) favor the

able to obtain no more in Enloe II than a patent requiring that the ILG be "inwardly biased," which is accomplished by tacking down the ILG at the waist regions of the diaper. The generic ILG claim was finally granted to KC in Enloe III, which was issued in February 1997, during trial in the litigation between Paragon and PG, and merely requires the use of *dual* cuffs. Enloe III is the broadest of the Enloe patents; it has neither a limitation as to perviousness nor a requirement that the ILG be "biased" in any direction.

pending interference action fought between PG and KC over ILG patent priority. Weyerhaeuser's in-house patent counsel, Mr. Coogan, knew that as a result, KC's Enloe patent would be amended to include the generic ILG claims originally granted to Lawson. This new patent, which would not be limited to "impermeable" or "fluid pervious" iterations, would squarely encompass Weyerhaeuser's Ultra ILG diaper.

28. The second event with impact on the ILG patent predicament facing Weyerhaeuser occurred August 26, 1992, when the Federal Circuit Court of Appeals affirmed the Seattle trial court's decision as to priority of invention in the Seattle litigation, again leaving PG's Lawson patent with valid claims to ILGs made of impermeable materials.[9] Based on this ruling, Weyerhaeuser's ILG diaper remained squarely within the claims of what was now a litigation-tested Lawson patent of impermeable diaper ILGs. It was foreseeable by Weyerhaeuser and known within the patent law practice at the time of the IPO that a license can be required from two different parties in order to sell a particular product.

29. Weyerhaeuser expected that both PG and KC would seek royalties from Weyerhaeuser for use of the ILG or, failing an agreed payment, would sue for an injunction against use of the feature and damages. In fact, Weyerhaeuser conducted dual license negotiations with PG and KC in the months before closing the IPO transaction to obtain freedom to use the ILG feature. No license agreement with PG or KC was concluded before closing.

PG's last demand before the IPO closed was for a 3% royalty on net sales of all ILG products in return for a license under Lawson and the companion ILG patent, Dragoo. No evidence shows that PG offered, before the IPO closed, to forgive past infringement as part of a license agreement. KC's last demand before the IPO closed was a 2.5% royalty on net sales of ILG products for seven and a half years in return for a license under Enloe I and the to-be-issued generic ILG patent (which later issued as Enloe III), which would be deemed fully paid after the 7.5 years. The proposed KC license did not contemplate a separate payment for past infringement. Both PG and KC rejected Weyerhaeuser's various counteroffers, which consisted of cross-licenses of various Weyerhaeuser diaper patents, or a royalty as low as 0.2%.

30. Weyerhaeuser could not have proceeded with the IPO had the Business been paying royalties in the range demanded by PG and KC. In the IPO Prospectus, which Weyerhaeuser and its attorneys drafted, Weyerhaeuser disclosed the existence of PG's and KC's ILG patent claims, but Weyerhaeuser did not disclose the level of royalties demanded or the severe impact the royalties would have on the Business if forced to pay them. Weyerhaeuser did not disclose that past attempts to license the feature from PG had failed; it downplayed the negotiations as "discussions"; and, the IPO Prospectus represented to the new public shareholders in at least three places that "the Company believes that any outcome with respect to these [ILG patent] matters will have no material adverse effect on its financial position or its results of opera-

---

**9.** *Kimberly–Clark Corp. v. Procter & Gamble Distrib. Co., Inc.,* 973 F.2d 911 (Fed.Cir. 1992). The trial court's order had been entered September 10, 1991. *Kimberly–Clark Corp. v. The Procter & Gamble Distrib. Co., Inc.,* No. C89–502 WD, 1991 U.S. Dist. LEXIS 19389 (W.D.Wash. Sept. 10, 1991).

tions." A 5.5% royalty (the aggregate amount PG and KC were demanding) would have eliminated virtually all of the Business's 6% profit margin. A 4% royalty (approximately the amount the Business eventually agreed to pay in 1999 in the settlement agreements with PG and KC) would have eliminated approximately two-thirds of the Business's profit margin.

31. Weyerhaeuser had withheld needed capital from the Business in the years before the IPO. The plan was for Paragon, after the IPO, to use its profits to finance its four-year capital improvement program, which was designed to (i) make its operations more cost-efficient so it could survive anticipated pricing actions of the brands and its private-label competitors, (ii) add and improve product features to keep pace with expected continuing diaper improvements in the industry, and (iii) expand production capacity. Being forced to pay royalties in the range of 5% would have severely undermined, if not destroyed, the Business's ability to make the capital investments necessary to survive the pending and anticipated future diaper price wars. In fact, PG and KC did continue their price wars after the IPO, and diaper prices sharply declined by 15 to 22% within three years. Had the Business been forced to pay substantially all its profits to PG and KC in royalties to use the ILG feature, the Business would not have been a viable, on-going business after the IPO, and the IPO likely would not have occurred.

32. The evidence showed that the Business could not, and its managers did not expect it could, independently raise its diaper prices to recoup the extra costs of ILG royalties. As a private-label manufacturer, the Business was a known price follower of the branded manufacturers' (PG and KC) prices. No evidence was presented to show that any of its managers expected they could rely on PG and KC to *raise* their prices if the Business paid them royalties, thus allowing price increases to recoup the royalty costs. PG and KC, with aggregate market share of ±70%, had been chronically engaged in "fierce battles" *inter se* over market share, and were lowering prices. In addition to the pressures from PG and KC, Paragon faced, as Weyerhaeuser had, vigorous competition from its private-label competitors that further constrained its ability to raise prices.

33. At the time of the IPO,[10] the Business had no alternative, market-tested design that could be used to replace the ILG feature for the Ultra diaper. Dropping the ILG feature from the Ultra diaper would have been disastrous to the Business, returning it to the "sick" condition from which the ILG feature had rescued it. The Ultra diaper, which was the Business's premium quality private-label diaper, represented approximately 84% of its net sales. The Business also produced and sold a line of economy diapers (the "Economy diaper") that had fewer features than the Ultra diaper. The Economy diaper, which represented about 14% of net sales in 1993 (15% in 1992), did not utilize an ILG feature when the IPO closed. At the time of the IPO, the Business had just introduced a training pant, which is a form of diaper used by older toddlers. The training pant did not then utilize an ILG and represented about 1% of the net sales of the Business at that time. Accordingly,

---

**10.** The preparation for the IPO began with the incorporation of the shell in June 1992 and concluded with the closing, which took place February 2, 1993, when the shell corporation received the Business, a bundle of assets with associated liabilities.

as sold to the public through the IPO, the Business had essentially been built as, and was, a company with a single product—the Ultra ILG diaper—but with good potential for growth and expansion.

34. The consequences of not having the right to use the key ILG feature had been discussed within Weyerhaeuser as similar to the consequences it suffered from the 1985 Buell injunction. These consequences included an injunction requiring the Business to pull the Ultra diaper from retailer shelves, costs to develop a new diaper design, lost sales and profits from being forced to sell an inferior, non-ILG product, payment of the substantial royalties PG and KC were demanding for a license to continue using the ILG feature, and liability to PG and KC for their lost profits, which Weyerhaeuser knew could be substantial.

## B. The IPO

35. Under these ominous circumstances, Weyerhaeuser closed the IPO February 2, 1993, selling 11.5 million shares [11] of Paragon common stock to public investors who paid $19.00 per share. Weyerhaeuser received $179,100,000 of the $218,500,000 IPO proceeds, [12] and $35,000,000 from Paragon, which Paragon had borrowed under its new revolving bank credit facility. In light of the previous estimations of the value of the Business, and in light of the patent infringement threats from PG and KC, the receipt of $214.1 million for selling its Business represented a successful transaction for Weyerhaeuser. By the end of the first trading day, Paragon's stock traded up to close at $24.75 per share, giving Paragon a market value of $284,625,000 on February 2, 1993.

36. At closing, Weyerhaeuser transferred the Business to Paragon by executing an Asset Transfer Agreement (ATA) and Intellectual Property Agreement (IPA) (together, the ATA and IPA are the "Transfer Agreements"). The ATA and IPA, as finally executed at the IPO closing, contained assumption of liabilities clauses, whereby Paragon assumed virtually all liabilities of Weyerhaeuser relating to operation of the Business, past and prospective (defined as the "Assumed Liabilities"), including patent liabilities. [13] The Transfer Agreements, at ATA Section 11.02(a) and IPA Section 4.01, also contained certain provisions providing that Paragon would

11. A total of 11,500,000 shares of Paragon stock were sold in the IPO, of which 10,000,000 represented the shares issued to Weyerhaeuser in connection with the formation of Paragon and the transfer of the Business to it, and 1,500,000 represented additional shares purchased by Weyerhaeuser from Paragon in order to cover the underwriters' over-allotment option.

12. The underwriters received $12,535,000 from the IPO proceeds as their fee. Paragon received $26,865,000 from the IPO proceeds (the purchase price for the over-allotment shares), which Paragon used to pay down the $35 million it had borrowed at closing to pay Weyerhaeuser.

13. ATA Section 2.02 provides, in part: "In consideration of the transfer of the U.S. [and Canadian] Assets hereunder ... Paragon shall assume from Weyerhaeuser the U.S. [and Canadian] Assumed Liabilities." "Assumed Liabilities" is defined in Annex II to the ATA to be "all Liabilities and obligations of Weyerhaeuser relating to or arising from the operation of the Business, whether before or after the Closing Date, including but not limited to" many listed categories. At closing, a U.S. Assignment And Assumption Agreement was executed by Paragon, but not by Weyerhaeuser, providing that Weyerhaeuser assigned, and Paragon assumed, the listed categories of Liabilities and obligations.

indemnify and defend Weyerhaeuser from the Assumed Liabilities, including any third party claims against Weyerhaeuser for patent infringement relating to operation of the Business. As discussed at length in the Summary Judgment Order entered October 30, 2002, assumption of liability and indemnity clauses existed in early drafts of these contracts, prepared months earlier than the February 2, 1993 actual closing. Later, however, numerous warranties were added to the contracts. Plaintiff sued on four of the warranties. Two are found in the ATA, and were made with no limitation as to Weyerhaeuser's knowledge. In the final, signed ATA, these two warranties provide, in relevant part:

> 3.01(c): [Weyerhaeuser] has, and will transfer to [Paragon] at the Closing, good title to all of the other Assets [all assets other than Real Property] ... free and clear of any and all mortgages, security interests, liens, claims, charges, options and encumbrances of any nature whatsoever, except for minor defects and irregularities in title or encumbrances that do not materially impair the use of any such Assets for the purposes for which they are held.

> 3.01(d): The Transferred Assets and the services and materials to be provided pursuant to the Related Agreements are

sufficient to conduct the Business[14] as now being conducted.

The other two warranties, in the IPA, provide that, "to the best of [Weyerhaeuser's] knowledge":

> 3.11(ii): "Schedules 3.01(a) and 3.01(b) are accurate and complete lists of all Patent Rights and Trademarks, as used in connection with the Business or the Products."

> 3.11(vii): "[T]he Primary Intellectual Property[15] plus Trademarks and Secondary Intellectual Property[16] are adequate for the continuation of the Business as currently conducted."

At closing of the IPO, Weyerhaeuser certified the warranties were true and correct. In Section 3.01(a) of the ATA, Weyerhaeuser represented and warranted to Paragon that the ATA warranties were enforceable on their terms. The IPA and ATA were each fully integrated contracts, which, pursuant to merger clauses in each, superceded all prior discussions between the parties over the subject matter of the agreements. The IPA and ATA were required to be, and were, filed with the SEC as "material contracts" and made a part of the Registration Statement for Paragon's newly issued common stock. Weyerhaeuser, in Section 11.02(b) of the ATA, agreed to indemnify Paragon for all losses, costs,

---

**14.** The ATA defines "Business" as the private-label baby diaper business of Weyerhaeuser.

**15.** The IPA defines "Primary Intellectual Property" as "those Patent Rights, Copyrights, Know–How, Trade Secrets and Third Party Intellectual Property Agreements that are owned, licensed or controlled by Weyerhaeuser and used by Weyerhaeuser as of the Closing Date solely in connection with the Business or the Products as they exist on the Closing Date."

**16.** The IPA defines "Secondary Intellectual Property Rights" as "those Patent Rights, Copyrights, Know–How and Trade Secrets that (i) are owned and controlled by Weyerhaeuser and with respect to which Weyerhaeuser has a right to grant the licenses being herein granted to Paragon, (ii) are used or may be used by Weyerhaeuser as of the Closing Date in connection with the Business or the Products as they exist on the Closing Date and (iii) are being licensed to Paragon pursuant to Section 3.03 of [the IPA]."

expenses and damages arising from a breach of any of the four warranties at issue.

## C. Paragon After The IPO

37. After the IPO, the Business now known as Paragon continued to make and sell the Ultra diaper with the same ILG feature Weyerhaeuser had used before the IPO. For infringement purposes, Paragon's ILG feature did not change from the feature on which Weyerhaeuser had built the Business. Paragon also continued to sell the Economy diaper and training pant. After the IPO, in the mid to late 1990s, Paragon added the ILG feature to the Economy diaper and to the training pant. Also after the IPO, Paragon began to sell a "Supreme" diaper. No credible evidence was introduced to show that this product ever had an ILG.

38. After the IPO, Paragon continued to employ the same outside patent counsel that Weyerhaeuser had used on diaper patent issues before the IPO.[17] After the IPO and through at least 1996, Paragon's attorneys continued to consult Weyerhaeuser's in-house patent attorney, Pat Coogan, regarding the ILG patent matters. For the first two years after the IPO, PG and KC lowered their diaper prices by more than 20%, and Paragon was forced to respond by lowering its diaper prices accordingly.

39. After the IPO, the representations in the IPO Prospectus that "the Company believes any outcome of [the ILG patent]

matters will have no material adverse effect" on the Business restrained Paragon from agreeing to licenses with PG and KC at royalty rates that would have so eroded Paragon's profits as to be a material adverse effect on Paragon's financial position.[18] On January 20, 1994, PG sued Paragon in federal district court in Delaware for infringing PG's Lawson and Dragoo patents (the "Delaware Litigation"). In return for dismissal of the lawsuit, PG demanded that Paragon pay a 2.5% royalty. Paragon sought an alternative resolution by tendering several alternative diaper designs to PG, and asked PG to agree that the designs would not infringe its patents. On February 28, 1994, PG responded to Paragon's request, agreeing that two of the samples would not infringe Lawson or Dragoo. PG asserted, however, that even if Paragon elected to switch to one of these designs, Paragon would still be required to pay a 2.5% royalty on all past infringement of Lawson and Dragoo, back to 1991 (approximately $30 million), plus a 1% royalty on future net sales of the sample diaper for licenses under PG's Aziz and Buell patents, because PG claimed the sample diaper infringed Aziz and Buell.[19]

40. Paragon rejected PG's offer. Paragon had not commercially tested the samples it had delivered to PG, and believed them to be inferior designs, which were not a commercially viable option. Paragon countered PG's offer by offering to pay a 0.1% royalty for licenses of Lawson and Dragoo for three years, after which no

---

17. The Dressler Goldsmith patent firm (including John Milnamow and Steven Geimer), and the Hopgood patent litigation firm (including partner Stephen Judlowe).

18. For Paragon to have obtained PG and KC license at the royalty rates demanded would

have resulted in a "field day" for securities class action lawyers in light of the disclosures in the IPO Prospectus. Abraham, Tr. (Oct. 30) 278; Widmann, Tr. (Oct. 30) 231.

19. The Aziz and Buell patents PG had issued before the IPO.

further royalties would be due. Paragon's offer and position was consistent with the IPO Prospectus immateriality disclosure, and with the pre-IPO advice of Mr. Coogan as to what would be a "reasonable royalty" for PG's ILG patents. PG rejected Paragon's counteroffer, telling Paragon it believed the parties were at an impasse. Consequently, pretrial discovery proceeded.

41. During 1995, KC filed a lawsuit against Paragon in Dallas, Texas for infringing its Enloe and Enloe II ILG patents. By July 1996, after settlement discussions with PG had resumed, PG had lowered its royalty demand for Lawson and Dragoo licenses to 2%, but still demanded Paragon pay $30 million for past infringement back to 1991, when Weyerhaeuser had begun selling the ILG diaper. Even though this was PG's lowest settlement offer, Paragon believed it could not afford to pay PG a 2% royalty, given its competitive situation and the likelihood that this rate would become precedent for a royalty payable to KC for licensing KC's Enloe patents, which Paragon considered stronger, more defensible patents than Lawson. The pendency of the KC claims under Enloe, which would (soon) include a generic claim for all ILGs, materially limited Paragon's options in reaching a settlement with PG. From the time of the IPO through the February 1997 PG trial in Delaware, Paragon continued to study alternative designs to avoid paying any royalty, but found no viable alternative to the ILG design on its diaper. Removing the ILG altogether was not a viable option for Paragon.

42. Before the trial in Delaware and thereafter, Stephen Judlowe, Paragon's trial counsel who had originally been selected by Mr. Coogan, Weyerhaeuser's in-house patent counsel, was advising Paragon that the likelihood of Paragon's success at trial against PG's claims was very high, and as high as 80%, and that even if Paragon lost on PG's claims it would win on its counterclaim for PG's alleged infringement of Paragon's Pieniak patent and would, "at the end of the day walk away making money" on the litigation. Paragon relied on Mr. Judlowe's advice and rejected PG's settlement offer. PG and Paragon proceeded to trial.

43. A bench trial before Judge Joseph Longobardi commenced in Delaware February 3, 1997. The day after the PG trial started, the PTO issued to KC the Enloe III patent containing the generic ILG claims originally granted to Lawson in 1987.[20] After presentation of evidence had concluded, but before the Delaware court ruled, PG and Paragon conducted further settlement discussions. At an April 1997 meeting, PG representatives met and explained the implications of the Enloe III patent, and how Paragon had no way to avoid single or even double jeopardy for infringement except by retreating to what essentially was its pre–1991 diaper, which would have been "commercial suicide" for Paragon. In May 1997, after the trial had

**20.** An interim patent, Enloe II, had issued to KC in May, 1995, and KC had sued Paragon on that patent and its original Enloe patent in 1995. What became known as the Enloe III patent then issued on February 4, 1997. The Enloe III patent included the generic Lawson claim to which KC had proven its entitlement in the Seattle litigation and PTO interference action. Enloe III is the patent Mr. Coogan had predicted, in 1991, would issue. While Paragon had room to maneuver around or debate the scope of the Enloe I claims, the generic ILG claim in Enloe III meant that Paragon faced an undeniable risk of double jeopardy with little or no room to escape.

been completed, PG renewed its pretrial offer of a 2% royalty, attributing 1.25% to Lawson and .75% to Dragoo, but increased its demand for past infringement damages to $40 million. Paragon calculated that accepting this offer would have cost it about $150 million. Paragon still believed it could not afford to accept PG's demand, in part due to the overhanging claims of KC, which by then had filed a second lawsuit against Paragon in federal district court in Dallas, Texas, to include its enforcement of the Enloe III generic claims to all ILG diapers (the "Texas lawsuits"). Also, Paragon's trial counsel continued to give bullish advice after the Delaware trial, advising that Paragon was a likely winner. For this and the reasons described earlier, Paragon rejected PG's post-trial pre-ruling settlement offers. In turn, PG rejected Paragon's counteroffer of a 0.2% royalty capped at $3 million.[21] The parties thus waited for Judge Longobardi's decision.

44. When the patent infringement lawsuits were filed against Paragon, Paragon did not send Weyerhaeuser a formal written notice demanding that Weyerhaeuser defend it or indemnify it for liability. Weyerhaeuser had actual notice, however, that Paragon had been sued by PG for infringing Lawson and Dragoo: Mr. Coogan was consulted after the IPO by Paragon in-house counsel, and was deposed in the PG case. Mr. Abraham testified he instructed each of Paragon's general counsels to consult with Mr. Coogan on ILG claims and strategy. Susan Barley, Paragon's General Counsel from at least January 1994 through the summer of 1995, provided credible testimony that she kept Mr. Coogan up to date on the progress of the negotiations with PG while she was at Paragon, and that Mr. Coogan attended meetings with her and lawyers from Mr. Milnamow's firm to strategize about PG and KC ILG patent issues. Cathy Hasbrouck, who was hired as its General Counsel when Paragon moved from Seattle to Georgia in 1996 and remained in that position through conclusion of Paragon's bankruptcy case, provided credible testimony that she also discussed these patent issues with Mr. Coogan during the period leading to trial, and received advice from him on the defense of the case that was consistent with the bullish advice received from Paragon's outside counsel. Mr. Coogan, while admitting receiving a call from a "woman in Georgia," claimed not to remember such a discussion. His denial was not credible.

## D. Paragon Is Driven To Bankruptcy By Intellectual Property Inadequacies

45. The Delaware Court's December 30, 1997 judgment, entered January 6, 1998, against Paragon, held that its ILG feature infringed PG's Lawson and Dragoo patents and permanently enjoined Paragon from selling its primary product, the private-label "Ultra" diaper. The judgment also required Paragon to pay PG lost profits damages, royalty damages equal to 2% of past infringing sales, and enhanced damages for what had been Weyerhaeuser's willful infringement of Dragoo equal to 100% of the damages award attributable to the March through December 1991 period. By order dated May 28, 1998, the damages portion of the judgment against

---

**21.** Once again, this 0.2% royalty proposal was consistent with in-house patent counsel's pre-IPO advice to the Weyerhaeuser Business team and Weyerhaeuser's auditor as to what would be a reasonable royalty for the PG patents.

Paragon was found to be $178,429,536.00.[22]

46. The Delaware Court's judgment precipitated the filing of Paragon's Chapter 11 bankruptcy petition January 6, 1998. Ten days later the United States Trustee appointed an Official Committee of Unsecured Creditors ("Creditors' Committee"). Weyerhaeuser was appointed as one of nine creditors to serve on the Creditors' Committee. Weyerhaeuser served as a Creditors' Committee member throughout the duration of Paragon's case in this court. On November 2, 1998, the United States Trustee also appointed an Official Committee of Equity Security Holders (the "Equity Committee").

## E. Paragon's Losses For Which Plaintiff Seeks Damages

### 1. Bankruptcy–Related Costs

47. During its Chapter 11, Paragon paid retention bonuses to key staff and managers. Paragon paid these bonuses to ensure that key personnel stayed with Paragon through the bankruptcy crisis. Paragon paid $4 million for retention bonuses in 1998, which were approved by order entered May 19, 1998, as reasonable and necessary.[23] Paragon incurred the retention bonus cost as a direct result of the Delaware Judgment and the ensuing bankruptcy. Paragon also paid legal and professional fees for bankruptcy-related matters totaling approximately $6.3 million in 1998, $9.6 million in 1999, and $7.0 million

in 2000. Paragon incurred these costs as a direct result of the Delaware Judgment and the ensuing Chapter 11 bankruptcy proceeding.

### 2. Product Re–Design Costs

48. To comply with the Delaware court's permanent injunction against using the ILG feature, Paragon engineers designed a new private-label diaper it called its "unitary leg gather" design ("ULG"). Paragon rolled out the new ULG diaper in phases to its retail customers during the six months following the Delaware Judgment.[24] The ULG design was the best design Paragon could devise. It was, however, more expensive to manufacture than the ILG diaper because it required more material, and redesigning and retooling for the new diaper was expensive. Actual incremental costs Paragon incurred as a result of having to redesign its product totaled at least $8,514,000.

### 3. Lost Profits

49. In addition to costing more, the ULG Ultra diaper did not perform nearly as well as the ILG diaper, and leakage increased significantly. As a result, Paragon experienced lower sales and much lower profits, as obtaining the sales Paragon did achieve necessitated more promotional costs. Paragon reported $512.8 million net sales of infant care products in 1998 and $486.1 million in 1999. These sales figures were less than the net sales of $542.9

---

22. The parties in Paragon's Chapter 11 case consented to relief from the automatic stay of 11 U.S.C. § 362(a) to obtain an order from Judge Longobardi liquidating the damages from the Delaware litigation.

23. The order followed upon hearing after notice to creditors and parties in interest.

24. Before the Delaware Judgment, Paragon and PG had entered into a conversion agreement that gave the losing party six months to convert its diaper to a non-infringing design should an injunction be issued. During the six month "conversion period," Paragon incurred royalties at the judgment rate for use of the infringing design.

million for 1998 and $554.6 million in 1999 that Paragon had projected in its pre-bankruptcy August 1997 Mid–Term Plan.[25] Applying Paragon's calculation of its 1997 gross profit margin at 22.3%, the lower-than-projected sales cost Paragon profits of $6.7 million in 1998 and $15.3 million in 1999. Paragon's August 1997 Mid–Term Plan projections for its 1998 and 1999 net infant care product sales were reasonable estimates at the time of what Paragon's infant care product sales would have been in those years if no injunction had issued against its Ultra diaper and if none of the resulting bankruptcy disruptions had occurred.[26] Paragon had an established business and profit history and had reasonable prospects for growth into the future, if its intellectual property had been sufficient and adequate, as warranted. Paragon's 1997 gross profit margin is a reasonable basis on which to calculate lost profits.

### 4. Obligations Incurred To PG And KC

#### a. PG obligations

50. After some months of selling the ULG Ultra diaper, Paragon management decided Paragon needed to return to the ILG design to have a commercially viable business in order to reorganize and emerge from bankruptcy. The only options for accomplishing that goal were (a) prevailing on appeal and overturning the Delaware injunction, or (b) settling, first, with PG for a license enabling Paragon to sell its ILG-designed diaper. Paragon's management, advised by Paragon's new patent counsel, Cravath Swain & Moore ("Cravath"), believed its chances of overturning the Delaware Judgment on appeal were no better than 30%. Losing the appeal likely would have forced Paragon to continue selling its inferior ULG product, which its managers did not believe provided a viable future. The bleak appeal prospects were compounded by PG's September 22, 1998 motion to the Delaware Court to hold Paragon in contempt for selling the ULG product. In that motion, PG argued that Paragon's ULG diaper still infringed its patents, in violation of the permanent injunction, and requested the Delaware Court to hold Paragon in contempt and to enjoin it from selling even that relatively unsuccessful diaper. Had PG's motion been successful, Paragon's business would have been shut down completely.

51. These factors led Paragon management to conclude that a settlement with PG allowing it to use the ILG feature was necessary for Paragon to survive as a going concern and emerge from bankruptcy. Paragon management was not alone in reaching this conclusion. The Creditors' Committee, on which Weyerhaeuser served, strongly supported Paragon settling with PG, based upon advice of its own

---

**25.** The August 1997 Mid–Term projections on which this lost profit calculation is based were prepared by Paragon's Chief Financial Officer, Alan Cyron, to give Paragon's Board of Directors the best view of Paragon's value based on what management felt were the best set of assumptions available at that time.

**26.** The inferiorly performing ULG product was not the only cause of Paragon's lower than projected sales post-bankruptcy. The bankruptcy itself undoubtedly contributed to

Paragon's loss of sales. [Cyron, Tr. (Nov. 4) 789 (bankruptcy-related factors "were a significant part of the reduction of sales"); Cole, Tr. (Nov. 3) 631–32 (environment of "fear, uncertainty and doubt", coupled with the inferior product, "caused us to lose business from the customers. The end product was our sales went down and our profits obviously plummeted").]

patent counsel, Fish & Neave, who had been employed to advise the Creditors' Committee concerning Paragon's ILG patent litigation prospects against PG and KC.

52. With strong Creditors' Committee encouragement and support, Paragon and PG, in October 1998, reached broad agreement on economic issues for a settlement. Their settlement agreement ("PG Settlement Agreement") was presented for approval by the bankruptcy court February 2, 1999. Key terms of the agreement included the following:

i. A PG license to Paragon for PG's Lawson and Dragoo patents permitting Paragon to use the ILG feature that the Delaware Judgment had enjoined it from using, in return for Paragon paying PG a 2% royalty on net sales of all Paragon ILG diapers ("PG License");

ii. The PG License would take effect February 2, 1999, with royalties payable at 2% from that date forward;

iii. As an express condition of the license, Paragon's consent to PG's $158.5 million unsecured claim for infringement dating back to 1991, plus interest on that sum at 6% per annum accruing from April 15, 1999 through the effective date of Paragon's reorganization plan (which was January 28, 2000); and

iv. Paragon's consent to a $5 million administrative expense claim for PG.

The PG Settlement Agreement was an arms-length, extensively negotiated agreement. The Creditors' Committee supported the PG Settlement Agreement and urged its approval.

53. In March 1999, the Equity Committee filed a motion to obtain discovery from Weyerhaeuser, pursuant to Bankruptcy Rule 2004. That discovery motion raised the breach of warranty claims forming the basis of this adversary proceeding. Weyerhaeuser opposed the motion. Accordingly, Weyerhaeuser, *before* approval of the Settlement Agreement with PG, was on notice of the claims that form the basis of this litigation.

54. The Equity Committee vigorously opposed approval of the PG Settlement Agreement. On March 22 and 23, April 13, 14, and 15 and June 8, 1999, evidentiary hearings were held, during which Paragon, the Creditors' Committee, its members (including Weyerhaeuser), PG and the Equity Committee had a full and fair opportunity to offer evidence and to argue in support of or in opposition to the PG Settlement Agreement (the "PG Settlement Agreement Hearing"). After hearing extensive evidence and argument, by order entered August 6, 1999 the PG Settlement Agreement was approved (the "PG Settlement Approval Order"). In that Order and in the Plan Confirmation Order, the PG Settlement Agreement was found to be both "reasonable" on its terms and "necessary" for Paragon to continue operating.

55. Weyerhaeuser, as a member of the Creditors' Committee, had notice of the terms of the PG Settlement Agreement and of the deadlines for objections to the Settlement Agreement. Weyerhaeuser had a full and fair opportunity to object to the PG Settlement Agreement, regardless of the position taken by the Creditors' Committee, as a whole, on the settlement.[27] With notice of the breach of warranty claims against it, Weyerhaeuser did

27. The Creditors' Committee By–Laws, at 9, § 3.6 allowed any individual Creditors' Com-

not oppose approval of Paragon's PG Settlement Agreement. The findings in the PG Settlement Approval Order and the Plan Confirmation Order are consistent with evidence presented during the Damages Trial of this action. Paragon's decision to enter into the PG Settlement Agreement to return to selling the ILG diaper, on which Weyerhaeuser had built Paragon's business, was both reasonable and necessary to ensure Paragon's survival as a going concern.

### b. KC obligations

56. During its Chapter 11 case, Paragon also entered into a settlement agreement with KC providing for a license under the three Enloe patents and dismissal of the Texas lawsuits. As problematic as PG's ILG patents were, Paragon management believed, based on advice of counsel, that KC's Enloe infringement claims would be even more difficult to defeat than the PG claims that led to the devastating loss in Delaware. Paragon, as Weyerhaeuser had anticipated, had no known non-infringement defense to Enloe III. Its principal defense was to argue that the Enloe patents were invalid based on a "Japanese Utility Model" cloth diaper cover. Optimism over this defense, however, was greatly tempered by the fact the PTO had considered this prior art during prosecution of the Enloe II and Enloe III patents, and still issued the patents. Also, Paragon

had urged the "Japanese Utility Model" in the Delaware litigation in an attempt to show that Lawson was invalid, but the Delaware Court had rejected the argument.

57. Paragon also faced potential liability to KC for sales dating back to 1991 under the Enloe I patent, which issued in November 1987, more than five years before the IPO closing. While Enloe I's claims were limited to "fluid pervious" ILGs, the patent did not define the degree of perviousness required, and the Weyerhaeuser/Paragon hydrophobic ILGs were undisputedly pervious to some degree.[28] Paragon management assessed, based on advice of counsel, that the Enloe I claim allowed KC a broader range of equivalent products it could argue infringed its patent under the doctrine of equivalents than Lawson. As Enloe was prior art to, and hence a stronger patent than Lawson, the potential liability appeared likely.

58. Given these and other factors, Paragon management, again advised by its new patent counsel, Cravath, believed it had no better than a 40% chance of prevailing against KC's Enloe infringement claims. Facing a 60% likelihood KC would obtain an injunction preventing sales of its ILG product and substantial damage claims as well, Paragon management concluded that settling with KC was also necessary to provide it a clear path to market for its ILG diaper product.

---

mittee member to act in its individual capacity as it deemed appropriate. *See also* 11 U.S.C.A. § 1109(b) (West 1993) (allowing members of committees to take action in their individual capacities contrary to committee positions).

28. At one point in the lengthy hearings during the Chapter 11 proceeding of Paragon, Paragon argued the apparently common sense legal notion that its diaper managed to fall between the patent claims on impermeability and fluid perviousness; i.e., that as the PG and KC patents went in opposite directions on ILG porosity, liability for infringement of the ILG patents of both PG and KC seemed logically unlikely. Unfortunately, patent law did not appear to be sufficiently supportive to "bet the company" on a lengthy appellate and PTO litigation trail.

59. In October 1998, shortly after Paragon agreed to settlement terms with PG, Paragon and KC reached general agreement on economic terms of a settlement. Paragon's settlement with KC was presented for approval in Paragon's motion filed April 12, 1999, for an order authorizing and approving settlement ("KC Settlement Agreement"). Important terms of the KC Settlement Agreement included the following:

i. A KC license to Paragon for KC's Enloe patents permitting Paragon to use the ILG feature in return for Paragon paying KC a 2.5% royalty on net sales of Paragon ILG diapers up to $200 million, and a 1.5% running royalty on net sales exceeding $200 million, with minimum royalties of $5 million to be paid annually until the last of the three Enloe patents expired ("KC License");

ii. As an express condition to the Enloe license, Paragon's consent to KC's $110 million unsecured claim for past infringement dating back to 1991, plus interest on that sum at 6% per annum accruing from April 15, 1999 through the effective date of Paragon's reorganization plan (which was January 28, 2000);

iii. Paragon's consent to a $5 million administrative expense claim for KC; and

iv. Paragon's consent to modify the super absorbent polymer ("SAP") used in Paragon's diaper to a "safe harbor" to avoid infringement of KC's Kellenberger, Melius and Good patents.

The KC Settlement Agreement was an arms-length, extensively negotiated agreement. The Creditors' Committee strongly supported the KC Settlement Agreement and urged its approval. As in the case of the PG Settlement Agreement, the Equity Committee contested approval of the KC Settlement Agreement.

60. On June 9, 10, 11, 24, 25, and 29, and July 1 and 13, 1999, evidentiary hearings were held, during which Paragon, the Creditors' Committee, its members (including Weyerhaeuser), KC and the Equity Committee had a full and fair opportunity to offer evidence and to argue in support of or opposition to the KC Settlement Agreement ("KC Settlement Agreement Hearing"). The order approving the KC Settlement Agreement (the "KC Settlement Approval Order") was entered August 6, 1999. That Order and the Plan Confirmation Order approved the terms of the KC Settlement Agreement as reasonable and necessary for Paragon to sell the ILG diaper, to avoid an injunction shutting down the sale of the ILG product, and to avoid the huge potential liability to KC. Weyerhaeuser, as a creditor and member of the Creditors' Committee, had notice of the KC Settlement Agreement and of the deadline to object to it. Weyerhaeuser, however, did not contest the KC Settlement Agreement. The findings in the KC Settlement Approval Order and the Plan Confirmation Order are consistent with evidence presented during and for the Damages Trial in this action, as to the need for Paragon to enter the KC Settlement Agreement to obtain a license under Enloe, in order to have a "clear path to market."

61. On November 1, 1999, after approval of the KC settlement and licenses, and while the PG and KC Settlement agreements were on appeal, a decision issued from the federal district court in Wisconsin in another lawsuit over Enloe I,

II, and III brought by KC against Tyco, another manufacturer of diapers.[29] The construction of the Enloe claims reached in *KC v. Tyco*,[30] which was later affirmed on appeal,[31] does not affect the reasonableness and necessity of Paragon's settlement with KC. The parties stipulated that the Tyco diaper had an ILG feature that was similar in relevant respects to the ILG of the Weyerhaeuser/Paragon diaper. The federal appeals court affirmed that Tyco's diaper did not infringe KC's Enloe patents but on an unexpected rationale. As Plaintiff's patent law expert, Tom Arnold, explained most cogently, that decision affirmed the November 1999 Wisconsin district court's construction of the claims of the Enloe patents, and *read into* the claims of all the Enloe patents a broad fluid pervious *limitation*, not—as expected—an expansion, based on the original Enloe application. When the KC Settlement Agreement was executed, however, given the prior history of this and other patents in the Paragon arena, no one predicted, or even surmised the possibility, that the Wisconsin trial court in *KC v. Tyco* would (or the Texas trial court in *KC v. Paragon* might) reach such a conclusion.[32] Also, until its opinion issued, no one could assure that the Federal Circuit would affirm the Wisconsin trial court's decision. Indeed, the Creditors' Committee, including Weyerhaeuser, knew of the Wisconsin trial court decision at or near the time it issued but did not request reconsideration of the KC Settlement Agreement Approval Order in light of that decision.

62. The ground on which the Wisconsin trial court held in Tyco's favor in narrowing the scope of KC's Enloe patent claims—by reading limitations from the patent specification into the claims—was a newly developing principle of patent law that Paragon's highly skilled patent counsel, Cravath, did not anticipate would be successful. During the damages trial in this adversary proceeding, Plaintiff's expert patent attorney, Tom Arnold,[33] testified that, at the time of Paragon's settlement decision, most reasonably skilled patent attorneys would not have anticipated with confidence that the Enloe claims would be limited in the fashion the Wisconsin court limited them, or that the *Tyco* decision's limitation, if adopted at trial, would be sustained on appeal. Weyerhaeuser itself, when dealing with the Enloe predicament before the IPO, and having had years to study Enloe and its prosecution history with the assistance of qualified patent counsel, did not anticipate

---

**29.** Tyco, a well-known conglomerate, had acquired ConFab, who had been one of Paragon's competitors, after KC initiated its patent infringement lawsuit against ConFab.

**30.** *Kimberly–Clark Corp. v. Tyco Int'l (US), Inc.*, No. 98–C–756–C, 1999 WL 33944112 (WD Wis., Nov. 3, 1999) (unpublished).

**31.** *Kimberly–Clark Corp. v. Tyco Int'l (US), Inc.*, 4 Fed.Appx. 946 (Fed.Cir.), *cert. denied*, 534 U.S. 890, 122 S.Ct. 204, 151 L.Ed.2d 144 (2001) (the "*Tyco* decision").

**32.** Significantly, the KC Settlement Agreement would expire by its own terms if the order approving it were not final within 90 days of entry.

**33.** Mr. Arnold, whose experience and judgment were reflected in his testimony and demeanor, was, perhaps, the most credible witness of all the experts who testified, opined or argued from the original Chapter 11 petition filing by Paragon January 6, 1998. His assessments and explanations were clear, cogent and extremely helpful in understanding the *Tyco* court's theory in juxtaposition to the prior prevailing theories, following decades of precedents.

that the claims of Enloe III, once issued, would be limited in the fashion the *Tyco* decision ultimately limited them. . Prior theories did not focus, or even mention in passing, *limitations* on the Enloe patents.

63. Paragon's Court-approved settlement with KC, like any reasonable settlement, was a compromise over an uncertain outcome; it was not a surrender based on a certainty of losing. The consideration paid in settlement was discounted to reflect this uncertainty. Paragon did not have the luxury of testing the KC claims through trial and appeal, as Tyco did. Paragon faced substantially more risk than Tyco faced if Paragon were to litigate the Enloe infringement claims to verdict and through appeal. The ILG diaper was Paragon's principal product. If Paragon lost and an injunction issued, Paragon would be out of business. By contrast, the Tyco/ConFab diaper represented only one of perhaps hundreds of businesses in the Tyco conglomerate. This disparity in risk tolerance explains why Paragon could not afford to lose in litigating KC's infringement claims to judgment. Tyco won, but could afford the potential loss. Also, Tyco/ConFab's volume of potentially infringing sales, and hence its potential past royalty and lost profits liability, was much smaller than Paragon's. Tyco did not face, either in absolute dollars or relative impact, the huge [34] potential liability Paragon faced from alleged infringement back to 1991 if KC were to prevail. Accordingly, Paragon's decision to enter into the KC Settlement Agreement, thereby incurring present and future costs attendant to the agreement, was reasonable and necessary for Paragon to obtain a "clear path to market" and maintain viable Business operations, notwithstanding the outcome of *KC v. Tyco*. Weyerhaeuser's arguments to the contrary, made with the benefit of perfect hindsight, are not persuasive. It is impossible to turn back the clock to change the fact that for Paragon to have litigated with KC instead of settling would have been a "bet-the-company" gamble.

### c. Wellspring's purchase of Paragon

64. In addition to the PG and KC Settlement Agreements, a third cornerstone of Paragon's Chapter 11 reorganization was sale of Paragon's diaper business. Wellspring Capital Management LLC ("Wellspring") emerged as the high bidder, and Paragon's Plan was centered on a transaction in which Wellspring paid the Paragon Estate $115 million for 98.5% of the newly-issued common stock of the Chapter 11 reorganized entity known as "Reorganized Paragon." [35] The purchase price was based on a valuation conducted

---

**34.** The proof of claim filed by KC in Paragon's bankruptcy sought lost profit damages for Enloe infringement of more than $2 billion.

**35.** Reorganized Paragon is an entity separate and distinct from the Paragon Estate and plaintiff herein. The filing of a Chapter 11 bankruptcy petition causes a fundamental legal change in the filing entity; the filing entity assumes the mantle of a debtor-in-possession and becomes an officer of the court subject to court supervision and control and to the provisions of Bankruptcy Code. *In re V. Savino*

*Oil & Heating Co., Inc.*, 99 B.R. 518 (Bankr. E.D.N.Y.1989). Similarly, the confirmation of the Chapter 11 plan created a new entity (Reorganized Paragon), which was sold, leaving behind the estate of the debtor-in-possession entity (Paragon) to distribute assets to creditors in accordance with the Plan and the Bankruptcy Code, to liquidate further assets, such as the claim that is the subject of this litigation, and to distribute those assets in accordance with the Plan and the Bankruptcy Code.

by Paragon's Chapter 11 financial advisor, The Blackstone Group ("Blackstone"), which valued the Paragon enterprise at approximately $290 million, applying a 15% discount rate. The Blackstone valuation was premised on projections of future cash flow and performance of the Business that were set forth in the Disclosure Statement, a necessary prerequisite to allowing voting on the Chapter 11 Plan of reorganization. The Disclosure Statement was approved by order entered November 18, 1999, following notice to all creditors and interested parties, including Weyerhaeuser. The projections and valuation included in the Disclosure Statement became the basis on which Paragon's Plan was ultimately confirmed.

65. The financial advisors for the creditor and shareholder constituents in the Chapter 11 case carefully reviewed the management projections underlying the bankruptcy reorganization.[36] They had a strong economic and fiduciary incentive to ensure the $290 million enterprise valuation was fair, because creditors, under the proposed reorganization plan, were to receive substantially less than 100% of their claims, based on the valuation and resulting sale price. The $115 million sale price was derived by subtracting from the $290 million valuation the $170 million amount of debt Reorganized Paragon faced post-reorganization. The $5 million difference reflected a Plan compromise that allowed Paragon's old shareholders to receive a small portion of equity in the new entity, Reorganized Paragon.

66. Reorganized Paragon's $170 million debt load was composed of $155 million in five-year promissory notes, bearing inter-est at 11.25% per annum, payable to Paragon's unsecured creditors in partial satisfaction of their claims against Paragon, and $15 million drawn on a new revolving credit facility at confirmation (i.e., when the Plan was confirmed by order following notice and hearing), proceeds of which primarily funded bankruptcy costs paid at confirmation. PG's *pro rata* portion of Reorganized Paragon's $155 million promissory notes was $61.9 million. This amount constituted a partial payment on PG's agreed $158.5 million unsecured claim. KC's *pro rata* portion of Reorganized Paragon's $155 million promissory notes was $42.9 million, as partial payment on its $110 million unsecured claim.

67. Both the cash Wellspring agreed to pay for the Paragon business and the value of the business at reorganization were directly affected by the obligations the business assumed at confirmation: to pay the promissory notes issued to PG, KC and the other unsecured creditors. To calculate the loss the Paragon Estate suffered from having to pay these obligations post-confirmation, use of a 15% discount rate is appropriate. Blackstone used a 15% discount rate in its valuation work; the other financial advisors working in fiduciary capacities in Paragon's bankruptcy case used a 15% discount rate; and Paragon used a 15% discount rate in its August 1997 valuation work. Using a 15% discount rate, as of the date of Plan confirmation, the present value of the debt that Reorganized Paragon would owe PG following confirmation was $54.1 million, and the present value of the debt that Reorganized Paragon would owe KC was $37.5 million. Paragon's expected post-confir-

---

36. The financial advisors who reviewed the Disclosure Statement projections and deemed them reasonable included The Blackstone Group, Price Waterhouse, Jay Alix, and Goldman Sachs.

mation royalty obligations to PG and KC also reduced what the Estate realized from the sale of Paragon to Wellspring because the projected cash flow on which the sale price was premised was appropriately reduced. Applying the 15% discount rate, as of Plan confirmation, the present value of the anticipated post-Plan confirmation PG and KC royalty burdens were $43.4 million for PG and $33.8 million for KC.

### d. Cash payments to PG and KC and remaining liability to them

68. In addition to the adverse impact on the value of Paragon's business when it was sold, the Settlement Agreements also required Paragon to pay substantial cash sums to PG and KC during the Chapter 11 and at Plan confirmation. First, as required by the Settlement Agreements, Paragon began paying PG and KC royalties immediately upon executing the license agreements. From February 2, 1999 through the January 28, 2000 effective date of the Plan, Paragon paid PG $10.4 million in royalties and KC $9.9 million. Second, at confirmation, Paragon paid PG $51.2 million and KC $37.5 million in cash from the proceeds of the sale of the Business to Wellspring, in partial satisfaction of their unsecured claims allowed pursuant to the settlements. Third, as provided in the two settlements, Paragon paid PG and KC $5 million each at plan confirmation, in satisfaction of their allowed administrative claims. At confirmation, the $290 million value of the Paragon business was well below the almost $400 million in allowed claims held by Paragon's unsecured creditors. Between the cash payments and notes issued to creditors upon

Plan confirmation, unsecured creditors received payments totaling approximately 68% of their allowed unsecured claims. Approximately $122 million remains due to creditors of the Paragon Estate today on account of allowed claims against, or liabilities of, Paragon. Included in this amount is $50.5 million due PG and $34.6 million due KC, inclusive of simple interest at 6% (per the settlements) through the effective date of the Plan, January 28, 2000. These sums represent the unpaid portion of their respective unsecured claims allowed under the settlements. The Plan provides that these unpaid claims will receive payment from a portion of any recovery in this and other litigation pursued by the Litigation Claims Representative.[37]

### e. SAP compliance costs

69. As a result of the KC Settlement Agreement and to avoid further patent conflicts with KC, Paragon incurred costs in modifying its super-absorbent polymer ("SAP") diaper fill, which Paragon agreed to do as a condition to KC's agreement to license the Enloe patents to Paragon. The evidence showed that the costs Paragon incurred to do that totaled at least $9.3 million.

### 5. Mabesa

70. Given the flat-to-declining expected U.S. diaper market, part of Weyerhaeuser's business plan at the time of the IPO was to grow the Business by expanding into Latin American countries, including Mexico. Paragon entered the Mexican market in 1996, after the IPO, by acquiring a 15% equity interest ownership in a

---

**37.** Another portion of such recovery will be distributed to equity claimants, the prepeti- tion shareholders.

joint venture named Grupo P.I. Mabe, S.A. de S.V. ("Mabesa"), which made and sold diapers in Mexico. As an equity owner, Paragon earned a *pro rata* share of Mabesa's profits. Paragon's investment agreement gave it a contractual option to increase its investment and equity share in Mabesa. Mabesa was a profitable venture in 1996 and 1997. In 1997, Paragon management planned to exercise its option and increase its investment in Mabesa to 49% in 1998. The Delaware litigation, followed by the bankruptcy filing and liquidity crisis, however, prevented Paragon from exercising that option. Plaintiff seeks to recover damages for Paragon's inability to exercise its option to increase its Mabesa investment. While global diaper expansion was then a logical and predictable direction for anyone competing in the intensely competitive mature-to-declining U.S. baby diaper market, pursuit of non-U.S. markets was not part of the Business or plans contemplated at the time of the IPO. Accordingly, the losses Plaintiff attributed to its inability to increase its Mabesa ownership are too speculative and too remote from the events involved in the breach of warranties by Weyerhaeuser to be allowed as an element of damages.

## F. Plan Confirmation and Proceedings in This Adversary Proceeding

71. Over Weyerhaeuser's opposition, the Equity Committee in Paragon's bankruptcy, on behalf of the Paragon Estate, commenced this breach of warranty adversary proceeding against Weyerhaeuser October 4, 1999, contending Weyerhaeuser breached the four ATA and IPA warranties (quoted above at page 17, ¶ 36). Following hearings on confirmation thereof, Paragon's Modified Second Amended Plan Of Reorganization (the "Plan") was confirmed by order entered January 13, 2000 (the "Confirmation Order"), and the effective date of the Plan was January 28, 2000. The Plan and Confirmation Order reaffirmed the reasonableness of and necessity for Paragon to settle with PG and KC. Pursuant to the Plan and Confirmation Order, Mr. Randall Lambert was appointed the Paragon Estate's Litigation Claims Representative to pursue this and other claims of the Estate. Accordingly, Mr. Lambert was substituted for the Equity Committee as Plaintiff in this action. Following the close of discovery, Plaintiff moved for partial summary judgment holding Weyerhaeuser liable for breaching the four warranties at issue. Weyerhaeuser cross-moved for complete summary judgment or dismissal. In support of the summary judgment motions, the parties jointly submitted an extensive record of more than nine volumes of joint exhibit appendices and twenty-five deposition transcripts. Oral argument on the motions was heard June 24, 2002.

72. The Summary Judgment Order entered October 30, 2002, found Weyerhaeuser breached all four warranties as a matter of law on the grounds that Paragon's intellectual property was not adequate or sufficient at the IPO closing, so that Weyerhaeuser's warranties were not true. Because Paragon lacked the licenses then necessary to operate its business, the Delaware Judgment, the risks of continued litigation, the disruption to Paragon's business from its inability to sell the ILG diaper, and the allowed claims of and license fees to PG and KC—which were necessary for Paragon to incur to obtain rights to use the ILG technology it did not have at closing of the IPO—constituted a stark gap in Paragon's intellectual property, known to Weyerhaeuser and undisclosed in the IPO. As a result, Plaintiff is entitled to damages for the breaches. For

the reasons set forth in the Summary Judgment Order, Weyerhaeuser's arguments—that Paragon's indemnity of Weyerhaeuser against intellectual property claims in IPA Section 4.01, and other assumption of liability promises in the ATA and IPA precluded Plaintiff's breach of warranty claims and entitlement to damages—were rejected.

73. Weyerhaeuser filed a motion for reconsideration of the Summary Judgment Order November 12, 2002. In its Reply to Plaintiff's response to its motion for reconsideration, Weyerhaeuser raised for the first time a new document and argument it had failed to raise either in the original proceedings or in its motion to reconsider: a U.S. Assignment And Assumption Agreement signed by Paragon at the IPO closing. Weyerhaeuser also raised for the first time the *Tyco* decision's issues discussed above, despite having notice of the trial and appellate court decisions at or near the time they issued, and despite entry of the Federal Circuit's *Tyco* decision over a year before oral argument on the summary judgment motions. Following oral argument on the motion for reconsideration, Weyerhaeuser's motion was denied. This matter was then set for trial only on damages.

74. During a fourteen-day damages trial conducted October 30 to November 6, November 24 and 25, and December 3 to 10, 2003, Plaintiff presented evidence and argument on the issue of damages for Weyerhaeuser's breach of warranties. Plaintiff argued three alternative common law measures of damages: a "cost to cure" measure, a "difference in value" measure, and a "destruction of business" measure, plus consequential damages under the first two measures. Alternatively, Plaintiff argued for damages pursuant to the indem-

nity provision in ATA Section 11.02(b), in which Weyerhaeuser promised to pay Paragon for all "Losses" arising from or relating to a breach of warranty. Plaintiff also seeks prejudgment interest and attorneys' fees under each remedy as well.

75. Weyerhaeuser contends Plaintiff is limited to the ATA Section 11.02(b) indemnity remedy for its breach of warranties, to the exclusion of a common law remedy customarily available for breach of warranty. Weyerhaeuser contends Plaintiff is entitled to no damages under the purportedly exclusive ATA Section 11.02(b) remedy because (i) given that Paragon settled, Plaintiff did not establish Paragon was actually liable to PG or KC for patent infringement, and (ii) Paragon and Plaintiff did not provide Weyerhaeuser sufficient notice of the PG and KC actions to be entitled to indemnity, and Weyerhaeuser was actually prejudiced from the lack of notice. Weyerhaeuser also argues that Paragon's agreements to indemnify and defend Weyerhaeuser from certain intellectual property liabilities under ATA Section 11.02(a) and IPA Section 4.01 require Paragon to repay to Weyerhaeuser any liability Weyerhaeuser owes Paragon for breach of Weyerhaeuser's warranties.

76. Finally, Weyerhaeuser contends that under Washington law, the only proper common law measure of damages is difference in value at the time of sale. Weyerhaeuser argues that under that measure, Plaintiff's damages are limited to what the missing PG and KC licenses hypothetically would have cost Paragon, both reduced to after-tax dollars and discounted to present value as of February 2, 1993, and then further reduced by Weyerhaeuser's assumption that Paragon would have raised prices and recouped much of the increased royalty costs to acquire the li-

censes. Plaintiff responds that it is not limited to a difference in value measure, and may recover all damages and losses necessary to put Paragon in the position it would have occupied if it had received Weyerhaeuser's baby diaper business in its as-warranted condition—that is, with sufficient intellectual property to conduct the ILG diaper business. Plaintiff submits the measure that best accomplishes that goal is an equivalent to a "cost to cure" measure.

77. Among other contentions, Weyerhaeuser contends that the consequential damages Plaintiff seeks are not recoverable under Washington law, that Plaintiff's damages should be limited for Paragon's alleged failure to mitigate damages, and that no damages should be allowed for KC-related losses because of the *Tyco* decision. Weyerhaeuser also asserts Plaintiff is not entitled to pre-judgment interest on any damage element. The parties have stipulated, however, to Plaintiff's entitlement to recover a certain amount of Plaintiff's attorneys fees and costs upon being awarded damages.

## III. CONCLUSIONS OF LAW

### A. Washington Law Governs

78. The parties agree that, because the ATA and IPA so state, Washington law controls the damages Plaintiff is entitled to recover.

### B. Prejudgment Interest

 79. Plaintiff's right to recover prejudgment interest is governed by Washington law, the law chosen in the ATA and IPA. *See Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1066 (11th Cir.1996); *In re Eagle Enters., Inc.*, 223 B.R. 290, 292 (Bankr.E.D.Pa.1998)[38]. Moreover, both parties appear to agree Washington law governs this issue. Under Washington law, entitlement to pre-judgment interest is governed by case law, not statute. *See Bailie Communications, Inc. v. Trend Bus. Sys., Inc.*, 61 Wash. App. 151, 810 P.2d 12, 19 (1991). Washington follows the liquidated-unliquidated test for prejudgment interest entitlement. *Hansen v. Rothaus*, 107 Wash.2d 468, 730 P.2d 662, 664 (1986) (*en banc*)(citing *Prier v. Refrigeration Eng'g Co.*, 74 Wash.2d 25, 442 P.2d 621 (1968), *Mall Tool Co. v. Far West Equip. Co.*, 45 Wash.2d 158, 273 P.2d 652 (1954), and *Parks v. Elmore*, 59 Wash. 584, 110 P. 381 (1910)). Prejudgment interest is applied to liquidated claims but not unliquidated ones. A liquidated claim is one " 'where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion.' " *Hansen*, 730 P.2d at 665 (quoting *Prier*). A claim is unliquidated " 'where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed.' " *Id.* "A defendant should not, however, be required to pay prejudgment interest in cases where he is unable to ascertain the amount he owes to the plaintiff." *Id.* at 665.

 80. A claim is not liquidated if, as in this proceeding, a court must choose between alternative measures of damages. *King Aircraft Sales, Inc. v. Lane*, 68 Wash.App. 706, 846 P.2d 550, 558–59 (1993). Plaintiff offered alternative mea-

---

**38.** *See* footnote 75, p. 911, ¶ 243.

sures of damages. Each alternative involved a range of damages alleged to compensate plaintiff for insufficient intellectual property. Each damage component Plaintiff seeks has been examined separately under these standards to determine whether any is a "liquidated claim" permitting award of prejudgment interest. *See King Aircraft,* 846 P.2d at 558.

■ 81. Because the consequential damages to which Plaintiff is entitled are damages to which Plaintiff would be entitled under either the cost-to-cure or the difference-in-value measure of damages, prejudgment interest on these amounts will be allowed except as to an award of lost profits damages. No other prejudgment interest is appropriate.

## C. Contractual Indemnity Is Not The Exclusive Remedy

■ 82. Plaintiff's Amended Complaint asserts two claims for relief: breach of contract and contractual indemnity, arising from Weyerhaeuser's breach of the warranties contained in the ATA and IPA. The ATA, at Section 11.02(b), also provides Plaintiff a remedy for Weyerhaeuser's breach of warranties. Under ATA § 11.02(b),[39] Weyerhaeuser as the Transferor agreed to indemnify Paragon "from and against any and all Losses arising from or relating to the breach by [Weyerhaeuser] of any representation, warranty, covenant or agreement of [Weyerhaeuser] contained in [the ATA] or any Related Agreement." Weyerhaeuser argues, incorrectly, that this contract remedy is Plaintiff's exclusive remedy. This view is

inconsistent with Washington's approach to damages and view of contract interpretation.

■ 83. Under Washington law, a contractually defined remedy is exclusive of all other remedies only when the contract clearly and explicitly expresses the parties' intention that the contract remedy be exclusive. The Supreme Court of Washington has long held that "[u]nless it is clear that it was the intention that the parties definitely decided to limit their rights, the courts will not interpret language to have that effect." *McCutchen v. Brink,* 129 Wash. 103, 105, 224 P. 605, 606 (1924); *accord, Paradise Orchards General Partnership v. Fearing,* 122 Wash.App. 507, 94 P.3d 372, 378 (2004). Nothing in the ATA expressly states that Section 11.02(b) is Plaintiff's exclusive remedy for breach of warranty. Because the ATA does not state that indemnity shall be the *exclusive* remedy for breach of warranty, Plaintiff is entitled to the common law remedies otherwise available for breach of warranty under Washington law.

■ 84. Weyerhaeuser argues, however, that exclusivity is *implied* by ATA Section 11.01(a), which provides that "[a]ll covenants and agreements of the parties contained in this [ATA] shall survive the Closing Date." Weyerhaeuser contends that because this survival clause fails to expressly identify "warranties," no breach of warranty can exist other than Weyerhaeuser's obligations under ATA Article XI, which encompasses the Section 11.02(b) indemnity remedy. Weyerhaeuser is wrong.

**39.** The ATA, Section 11.02(b) provides:
Each Transferor agrees to indemnify, defend and hold harmless each Transferee and its respective directors, officers, employees and agents from and against any

and all Losses arising from or relating to the breach by such Transferor of any representation, warranty, covenant or agreement of such Transferor contained in this Agreement or any Related Agreement.

85. Merely stating that one contract promise survives closing does not imply that all others will terminate. A presumption that warranties were omitted from the Section 11.01(a) survival provision is incorrect. A warranty is an "absolute undertaking" by the warrantor, and is a contractual promise concerning the matter warranted. A promise is a covenant, and without question, the warranties were among the "covenants" of the parties in the ATA. The warranties *a fortiori* were forward-looking and the contracts were signed at closing. Accordingly, Section 11.01(a) should be understood to provide expressly for the survival of the ATA warranties beyond closing. Otherwise, the warranties are meaningless exercises.

86. Even if Section 11.01(a) could be construed to implicitly render Weyerhaeuser's ATA warranties limited in duration to the pre-closing period, it could have no such effect on Weyerhaeuser's IPA warranties. Section 11.01(a) is limited to the "covenants and agreements" contained "in *this* Agreement." (Emphasis added) "This" refers to the ATA. When an ATA provision was meant to apply to the IPA, it consistently referred to "this Agreement and the Related Agreements." The ATA defines "Related Agreements" to include the IPA.

87. If the IPA and ATA warranties did not survive closing, it would mean the warranties never had any effect, because the ATA and IPA were not signed *until* closing. Any interpretation to the contrary is unreasonable. No underwriter would have continued with the IPO, for warranties are worthless if they die as soon as the ink is dry. The ATA and IPA are unlike other sale contracts that are signed months before closing and include warranties that, if demonstrated to be un-true as a result of intervening due diligence, can provide a basis for the warrantee to terminate the sale contract or seek damages. A single party—Weyerhaeuser—controlled the decision to proceed to closing. As a division controlled by Weyerhaeuser until closing, when assets filled the new corporate shell, the Business being sold by Weyerhaeuser had no ability to stop the IPO by asserting breach of a warranty in a contract not yet signed and enforceable. Weyerhaeuser's argument reads the warranties out of existence, and thus violates a basic principle of Washington contract law that an interpretation rendering the warranties meaningless is not a reasonable interpretation. *Stouffer & Knight v. Continental Cas. Co.*, 96 Wash. App. 741, 982 P.2d 105, 110 (1999). Section 11.01(a) is not applicable to bar Plaintiff's recovery in this action.

88. Even if Weyerhaeuser's non-survival argument were not inherently flawed, the argument must also be rejected because, as a potential bar to liability, the argument is one that Weyerhaeuser should have raised before entry of the Summary Judgment Order finding Weyerhaeuser liable for breach of the warranties. If this and Weyerhaeuser's related arguments were correct, they would provide Weyerhaeuser a complete defense to liability for breach of warranty. Weyerhaeuser did not raise these arguments in the motions for summary judgment on the issue of liability, however, nor did Weyerhaeuser raise them in its Motion for Reconsideration or in its Reply brief in support of that motion. These newly urged arguments fail for the same reasons explained in rejecting other new arguments based on old information that Weyerhaeuser raised for the first time in its Motion for Reconsideration.

## D. Contract Indemnification Remedy

89. The ATA provides Plaintiff a separate and alternative remedy to its common law remedy for breach of the warranties. In Section 11.02(b), Weyerhaeuser agreed to indemnify Paragon for "all Losses arising from or relating to" a breach of warranty by Weyerhaeuser. The ATA, Section 1.01, defines the types and categories of "Losses" recoverable expansively:

> [A]ny loss, liability, claim, damage, obligation, payment, cost or expense, (including without limitation, the costs and expenses of any Action, any demand, assessment, judgment, settlement or compromise related thereto and reasonable attorneys' fees, disbursements and other charges in connection therewith) (emphasis added).

Action is further defined broadly in the ATA, § 1.01. Paragon's cost-to-cure royalty-related damages, its product re-design costs, bankruptcy costs and lost profits are "Losses" ATA Section 11.02(b) covers.

90. Weyerhaeuser interposes three defenses, including a "circular indemnity" counterclaim against Plaintiff's right to recover damages under the contractual indemnity section. The first defense is that Plaintiff was required to prove Paragon was actually liable for the underlying settled claims. The second defense is based on Paragon's alleged failure to follow the ATA's contractual indemnity notice procedures, which Weyerhaeuser argues resulted in actual prejudice. The third defense arises from Paragon's agreement in ATA Section 11.02(a) to indemnify and hold Weyerhaeuser harmless for the liabilities Paragon contractually assumed under the contracts. Weyerhaeuser contends this section, read together with IPA Section 4.01, requires Paragon to indemnify Weyerhaeuser for all damages Weyerhaeuser owes Plaintiff for Weyerhaeuser's breach of warranties. This latter defense essentially argues that Paragon agreed to indemnify Weyerhaeuser for its own breach of warranty to Paragon.

### 1. Actual Liability Defense

■ 91. Weyerhaeuser argues Plaintiff's contractual indemnity claim fails because Plaintiff failed to prove Paragon was actually liable to PG and KC for infringing their ILG patents. Weyerhaeuser cites *Gilbert H. Moen Co. v. Island Steel Erectors, Inc.*, 128 Wash.2d 745, 912 P.2d 472, 482 (Wash.1996)(*en banc*), as one of a series of Washington cases that it argues establish a rule that when one seeks indemnity for amounts paid to settle a claim, the indemnitee first must prove it was actually liable to the underlying claimant before a right to indemnity can exist.

92. The Washington cases upon which Weyerhaeuser relies for its actual liability defense are inapposite. None involved a situation with facts similar to those present here—where the predicate for indemnification under a contract has been judicially determined. Application of any actual liability rule depends on the particular facts and indemnity language at issue, and must be analyzed on a case by case basis. In *Moen*, for example, a subcontractor contractually indemnified a general contractor for personal injuries suffered by third parties on the job site in connection with the subcontractor's services, unless the general contractor's negligence was the sole cause of the injury. *Id.* at 474. The general contractor settled a personal injury lawsuit and sought indemnity from the subcontractor. The settlement did not resolve whose negligence caused the injury. Therefore,

in the indemnity action, the general contractor was required to prove that the subcontractor's negligence caused the injury. *Id.* at 482. In *Moen,* unlike the present action, the basis for triggering indemnity under the contract had not been determined in either the underlying personal injury action or the indemnity action.

93. Similarly, in *Dixon v. Fiat–Roosevelt Motors, Inc.,* 8 Wash.App. 689, 509 P.2d 86 (1973) and *United Boatbuilders, Inc. v. Tempo Products Co.,* 1 Wash. App. 177, 459 P.2d 958 (1969), sellers of products (in *Dixon* a car, in *United* a boat) settled consumer claims for product defects. The sellers then sought indemnity under product liability, implied warranty, and negligence theories against suppliers of allegedly defective parts of the products causing the injuries. In neither case had the defective parts at issue been established to be the proximate cause of the underlying injury. The sellers' rights to indemnity from the suppliers did not exist absent such a showing. *Dixon,* 509 P.2d at 91–92; *United,* 459 P.2d at 961.[40] Unlike in *Dixon* and *United,* the predicate facts triggering Plaintiff's right to indemnity have been determined. Additionally, unlike in *Dixon* and *United,* in which the rights to indemnity arose under tort theories and theories of breach of *implied* warranties, Weyerhaeuser's liability arises from breach of *express* warranties in the same contract which expressly defined Plaintiff's indemnity rights.

94. An unpublished Washington Court of Appeals decision cited by Weyerhaeuser, *Frost v. Tree Top, Inc.,* No. 16221–4–III, 1997 WL 740766 (Wash.Ct.App. Dec.2,

1997), is also distinguishable. In that case, a buyer of a business sought indemnity for its post-sale settlement of a claim that arose pre-sale. The indemnity clause provided the buyer indemnity for "undisclosed payments, claims, liabilities, costs and damages (including, without limitation, amounts paid in settlement)." *Id.* at *2. The seller argued the settlement was a "gross overpayment." *Id.* at *1. Because the purchaser failed to notify the seller of the lawsuit or its settlement, as the contract contemplated, the court held the buyer was entitled only to be paid "a reasonable amount of money for which it was legally liable." *Id.* at *2. Based on these facts, and motivated by a desire to protect the indemnitor from a possible "sweetheart deal" where the indemnitee had made no showing "the amount paid was reasonable," the court overruled a summary judgment for the indemnitor. *Id.*

95. Unlike that case, however, Paragon's settlement obligations for which Plaintiff seeks indemnity have been judicially determined, in both the 1999 PG and KC settlement hearings and in this case, to be both reasonable and necessary for Paragon. Weyerhaeuser, as a member of the Creditors' Committee, had notice of the settlements and declined to participate in Court proceedings to determine their reasonableness. Weyerhaeuser is not faced with the danger that the settlements might be the kind of "sweetheart deal" about which the *Tree Top* court was concerned. The reasonableness of the settlements' terms in light of Paragon's substantial actual or potential liability has been established. Weyerhaeuser's actual liability arguments do not limit Plaintiff's right to

---

**40.** Another distinguishable aspect of *Dixon* is that it had not been established that the defect in question existed when the part left the manufacturer's control. *Dixon,* 509 P.2d at 91.

contractual indemnity for Weyerhaeuser's breach of warranties.

96. The actual liability rule Weyerhaeuser urges is without merit.[41] The Summary Judgment Order set forth conclusions on the issue of liability. As a predicate for assessing damages, Weyerhaeuser's actual liability for breach of warranty is established.

## 2. Failure To Provide Notice Defense

97. Weyerhaeuser's second defense to Plaintiff's contract indemnity claim relies on the ATA's notice provisions. Weyerhaeuser argues that Paragon failed to comply with the ATA's notice provisions by failing to provide prompt written notice of and demand for indemnity for PG's and KC's claims; and that it was actually prejudiced by such failure. Weyerhaeuser contends the combination of lack of notice and prejudice means Plaintiff is precluded from recovering indemnity for PG's and KC's claims under Section 11.02(b).

### a. ATA notice provision

98. Weyerhaeuser contends the operative notice provision is ATA Section 11.03(a). That section pertains to notice requirements when a party seeks indemnity for a Third Party Claim, defined as a claim by one not a party to the ATA. The PG and KC lawsuits were Third Party Claims. Section 11.03(a) provides as follows:

> If any party shall receive notice of any claim or Action brought, asserted, commenced or pursued by any person or entity not a party to this Agreement with respect to which any other party is

or may be obligated to indemnify such party (a "Third Party Claim"), the Indemnitee shall give the Indemnifying Party *prompt notice thereof* (including any pleadings relating thereto) after becoming aware of such Third Party Claim, specifying in reasonable detail the nature of such Third Party Claim and the amount or estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim); provided, however, that the failure of an Indemnitee to give notice as provided in this Section 11.03 shall not relieve the Indemnifying Party of its indemnification obligations hereunder, except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice.

(Emphasis added).

### b. Paragon substantially complied with Section 11.03(a)

99. Section 11.03(a) does not require the "notice of Third Party Claim" to be in writing, nor does it require that a demand for indemnity or defense be given. According to the plain language of the clause, all the Indemnitee must do is provide "prompt notice" of the Third Party Claim after the Indemnitee becomes aware of it.

100. Paragon's satisfaction of Section 11.03(a)'s prompt notice requirement with respect to the PG and KC lawsuits is measured by a substantial compliance standard. *See Pilgrim v. State Farm Fire & Cas. Ins. Co.*, 89 Wash.App. 712, 950 P.2d 479, 483 (1997). Paragon substantially complied with Section 11.03(a)

---

41. For reasons set forth at page 892, ¶ 171, below, an actual liability argument with respect to Plaintiff's common law breach of warranty claims was waived, and, in any event, actual liability need not be shown for a breach of the warranties.

with respect to PG's lawsuit. Ms. Barley credibly testified that she consulted with Mr. Coogan, Weyerhaeuser's in-house patent attorney, during the entire time she was Paragon's General Counsel (from January 1994 to summer 1995). Therefore, Mr. Coogan would have known about PG's lawsuit. She kept Mr. Coogan informed of the settlement progress with PG, and Mr. Coogan attended and participated in strategy sessions with her and Paragon outside counsel about defending the lawsuit. Mr. Coogan had a Weyerhaeuser file opened in 1994 for "PG v. Paragon." Mr. Coogan was deposed in the PG lawsuit. Through Mr. Coogan, Weyerhaeuser had prompt notice of PG's lawsuit at a high, internal level. Indeed, it was Mr. Coogan who predicted the suit in September 1991 before the IPO closed.

101. The evidence was not as clear as for PG's lawsuit that Weyerhaeuser had prompt notice of KC's lawsuits soon after Paragon knew they were filed. Weyerhaeuser, however, never claimed it was unaware of those lawsuits. Also, the patent issues with KC had been under close Weyerhaeuser scrutiny since before the IPO. At the latest, Weyerhaeuser would have known of the KC lawsuit in January, 1998, shortly after Paragon filed its bankruptcy case, as a result of Weyerhaeuser's appointment to and acceptance of service on the Creditors' Committee. Early in Paragon's Chapter 11 case, KC sought approval to lift the stay to proceed with its claims in Texas. The KC lawsuits never went to trial, and were not resolved by settlement until well into the bankruptcy. For purposes of indemnity, Weyerhaeuser had sufficiently prompt notice of the KC lawsuits as required under Section 11.03(a).

### c. Weyerhaeuser did not suffer actual prejudice

102. Even if Paragon did breach its notice obligation, by the express terms of Section 11.03(a), a breach relieves Weyerhaeuser of its indemnity obligation only *to the extent* Weyerhaeuser was *actually prejudiced* by a failure to receive notice. Weyerhaeuser argues that actual prejudice should be presumed from Paragon's failure to send a written demand for indemnity for the PG lawsuit until after the Delaware Judgment, and from Paragon's failure to serve such a demand with respect to the KC lawsuits until long after KC filed them.

103. Weyerhaeuser relies on several insurance cases for its argument that prejudice should be presumed. Under Washington insurance law, an insured's breach of a notice provision will not deprive the insured of coverage unless the insurer shows it was actually prejudiced by the noncompliance. *Public Util. Dist. No. 1 Of Klickitat County v. International Ins. Co.*, 124 Wash.2d 789, 881 P.2d 1020, 1029 (1994) (*en banc*). The burden to show actual prejudice is on the insurer, and prejudice is a factual determination. *Id.* The insurer must demonstrate some concrete detriment resulting from the delay that interfered with the insurer's preparation of defenses to coverage or the insured's underlying liability. *Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co.*, 83 Wash.App. 432, 922 P.2d 126, 133 (1996); *Canron, Inc. v. Federal Ins. Co.*, 82 Wash.App. 480, 918 P.2d 937, 941 (1996). Weyerhaeuser has the burden of proof to establish actual prejudice.

104. To establish actual prejudice, Weyerhaeuser relies on two cases in which the courts upheld findings that late notice prejudiced the insurer by depriving it of the opportunity to evaluate the facts of the underlying claims. *Felice v. St. Paul Fire & Marine Ins. Co.*, 42 Wash.App. 352, 711 P.2d 1066, 1070 (1985); *Twin City Fire Ins. Co. v. King County, Washington*, 749

F.Supp. 230, 234 (W.D.Wash.1990). In these cases, the insurer had no notice of the underlying claim until after it had been litigated and after notices of appeal had been filed. The courts held the delayed notice prejudiced the insurer because "it was precluded from investigating and evaluating the case prior to, during and after trial." *Felice*, 711 P.2d at 1070; *Twin City*, 749 F.Supp. at 234 (citing *Felice*). In *Felice*, the court found prejudice sufficient to bar indemnification for $18,000 in attorneys' fees in the underlying action because St. Paul had been denied an opportunity to evaluate the facts and determine whether a trial and incurrence of fees was justified. *Felice*, 711 P.2d at 1071. In another case Weyerhaeuser relies upon, *Unigard Ins. Co. v. Leven*, 97 Wash.App. 417, 983 P.2d 1155, 1161–63 (1999), the court found prejudice because the insurer identified a defense that the insured's sworn statements in the underlying action precluded the insurer from raising after being notified of the claim.

105. The circumstances of the Paragon/Weyerhaeuser claims are distinguishable. First, unlike the insurers in *Felice, Twin City Fire Ins.*, and *Unigard*, Weyerhaeuser had actual notice of the PG lawsuit at or near the time it was filed. Weyerhaeuser, as a creditor and member of the Creditors' Committee, also knew of the KC lawsuits well before Paragon settled them. Second, unlike insurers in the cases cited by Weyerhaeuser, to defend PG's and KC's lawsuits, Paragon used the same legal defense team Weyerhaeuser itself had assembled to defend the lawsuits pre-IPO. Weyerhaeuser likely would have continued to use this legal defense team if it had assumed Paragon's defense. Weyerhaeuser's Mr. Coogan participated in strategy sessions with Paragon's in-house counsel and the Weyerhaeuser-assembled legal team after the IPO about how to handle PG's and KC's claims. Indeed, Weyerhaeuser, through Coogan, before and for years after the IPO, carefully guided the pre-IPO Business and Paragon post-IPO in its positions, postures, counsel and orientation to the threatening patent issues. Coogan set the course, trained Paragon management in how to follow it, and consulted with his various Paragon counterparts over the years. Weyerhaeuser presented no evidence that it would have retained different counsel, that different counsel might have advised Weyerhaeuser to a different settlement position before the Delaware Judgment, that different counsel might have achieved a better trial result, or that Weyerhaeuser would have stepped forward and financed the royalties demanded by PG and KC since before the IPO.

106. A third very compelling distinction between circumstances of this case and Weyerhaeuser's insurance cases is that Weyerhaeuser did extensively investigate the PG and KC claims before launching Paragon's IPO. Paragon's decision to continue selling the ILG Ultra diaper without paying PG and KC their demanded royalties was consistent with Weyerhaeuser's response when confronted with the same claims before the IPO. Additionally, the Weyerhaeuser-drafted disclosures to investors in the Prospectus included statements that "the Company believes any outcome" of the claims would be immaterial. Such statements were a disincentive, if not an intangible barrier, for Paragon to pay royalties in settlement and constrained Paragon's ability to settle the claims at the high royalty rates and lump sum payments PG and KC were demanding.

107. The Washington insurance cases upon which Weyerhaeuser relies do

not require that actual prejudice to Weyerhaeuser sufficient to bar Plaintiff's ATA Section 11.02(b) claim must be presumed. *See Public Util. Dist. No. 1 Of Klickitat County,* 881 P.2d at 1029 (stating, in reference to an analogous cooperation clause, that "an insurer cannot deprive an insured of the benefit of purchased coverage absent a showing that the insurer was actually prejudiced by the insured's noncompliance with conditions precedent"); *Tran v. State Farm Fire And Cas. Co.,* 136 Wash.2d 214, 961 P.2d 358, 365 (1998) (*en banc*) ("prejudice is an issue of fact and will seldom be established as a matter of law"); *Canron, Inc. v. Federal Ins. Co.,* 82 Wash.App. 480, 918 P.2d 937, 943 (1996) ("Federal essentially argues that deprivation of the opportunity to conduct a prompt investigation is automatically prejudicial. Such an approach, however, would obviate the need to show actual prejudice, and Washington authorities do not support Federal's argument."). The burden remains on Weyerhaeuser to demonstrate it was actually prejudiced by late notice. This it cannot do—and did not attempt—because its in-house patent counsel was intimately familiar with and closely followed Paragon's patent troubles.[42]

108. Weyerhaeuser argues it suffered actual prejudice from the allegedly late written notice and indemnity demands because it was prevented from invoking the ATA's alternative dispute resolution procedure. Weyerhaeuser's sole evidence on this point was the testimony of its current General Counsel, Robert Dowdy, who was also the IPO's project manager. Mr. Dowdy testified that if Weyerhaeuser had received earlier notices and demands, it would have had the opportunity to invoke, and to contest its liability to Paragon through, the ATA's dispute resolution procedures in Article XII, which calls for a meeting of the parties, mediation, and binding arbitration. Mr. Dowdy asserted that if the indemnity claims had been arbitrated instead of litigated, Weyerhaeuser would have won. If it had lost, Weyerhaeuser would have stepped in, defended, and protected Paragon against the Delaware Judgment. That intervention by Weyerhaeuser, Mr. Dowdy asserted, would have eliminated the need for Paragon to file bankruptcy and incur its bankruptcy-related losses.

109. Mr. Dowdy's testimony of actual prejudice, however, is unconvincing. Mr. Dowdy did not so testify during his deposition. He testified instead that he did not know "what would have been different" had an earlier demand been sent. The earlier testimony is closer to the truth, as Weyerhaeuser charted Paragon's patent course, and the course thus navigated was difficult to alter later, as events have shown.

110. Weyerhaeuser offered neither evidence nor argument that the PG lawsuit would have ended differently if the arbitration had been completed and Weyerhaeuser had stepped in to defend Paragon. Weyerhaeuser offered no evidence that it would have settled the PG lawsuit before judgment and would have agreed to reimburse Paragon for the substantial damages and ongoing royalties (over $10 million per year) that PG demanded in its pre– and post-trial settlement offers. Weyerhaeuser offered no evidence that it could have or would have bonded the $178 million

---

**42.** Weyerhaeuser's apparent strategy was to defer the inevitable as long as possible. From this perspective, it has succeeded: Instead of paying the royalties in 1992 when they were demanded, it has postponed reckoning until now.

judgment, cured Paragon's default under its bank loans, and agreed to reimburse Paragon for losses suffered from being forced to sell a vastly inferior diaper. Weyerhaeuser failed to carry its burden of proving that Paragon's bankruptcy would have been prevented if Weyerhaeuser had been afforded an opportunity to handle the Delaware litigation in advance of the judgment. Any of the foregoing possibilities appear to be unlikely departures from Weyerhaeuser's desire and strategy to distance itself from the liabilities presented by the patent issues' liability known before the IPO.

111. Accepting, *arguendo,* the hypothesis that Paragon's bankruptcy could have been avoided had Paragon made an earlier, "timely" indemnity demand, Weyerhaeuser would be relieved from indemnifying Plaintiff under Section 11.02(b) only for Paragon's bankruptcy-related costs and losses. Section 11.03(a) states that the Indemnifying Party (Weyerhaeuser) is entitled to relief for a late notice only to the extent the Indemnifying Party is actually prejudiced. Weyerhaeuser would not be relieved of its obligation under Section 11.02(b) to indemnify Paragon for any other loss.[43]

112. Weyerhaeuser has also not carried its burden of proving that it suffered prejudice from Paragon's alleged delay in providing notice with respect to the KC lawsuits. The KC lawsuits remained pending, and the KC Settlement Agreement was not yet approved when Weyerhaeuser received the Equity Committee's notice of the breach of warranty claims against it. Weyerhaeuser had the opportunity to step in, object to the settlement, and defend Paragon against the KC lawsuits, but it never offered to do so. Instead, as with the PG Settlement Agreement, Weyerhaeuser chose not to object while the Creditors' Committee advocated approval of the KC Settlement Agreement as reasonable and necessary for Paragon. No evidence shows Weyerhaeuser was prejudiced by the allegedly late notice concerning the KC lawsuits and their settlement.

■■■ 113. Finally, any alleged failure of Paragon to comply with Section 11.03 is not a bar to Plaintiff's common law remedies for breach of warranty. Section 11.03 places obligations on an "Indemnitee," which Section 11.02(c) defines as a party entitled to indemnity *pursuant to* ATA Sections 4.02, 6.02, 8.03(b), 8.11, 11.02(a) or 11.02(b). In addition, Section 11.03(a) provides that failure to give notice does "not relieve an Indemnifying Party of its indemnification obligations *hereunder.*" (emphasis added) "Hereunder" refers to the indemnity obligations under the ATA. The notice provisions govern procedures for contractual indemnity and have no application to Plaintiff's common law remedies for breach of warranty.

### 3. Weyerhaeuser Defenses And Counterclaim

■■■ 114. Weyerhaeuser's third defense to Plaintiff's contractual indemnity

---

**43.** Weyerhaeuser presented no evidence or argument that the results for Paragon in the PG Settlement Agreement were adversely affected by its having been negotiated while Paragon was in bankruptcy. Weyerhaeuser presented no evidence that it would have pursued an appeal of the Delaware Judgment rather than settling on the terms accepted by Paragon. Weyerhaeuser presented no evidence that Paragon's decision to settle on such terms was not a reasonable one. During Paragon's Chapter 11 case, Weyerhaeuser, with notice of the instant claims against it, elected to remain silent on the issue of Paragon's settlement terms, even though it could have offered to take over the appeal of the Delaware Judgment and indemnify Paragon for the consequences of losing if it thought an appeal was a prudent course to take.

claim and its counterclaim rely on IPA Section 4.01 [44] and ATA Section 11.02(a) [45] under which Paragon assumed the liabilities of the Business and promised to indemnify Weyerhaeuser for liabilities relating to the Business. In the summary judgment phase, Weyerhaeuser contended Paragon's agreement in IPA Section 4.01 to indemnify Weyerhaeuser for patent claims precluded Paragon's breach of warranty claims. Weyerhaeuser argued that allowing Plaintiff to pursue its breach of warranty claims would render this indemnity provision meaningless. The Summary Judgment Order determined, however, that the reverse is true: IPA Section 4.01 had meaning and, read in the context of the entire section, IPA Section 4.01 provided Weyerhaeuser indemnity for claims by *third parties* against Weyerhaeuser for patent infringement relating to the Business. Because Plaintiff is not a third party to the contracts, its own breach of warranty claims were not subsumed within the IPA Section 4.01 indemnity. Weyerhaeuser's reliance on IPA Section 4.01 as a basis for relieving it of liability for breach of warranty was found to be, and remains, without merit. For the same reasons that IPA Section 4.01 does not bar Plaintiff's warranty claims, it does not permit Weyerhaeuser, by way of a circular indemnity counterclaim, to be repaid any amounts it owes Paragon for breaching its own warranties. IPA Section 4.01 does not limit the damages Plaintiff is entitled to recover for Weyerhaeuser's breach of warranties, and Weyerhaeuser is entitled to no recovery on its counterclaim based on IPA Section 4.01.

115. Weyerhaeuser contends that its contractual indemnity defense and counterclaim based on ATA Section 11.02(a) remain alive [46] and that ATA § 11.02(a) operates, just as Weyerhaeuser argued IPA Section 4.01 operated, to exclude all damages Plaintiff seeks. The evidence Weyerhaeuser offered on its counterclaim and defense, both based on ATA Section 11.02(a), neither supports a conclusion that 11.02(a) limits the damages Plaintiff may recover for Weyerhaeuser's breach of warranty, nor requires Weyerhaeuser to be indemnified *by* Paragon for its breach of warranty liability *to* Paragon. Section 11.02(a) of the ATA provides as follows:

> [Paragon] agrees to indemnify, defend and hold harmless [Weyerhaeuser] and its respective directors, officers, employ-

---

44. IPA Section 4.01 provides:

*Patent Trade Secret or Trademark Claims.* Paragon shall be obligated for and hereby agrees to indemnify, defend and hold harmless Weyerhaeuser for, from and against any and all liability, expense and costs asserted against, imposed on, or incurred by Weyerhaeuser, directly or indirectly, for patent, trade secret, copyright or trademark infringement or other similar claims involving products, processes, materials and/or equipment relating to the Business or Products made, used or sold prior to, on or after the Closing Date. The indemnification procedures set forth in Section 11.03 of the Asset Transfer Agreement shall apply with respect to the indemnification provided in this Section 4.01.

45. ATA Section 11.02(a) provides:

Each Transferee agrees to indemnify, defend and hold harmless each Transferor and its respective directors, officers, employees and agents from and against any and all Losses arising from or relating to (i) any of the Assumed Liabilities assumed by such Transferee or (ii) the breach of any representation, warranty, covenant or agreement of such Transferee contained in this Agreement or any Related Agreement.

46. Weyerhaeuser did not raise Section 11.02(a) in the Summary Judgment phase of this adversary proceeding.

ees and agents from and against any and all Losses arising from or relating to (i) any of the Assumed Liabilities assumed by [Paragon] or (ii) the breach of any representation, warranty, covenant or agreement of [Paragon] contained in this Agreement or any Related Agreement.

ATA Section 11.02(a) does not, on its face, purport to qualify or limit either Paragon's common law or Section 11.02(b) remedy for breach of warranty. None of the warranties on which Plaintiff sues are qualified in any respect by reference to ATA Section 11.02(a).

116. In the contracts, "Assumed Liabilities" are defined collectively as the "U.S. Assumed Liabilities" and "Canadian Assumed Liabilities," which, in turn, are defined to be "all Liabilities of Weyerhaeuser identified in Annex II" and "all Liabilities of Weyerhaeuser Canada identified in Annex II," respectively. Annex II provides that "U.S. Assumed Liabilities" and "Canadian Assumed Liabilities" are "all Liabilities and obligations of Weyerhaeuser [and of Weyerhaeuser Canada] relating to or arising from the *operation of the Business,* whether before or after the Closing Date." (emphasis added). Weyerhaeuser's warranty liability to Paragon, however, arises foremost from its *contractual promises* in the ATA and IPA concerning patent rights, good title, and sufficiency of the transferred assets to conduct the Business unimpeded. Thus, damages Plaintiff seeks for Weyerhaeuser's breach of its contractual promises are not subsumed in Paragon's Section 11.02(a) indemnity to Weyerhaeuser. Any doubt or ambiguity in the agreements would, in accordance with Washington law, be resolved against Weyerhaeuser because it drafted the contracts. *See Felt v. McCarthy,* 130 Wash.2d 203, 922 P.2d 90, 93 (1996) (*en banc*); *Guy Stickney, Inc. v. Underwood,* 67 Wash.2d 824, 410 P.2d 7, 9 (1966); *Paullus v. Fowler,* 59 Wash.2d 204, 367 P.2d 130, 136 (1961); *Car Wash Enters., Inc. v. Kampanos,* 74 Wash.App. 537, 874 P.2d 868, 874 (1994).

117. The warranties were important parts of the IPA and ATA, both of which were fully integrated "material contracts" publicly filed as part of the IPO Registration Statement. Weyerhaeuser certified the warranties were true as a condition to closing the IPO. Accepting Section 11.02(a) as precluding recovery of damages from Weyerhaeuser for breach of the warranties it gave would render the warranties meaningless. Under Weyerhaeuser's construction of Section 11.02(a), although Weyerhaeuser breached its warranties, Paragon could recover no damages for the breach, but if it did recover from Weyerhaeuser, would have to repay Weyerhaeuser the same damages. Weyerhaeuser's interpretation renders its warranties illusory promises, and such an interpretation offends the basic Washington contract interpretation principle that every provision should be given effect and that no provision should be rendered meaningless. *Grant County Constructors v. E.V. Lane Corp.,* 77 Wash.2d 110, 459 P.2d 947, 953 (1969).

118. Additionally, Weyerhaeuser's interpretation of ATA Section 11.02(a) requires the grafting of an unwritten limitation or disclaimer onto Paragon's warranty rights. Disclaimers or limitations on warranties, to be given legal effect, must be explicitly negotiated and must set forth with particularity the qualities and characteristics being disclaimed. *Olmsted v. Mulder,* 72 Wash.App. 169, 863 P.2d 1355, 1359 (1993). *See also Limited*

*Flying Club, Inc. v. Wood,* 632 F.2d 51, 56–57 (8th Cir.1980); *Dobias v. Western Farmers Ass'n,* 6 Wash.App. 194, 491 P.2d 1346, 1350 (1971). No disclaimer or reservation appears either in ATA Section 11.02(a) or in the terms of the warranties at issue.

119. Contrary to Weyerhaeuser's assertions, allowing Plaintiff to recover damages for breach of warranty does not render Section 11.02(a) meaningless. Other situations could have arisen after the IPO involving Weyerhaeuser liabilities stemming from the Business's operation that would not result in Weyerhaeuser breaching its warranties, and would require Paragon to indemnify and defend Weyerhaeuser. If the Paragon defense team had been correct, and if Paragon had prevailed against PG, no breach of warranty claim against Weyerhaeuser would have arisen as to PG's patents. Weyerhaeuser would have received the benefit of defense, the costs of which Paragon bore. As with IPA Section 4.01, Section 11.02(a) also provided Weyerhaeuser protection if aspects of the Business's past operations *not being conducted at closing* infringed a third party's patents or breached a contract with a third party. Paragon took on the defense obligation and cost and would have no claim for breach of warranty if a third party prevailed on such a claim.

120. During trial, Weyerhaeuser offered testimony from Bobby Abraham,[47] Scott Ryles,[48] John Cook,[49] Cliff Bickell,[50] Alan Cyron[51] and Cathy Hasbrouck[52] about their subjective beliefs and understandings about the meaning and intended purpose of the contracts' assumption of liabilities and indemnification provisions. None of these witnesses participated in negotiating or drafting the warranties.[53] None testified that any of them participated in negotiating or drafting the assumption of liabilities or indemnification provisions. They testified about their "understandings" of the undisputed point that Paragon assumed the patent (and most other) liabilities of the Business. For the reasons explained in the Summary Judgment Order, the testimony of those witnesses, who had no involvement in negotiating or drafting the actual contract terms at issue or any other material provision of the IPO agreements, is inadmissible, or at a minimum entitled to little weight, on the issue of interpretation of the warranties and the assumption of liability and indemnity provisions. Paragon's assumption of patent liabilities does not negate or limit Plaintiff's breach of warranty claims.

---

47. Vice president and general manager of Weyerhaeuser's PCP division before the IPO and president of Paragon.

48. Managing director of Merrill Lynch.

49. Vice president of Research and Development, Weyerhaeuser's PCP division.

50. Vice president of finance, CFO and treasurer, Weyerhaeuser's PCP division.

51. Paragon's CFO.

52. Paragon's general counsel from 1996 through the conclusion of Plan consummation of the sale to Wellspring.

53. Mr. Dowdy's testimony that Abraham was a primary negotiator of the ATA and IPA is not credible, given Mr. Dowdy's obvious bias, his prior inconsistent sworn interrogatory answer, and Mr. Abraham's credible testimony to the contrary. Additionally, during the three weeks before the IPO closing, Paragon's CEO (Abraham), COO and CFO, were traveling with representatives from Merrill Lynch to various cities in Europe for the IPO "roadshow." It was during this period that some or all of the warranties were added to the ATA and IPA.

121. Section 11.02(a) of the ATA provides Weyerhaeuser no defense against Plaintiff's contractual indemnity claim. Weyerhaeuser's counterclaim, to the extent it is based on Section 11.02(a), fails as well. Section 11.02(a) does not create a circular indemnity whereby Weyerhaeuser can recover any liability it owes Paragon.[54]

## E. Common Law Measures Of Damages

■ 122. Plaintiff and Weyerhaeuser differ over the appropriate common law measure for compensatory damages. Plaintiff contends it is entitled to recover losses that Paragon actually incurred to remedy the asset deficiencies that gave rise to the warranty claims. Plaintiff refers to this as a "cost to cure" measure of damages. Weyerhaeuser contends that damages should be limited to the difference in the value of the Business transferred to Paragon as warranted and as actually delivered.

■ 123. The basic goal of Washington damages law is to make the injured party whole. See e.g. Pugel v. Monheimer, 83 Wash.App. 688, 922 P.2d 1377 (1996). Damages awarded should not provide a plaintiff with a windfall, however. See Eastlake Construction Co., Inc. v. Hess, 102 Wash.2d 30, 686 P.2d 465 (Wash. 1984)(en banc). The arguments put forth by the parties in this case place these two features of Washington damages law— making the injured party whole and avoiding a windfall—in tension with each other.

124. In arguing that difference in value is the proper measure of damages, Defendants rely on Lyall v. DeYoung, 42 Wash. App. 252, 711 P.2d 356 (Wash.App.1985). In Lyall, a seller of real property warranted that continued use of a water well serving the property was authorized by a State permit or other water right. After the sale, the State notified the buyer that the well, which was actually a cistern, was within its right-of-way and did not meet State standards for human consumption. When the seller sued the buyer for specific performance of contract payments, which the buyer had ceased making, the buyer counterclaimed for breach of warranty damages, seeking to recover the costs necessary to procure potable water for the property. The trial court dismissed the buyer's breach of warranty claim,[55] but the appellate court reversed the trial court's judgment and rendered partial judgment

---

54. Even if Section 11.02(a) could be construed to prevent Plaintiff from recovering damages for ILG patent infringement liabilities Paragon agreed to pay PG and KC, Section 11.02(a) would not affect the common law difference in value measure of damages (plus appropriate consequential damages under that measure) that Plaintiff may recover for the breach of warranties. The difference in value remedy does not measure the actual costs to cure the ILG patent deficiency, but rather the difference in value of Paragon at the time of transfer as warranted versus as delivered, lacking the intellectual property it needed to sell its principal product. Thus, if the cost-to-cure losses relating to the PG and

KC claims were barred by Paragon's indemnity to Weyerhaeuser in ATA 11.02(a) or IPA 4.01, Plaintiff would be entitled to the difference in value damages as an alternative measure.

55. The trial court dismissed the buyer's counterclaim for breach of warranty on the grounds that the warranty provision in the contract was not known to her, had not been bargained for by the parties and was not relied upon in making the contract. The Washington Court of Appeals reversed that finding by holding that "a voluntary signator to a contract cannot resist application of its terms simply by stating ignorance of its contents." Id. at 358, 711 P.2d 356.

for the buyer, concluding that the warranty had been breached as a matter of law, but that an insufficient record had been established at trial to determine the measure of damages. *Id.* at 360. The buyer had not yet spent money to cure the defect[56] but had presented evidence of the cost of connecting to a water system over a mile away. *Id.* at 361 n. 5. That cost estimate exceeded the purchase price of the real estate. *Id.*

125. Anticipating a damages trial on remand, the appellate court stated that under principles established in *Eastlake Constr. Co. v. Hess*, 102 Wash.2d 30, 686 P.2d 465 (1984), "if the seller can establish on remand that the cost of a cure is less than the benefit of the bargain measure [which the *Lyall* court also refers to as the difference in value measure], the cost of cure would be the proper measure of damages." *Lyall*, 711 P.2d at 360–61. The court noted that "the cases which permit damages based on cure ... all involve performance contracts for construction rather than contracts for sale, and thus do not control here." *Id.* at 360.

126. This adversary proceeding can be distinguished from *Lyall* in two important respects. First, the decision in *Lyall* was based on a breach of warranty for a sale of real property, while the dispute in this case surrounds the sale of business assets and intellectual property. Inasmuch as *Lyall* distinguished cases favoring cost to cure damages because they involved performance contracts for construction rather than contracts for the sale of real estate, *Lyall* itself can be distinguished from this adversary proceeding because *Lyall* involved sales of real estate rather than the sale of business assets and intellectual

property. The second, and more compelling, reason for distinguishing *Lyall* from this proceeding is that Plaintiff has already *reasonably incurred* the costs of curing Defendant's breach of the warranties in the ATA and IPA. Granting Plaintiff cost to cure damages will not produce a windfall in favor of Plaintiff because Plaintiff has already incurred the expense of curing the deficiency in intellectual property caused by Weyerhaeuser's breach of the warranties in the ATA and IPA.

127. The case cited in *Lyall, Eastlake*, 102 Wash.2d 30, 686 P.2d 465 (Wash.1984), involved a construction contract and awarded damages based upon a cost-to-cure measure of damages. In *Eastlake*, the contractor had left the construction incomplete, including work to be corrected and work not performed in compliance with the specifications. To render the property habitable, the homeowner completed some of the incomplete construction himself with the assistance of two carpenters. Damages awarded to the homeowner for the contractor's breach included the reasonable costs of completing construction to make the property habitable, the reasonable rental value from the time construction should have been completed, the reasonable costs to complete construction, and the reasonable costs to repair and replace work performed not in compliance with the contract specifications. In *Eastlake*, the cost-to-cure damages exceeded the difference in value between the value of the property as completed by Eastlake and its value if the work had been properly completed.

128. In *Eastlake*, the Washington Supreme Court noted:

> The general measure of damages for breach of contract is that the injured

56. The buyer apparently had made three unsuccessful attempts to drill a new well, lead-ing to advice that the property would not support a well.

party is entitled (1) to recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a pecuniary position as he would have had if the contract had been performed.

*Id.* at 470. The Court went on to note that construction contracts present special problems leading to special rules for measuring damages. The Court adopted the formula for damages set forth in the Restatement (Second) of Contracts. The Court instructed:

> The rule recognizes that damages should put the injured party in the position which he would have enjoyed without the breach. In many cases this will be achieved by awarding the costs of repairing defective construction so as to conform to the contract. Some defects, however, cannot be remedied without great expense and substantial damage to the rest of the structure (for instance, the cracked foundations [citation omitted] or the nonconforming insulation beneath the concrete floor in the present case). In such cases, the cost of remedying the defect would far exceed *the value to the injured party of the improvement. An award of the cost of repairs in such cases would therefore constitute a substantial windfall to the injured party.* The cost of repairs should not be awarded if that cost is clearly disproportionate to the value to the injured party of those repairs.

*Eastlake,* 686 P.2d at 473 (Wash.1984) (emphasis added).

129. The cases cited by the parties as to the proper measure of damages appear to be divided between contracts for the sale of real estate and construction contracts, with the courts awarding difference-in-value damages in sales and cost-to-cure damages in construction contracts. This adversary proceeding concerns a sale, but the IPO was not a static sale, such as a sale of real estate or a sale of goods under the UCC; rather, it was the sale of an ongoing business, with numerous promises and warranties made on which the buyer (the investors, as well as Paragon) could base an expectation of growth and profit in the future. In addition to the relatively simple capitalistic motivations that underlie most sales, Weyerhaeuser's motivations for divesting itself of the Business were varied and complex, as discussed elsewhere in this Order. Additionally, Weyerhaeuser was in control of all significant aspects of the sale, charted the patent course pre-IPO, and influenced management's patent-related business decisions for some period after the IPO. Such transactions not being arms-length, merit closer scrutiny. Thus, to treat the transaction between Paragon and Weyerhaeuser as a simple sale would be overly simplistic and would deprive Plaintiff of damages appropriate to make it whole.

130. The $284 million value of Paragon's business at the time of the IPO included assumptions of future growth. An August 1997 (before entry of the Delaware Judgment in December) estimate of Paragon's value by Paragon's CFO, yielded a range of equity value of $402 to $472 million with an enterprise value of approximately $550 million.[57] Limiting Paragon's damages to a difference in value measured as of 12 years ago in 1993 ignores Paragon's expected growth in value over time.

---

57. Enterprise value is calculated by adding the "Equity Value Today" figures in Paragon's August 4, 1997 MidTerm Plan to the "Debtholders Claim" of $148.8 million. PTX 181 at PTB 963.

131. It also ignores the value to Weyerhaeuser of ridding itself of a potential drain on its otherwise healthy balance sheet. The gravamen of Weyerhaeuser's liability is that, in addition to the funds Weyerhaeuser received in connection with the IPO the primary benefit of the bargain to Weyerhaeuser was divorcing itself from what it knew to be an enormous potential patent infringement liability that was substantially certain to occur. Additionally, Weyerhaeuser was able to reap the benefit of an unpredictably successful IPO. To reward Weyerhaeuser's strategic divestment by limiting damages to the value of the business at the time of the IPO would encourage other large corporations to evade liabilities by transferring assets to a subsidiary and divesting themselves of their liability-laden subsidiaries.

132. The financial difficulties that landed Paragon in bankruptcy were directly attributable to its falsely warranted condition. The implementation of the PG and KC settlement agreements and Paragon's Plan provided its secured and unsecured creditors, to whom Paragon owed fiduciary duties, better value than they would have received if Paragon had been liquidated or had not entered into the agreements. The PG and KC settlements, which remedied the patent insufficiencies, were integral parts of its reorganization Plan. Without them, the value-maximizing Plan would not have been accomplished, Paragon's business would likely have been destroyed, and the creditors and stakeholders would have received much less, if anything. The $290 million enterprise value as of confirmation would have been reduced to liquidation value, if that. Relative to an equity value of more than $400 million and an enter-

prise value of more than $550 million at the time of the Delaware Judgment, the total loss Paragon would have faced from not curing the defects in its intellectual property would have been substantially greater than the costs Paragon actually incurred to cure the defective intellectual property. The (bankruptcy) context in which Paragon incurred obligations to achieve maximum value for those to whom it owed fiduciary duties and to minimize the diminution in value of its enterprise is distinct from the situation in *Lyall.* Paragon had little, if any, choice; thus, Plaintiff should not be limited to a difference-in-value-at-the-time-of-IPO-sale measure of damages under Washington law.

133. The proper measure of damages to be awarded for Weyerhaeuser's breach of the warranties is a cost-to-cure measure. Although the cost-to-cure damages are arguably greater than difference-in-value damages would be, cost-to-cure damages are not disproportionate to the value to the injured party of those repairs. Paragon has incurred the costs of those repairs and will reap no windfall if it is fully compensated by Weyerhaeuser. Limiting Plaintiff to a difference-in-value measure of damages would, instead, allow *Weyerhaeuser* a windfall in the form of the time value of the funds it received from the IPO over twelve years ago.[58]

134. Below is a discussion of the application of the cost-to-cure measure of damages [F], the difference-in-value measure of damages [G], consequential damages [I], and whether damages should be limited based on Weyerhaeuser's contention that Paragon failed to mitigate damages [J].

## F. Cost To Cure Measure Of Damages

 135. Under Washington law, Plaintiff has the burden to prove the fact

---

58. The net proceeds of $214.1 million that Weyerhaeuser received from the IPO at 12% simple interest over 12 years yields $308.4 million.

of damages, and must prove the damage amount with reasonable certainty through competent evidence. *Lewis River Golf, Inc. v. O.M. Scott & Sons,* 120 Wash.2d 712, 845 P.2d 987, 990 (1993) *(en banc).* Once the fact of loss is established with reasonable certainty by a preponderance of evidence, however, uncertainty regarding the amount of loss does not prevent recovery. *Id.* at 990. Thus, a plaintiff is not required to prove an exact amount of damages, and will not be denied recovery just because damages might be difficult to ascertain. *Id.* Evidence of the requested damage amount is sufficient if it affords a reasonable basis for estimating the loss, and does not require the trier of fact to engage in mere speculation or conjecture. *Fed. Signal Corp. v. Safety Factors, Inc.,* 125 Wash.2d 413, 886 P.2d 172, 188 (1994)(*en banc* ). Whether the evidence is sufficient to afford a reasonable basis for estimating a requested damage award depends on the circumstances of each case. *Jacqueline's Washington, Inc. v. Mercantile Stores Co.,* 80 Wash.2d 784, 498 P.2d 870, 871 (1972) (*en banc* ).

### 1. PG–Related Losses Arising From Inadequate Intellectual Property To Utilize ILG Feature

#### a. Cost to cure damages attributable to the PG Royalty

##### (1) "Conversion period" royalties paid

136. Before the Delaware Judgment, Paragon and PG entered into an agreement that allowed the patent loser six months following entry of judgment to convert its diaper to a non-infringing design (the "conversion period"). Thus, Paragon would be, and was, obligated to pay PG royalties on net sales of infringing products during the conversion period. After the Delaware Judgment, Paragon invoked its conversion agreement rights. During the six-month conversion period, Paragon paid PG $4.5 million in royalties for use of the ILG technology. These damages are fairly characterized as losses Paragon incurred to cure Weyerhaeuser's breach. Plaintiff is entitled to recover this $4.5 million as part of the cost to cure measure of damages.

##### (2) Other royalties paid before Plan confirmation

137. The PG License obligated Paragon, commencing January 7, 1999, to pay PG a 2% royalty under Lawson and Dragoo on all net sales of products utilizing the ILG feature. From January 7, 1999 through January 28, 2000, the effective date of Paragon's Plan, Paragon paid PG royalties of $9.6 million for 1999 sales and $800,000 for January 2000 sales, for a total of $10.4 million. Plaintiff is entitled to recover this $10.4 million royalty amount from Weyerhaeuser as part of the cost to cure measure.

##### (3) Loss attributable to post-Plan-confirmation royalty obligation

138. The royalty Paragon agreed to pay PG resulted in a further loss to the Paragon Estate in connection with its sale to Wellspring equal to the reduced sale proceeds attributable to the future royalty obligation. The sale price Paragon's creditors were willing to accept was largely determined by The Blackstone Group's valuation of Paragon. Blackstone estimated Paragon's enterprise value to be $290 million. With $170 million in new debt at confirmation, the value of the 98.5% of Reorganized Paragon's stock

Wellspring purchased was $117.5 million. This valuation was based on projections in the Disclosure Statement for Paragon's future financial performance. The projections assumed future royalties payable to PG pursuant to the PG license, and assumed no price increases to cover the cost of the royalties. Had no future royalty obligation been due to PG, the value of Paragon at confirmation would have been at least $43.4 million higher. The loss the Paragon Estate incurred as of confirmation from the PG royalty obligation is $43.4 million.

139. Weyerhaeuser criticizes this conclusion by arguing that the evidence failed to show how the future royalty obligation actually affected the price Wellspring was willing to pay for Paragon, and that Wellspring *may* have projected Paragon could raise prices to cover the entire royalty cost. Paragon's loss is not the reduced value of Paragon that *Wellspring, as the buyer,* may have assigned to the future royalty obligation. The loss, instead, arises from the reduced value of Paragon's obtainable sales price *in selling* the Paragon business to any willing buyer.

140. Weyerhaeuser criticizes the Disclosure Statement projections as not reasonable because they should have assumed price increases to recoup the cost of royalties. The Blackstone projections were reviewed by the Creditors' Committee financial advisor, and were accepted and approved by all creditors and the bankruptcy court. Weyerhaeuser served as a member of the Creditors' Committee, which had strong economic interests in maximizing sale proceeds by including a future price increase in the projections, if that assumption had been reasonable at the time. The Plan was confirmed in reliance on these projections.[59]

141. The reasonableness of not including price increases in the Court-approved projections finds further support in the fact that the same financial advisors forewent the Plan-provided option to reorganize through a "stand-alone" entity, independent of Wellspring, with most claims converted to equity. The financial advisors unanimously concluded, based on information known and circumstances existing at the time, that their constituents would receive less value from a "stand-alone" reorganized Paragon than from consummating the Wellspring transaction.

142. Plaintiff is entitled to recover $43.4 million on account of the future PG royalty obligation as part of a cost to cure measure of damages.

**(4) Should the PG royalty-related cost to cure damages be reduced for royalties attributable to products not utilizing the ILG feature on the IPO date?**

 143. The PG License provides that the 2% royalty is payable on "Li-

59. While Plaintiff's expert Dr. Beyer and Plaintiff himself may have been critical of Paragon management projections that predated the November 1999 Disclosure Statement projections, their criticisms focused on assumptions different from the assumptions Weyerhaeuser now criticizes. Dr. Beyer and Mr. Lambert's criticism of Paragon's projections promulgated earlier in 1999 did not relate to whether royalties should be assumed payable in the future or whether price increases could be instituted to cover the royalty cost. Instead, their criticism was that the projections assumed unrealistic growth in sales because Paragon's sales were drastically declining, as a result of the bankruptcy events and disruption. Paragon's declining sales earlier in 1999 were cause for concern. Neither Dr. Beyer nor Weyerhaeuser criticized the November 1999 projections used in the Disclosure Statement. But even if they had, past criticism would be irrelevant because the November 1999 Disclosure Statement projections were approved in the Disclosure Statement Approval Order and were in fact reasonable as the basis for Paragon's sale.

censed Products," defined to include infant and adult diapers and training pants falling within the scope of Lawson, Dragoo, Aziz or Buell patents. The evidence demonstrates that Paragon's Economy diaper and training pant product did not utilize an ILG feature when the IPO closed, but Paragon was utilizing the feature on such products by the time it filed its bankruptcy petition and Reorganized Paragon was anticipated to use the feature on these products after bankruptcy. Weyerhaeuser argues at least some of the royalty-related damages should be reduced correspondingly.

144. Weyerhaeuser's reasoning is that the ILG feature on these products did not constitute part of "the Business" as of the IPO. Weyerhaeuser thus argues its warranties did not pertain to these products *with the feature.* Weyerhaeuser contends Paragon's losses attributable to royalties for these products' sales should be excised from the damage award. Weyerhaeuser also makes the same argument with respect to Paragon's Supreme diaper, which is a product the Business was not selling at time of the IPO but was selling by the time of the bankruptcy. Finally, Weyerhaeuser argues Plaintiff's damages should be reduced for portions of the damages attributable to Paragon's Canadian sales.

### (a) Economy diaper and training pant

145. Plaintiff's royalty-related cost to cure damages should not be reduced based on Paragon's use of the ILG feature on the Economy diaper and training pant after the IPO. The ILG feature was a key part of the Business at the time of the IPO. Paragon's freedom to practice the ILG technology was encompassed in the warranties Weyerhaeuser made in the ATA

and IPA. A training pant is a form of diaper for older toddlers, designed to be reusable between accidents. Paragon's post-IPO use of the ILG technology on its other infant care diaper products does not constitute a "new business" not conducted at time of the IPO but is a logical application of ILG technology within the Business. The warranties would pertain equally to Paragon's use of the ILG technology on, for example, a slightly re-designed version of the Ultra diaper Paragon might have marketed as the "Ultra II" diaper, as they pertain to Paragon's use on the Economy diaper and training pant. Using the ILG feature on its other products is no different from Paragon adding any other purportedly available feature, such as Muppet characters, to the Economy diaper and training pant product already in use on the Ultra diaper at time of the IPO.

146. The ILG feature was perhaps the most important feature of all diaper improvements. Weyerhaeuser promised that the Paragon business had the right to use the ILG feature in the operation of its business at closing of the IPO. The diaper market had moved to the ILG technology at the time of the IPO, and customers were demanding this feature. Adding the ILG feature to Paragon's secondary product lines after the IPO was a natural and foreseeable refinement of product offering by the Business. If Weyerhaeuser's warranties had been true, so that Paragon had sufficient intellectual property to sell its Ultra ILG diaper without the need to obtain licenses from PG or KC to use the ILG, Paragon also would have had sufficient intellectual property to sell an ILG Economy diaper or ILG training pant diaper. Thus, Paragon's addition of the ILG feature to its Economy diaper and training pant should not so artificially limit the losses Plaintiff is entitled to recover.

### (b) Supreme diaper

147. In addition to the reasons set forth above, Plaintiff's royalty-related cost to cure damages based on the Supreme diaper should not be reduced because, although Weyerhaeuser implied the Supreme diaper used an ILG, Weyerhaeuser offered no evidence in support. Weyerhaeuser, on its cross-examination of Paragon's former Chief Operating Officer, David Cole, failed to ask him whether Paragon used the ILG on the Supreme diaper and approximately when it began to do so. Thus, insufficient evidence appears in the record to conclude either the Supreme diaper utilized the ILG feature or that reductions for it are warranted.

### (c) Canadian sales

148. The sales of Paragon Canada[60] were subject to royalties based on Lawson and Enloe counterpart patents issued in Canada. Paragon's Canadian operations were a part of the Weyerhaeuser diaper "Business" at closing. Thus, the ATA and IPA warranties promised adequacy of intellectual property to conduct the Canadian aspect of the Business as well. Thus, no reduction in the cost to cure damage amounts based on Paragon Canada's sales is warranted.

### (5) Should the PG royalty-related cost to cure damages be reduced based on damages attributable to non-ILG patents?

149. In the agreement with PG, in addition to licensing the ILG feature under the Lawson and Dragoo patents, PG granted Paragon a license under the Aziz and Buell patents for no additional royalty, as long as Paragon was paying the 2% royalty for Lawson and Dragoo. Weyerhaeuser argues some amount of the royalty-related cost to cure damages should be attributable to the Aziz and Buell patents, and damages reduced by the attributed amount.

150. The PG License attributes none of the 2% royalty to the Aziz or Buell patents and no other evidence suggests the parties attributed any part of the 2% royalty to Aziz or Buell. The evidence, in fact, strongly suggests the contrary: The 2% figure is precisely the amount the Delaware Court found to be a reasonable royalty for Paragon to pay for the Lawson and Dragoo rights. ConFab, in its license agreement with PG, agreed to pay 2% for Lawson and Dragoo. Two percent was PG's consistent royalty demand in the pre-Delaware Judgment negotiations. PG never sued Paragon over the Aziz and Buell patents, demonstrating their relative insignificance in the license negotiations.

151. Moreover, the Aziz and Buell patents were issued to PG before the IPO. Thus, if part of the 2% royalty were attributed to Aziz or Buell, and if a royalty for a license under those patents were due, it would, similarly, constitute a breach of Weyerhaeuser's warranties that Paragon had sufficient intellectual property, and Weyerhaeuser would be liable for it. Accordingly, a reduction of royalty-related cost to cure damages for the Aziz or Buell patent licenses is not justified.

### (6) Should the royalty-based damages be reduced to an after-tax measure?

152. Weyerhaeuser, through Dr. Jonathan Putnam, its damages expert who testified at trial, argue Paragon's damages

---

**60.** The shortened name used in the ATA for Paragon Trade Brands (Canada) Inc.

should be limited to the after-tax cost of the royalties to Paragon. Weyerhaeuser, however, has cited no authority in Washington law or elsewhere to support this contention. The economic literature Dr. Putnam used to buttress his damage approach also supports "grossing up" damage awards to make Plaintiff whole for effects taxes may have on damage recoveries. Thus, computing losses on an after-tax basis would double-tax Plaintiff on recoveries in this action, and Plaintiff has not sought to enhance its damage recovery for taxes payable by the Paragon Estate or its stakeholders on the recovery in this litigation.

153. Reducing Paragon's royalty damage recovery for tax effects is also not consistent with the fact Paragon did not pay dividends on its earnings but instead reinvested its operating income into tax-deductible expenses of doing business, such as research and product development, and capital investment programs that created depreciation and amortization tax benefits over time. These investments, which Paragon would not have been able to make had it been paying the royalties demanded by PG and KC, created tax deductions to Paragon which would not have been available had Paragon been paying royalties. Thus, no basis, in law or in fact, appears to discount or limit Plaintiff's damages to the after-tax cost of royalty obligations of Paragon.

### b. Cost to cure damages attributable to PG's agreed $158.5 million unsecured claim and $5 million administrative claim

154. Paragon could not have obtained the license necessary to use the Lawson/Dragoo ILG technology without paying an appropriate sum for past infringement. The PG license was expressly conditioned on approval of the settlement claim for past infringement. Accordingly, the cost to cure measure should include costs and losses Paragon incurred to satisfy the past infringement liability to PG.

155. PG agreed to accept a $158.5 million unsecured claim and a $5 million administrative claim against Paragon's Estate to resolve past infringement liability. This compromise amount was less than the $178 million in damages awarded to PG for infringement in the Delaware Judgment. The PG claim was satisfied, in part, through cash paid on the Plan confirmation effective date and promissory notes issued to unsecured creditors under the Plan that were payable by Reorganized Paragon. The remaining unpaid portion remains due from the Paragon Estate as and if funds become available.[61]

#### (1) Cash payment

156. Upon Plan confirmation, Paragon paid PG $51.2 million on account of its unsecured claim, and $5 million on account of its administrative claim. Those amounts constitute a portion of the proper cost-to-cure measure of damages for Weyerhaeuser's breach of warranties.

#### (2) Promissory note obligations

157. Based on PG's unsecured claim, PG received a five-year, $61.9 million promissory note, bearing simple 11.25% annual interest, payable by Reorganized Paragon. Discounted to present value as of the effective date of Paragon's Plan, the value of the promissory note is $54.1 mil-

61. The Plan provides, *inter alia,* that unsecured creditors, including PG and KC, will receive, in whole or partial satisfaction of their claims, a portion of any recovery in this lawsuit.

lion. The promissory note to PG resulted in a loss to Paragon. Because the note was a large part of Reorganized Paragon's $170 million new post-confirmation debt obligations, it reduced the value of the Paragon business sold to Wellspring. Weyerhaeuser failed to challenge this cure cost.

### (3) Unpaid portion of PG's unsecured claim

158. The remaining unsatisfied principal portion of PG's allowed unsecured claim remains due and payable by the Paragon Estate. Debtor's confirmed plan provides that a portion of the recovery received in any of the Litigation Claims [62] will be allocated to the holders of unsecured claims, including PG. Pursuant to the PG Settlement and the Plan, the claim is entitled to simple interest at 6% from the date of allowance through the January 28, 2000 effective date of the Plan as confirmed. The total due is thus $50.5 million. This amount constitutes a loss Paragon incurred to cure its inadequate intellectual property condition. If Paragon had received at the time of the IPO sufficient intellectual property to conduct its business, this liability would not be payable. Accordingly, Plaintiff is entitled to recover the $50.5 million unpaid portion of PG's unsecured claim.

### (4) Deductions to PG's unsecured claim-related cost to cure damages because a portion of damages are attributable to Paragon's non-Ultra diaper products?

159. Weyerhaeuser argues damages for PG's $158.5 million unsecured claim

should be reduced by amounts attributable to Paragon's Economy diaper, Supreme diaper and training pant. The Delaware lawsuit and monetary judgment entered against Paragon concerned only the Ultra diaper. No evidence suggests that the parties' agreement concerning PG's unsecured claim was anything other than an agreement to reduce the amount payable under the $178 million judgment entered in the Delaware lawsuit. None of Paragon's other diaper products were the subject of the Delaware lawsuit and thus, none of the damages awarded in that case could be attributable to any of those products. Therefore, no reduction in the element of cost to cure damages for PG's $158.5 million unsecured claim is appropriate.

### (5) Deductions to PG's unsecured claim-related cost to cure damages because a portion of the damages are attributable to Paragon settling other disputes with PG?

160. In addition to the compromise of the Delaware Judgment, PG released Paragon from claims that PG asserted in its Proof of Claim for (1) Paragon's prepetition Canadian sales allegedly infringing Canadian counterparts to Lawson and Dragoo, (2) Paragon's United States and foreign joint ventures' sales allegedly infringing PG's Aziz, Buell, Robertson and Anderson patents, (3) Paragon's post-petition United States and foreign joint ventures' sales allegedly infringing these patents, and (4) Paragon's alleged

---

**62.** In addition to the claims asserted against Weyerhaeuser in this adversary proceeding, the Plan contemplated that the Litigation Claims Representative could pursue claims against Pope & Talbot, Oracle Corporation, and Andersen Consulting LLP. An adversary proceeding filed by the Litigation Claims Representative against Oracle Corporation and Andersen Consulting LLP, Adversary Proceeding No. 00–06013 was resolved by order entered November 8, 2001.

post-petition violation of the Delaware injunction for which PG sought damages in its Motion for Contempt. Weyerhaeuser's contention that the $158.5 million unsecured claim-related cost to cure damages should be reduced by amounts fairly attributable to PG's release of these other claims is not sustainable.

### (a) Canadian sales

161. No reduction in damages awarded Plaintiff is appropriately based on any portion of the PG settlement value allocated to PG for having released its claim regarding Paragon's Canadian sales. Such a claim, if brought, would have "involve[d] the same patents that [were] at issue in the [Delaware] Judgment." [63] The warranties breached included Paragon's Canadian operations, not just Paragon's United States operations, and were also made by Weyerhaeuser Canada, not just Weyerhaeuser United States. Accordingly, no reduction in damages for PG's release of claims for Paragon's Canadian sales is appropriate.

### (b) Pre-petition and Post-petition sales allegedly infringing PG's Aziz, Buell, Robertson and Anderson patents

162. Weyerhaeuser also contends damages should be reduced by allocating a portion of PG's unsecured claim as consideration for PG's release of Paragon from potential infringement claims for Paragon's United States and foreign joint ventures' sales allegedly infringing PG's Aziz, Buell, Robertson and Anderson patents. For the reasons stated beginning at page 78, ¶ 149, *et seq.*, however, reducing damages for settlement values attributable either to Aziz and Buell or to Robertson and Anderson is not appropriate. The license agreement between Paragon and PG assigns no value to any of those patents, PG had not sued Paragon or any of its joint venture affiliates on these patents before the Delaware Judgment, and no evidence shows Paragon ever considered these patents a commercial threat to its operations before the bankruptcy. As stated earlier, the Delaware Judgment and its consequences required Paragon to obtain a "clear path to market" for its products. Paragon could not afford the risk or disruption of another lawsuit. Paragon, during the PG Settlement hearings, assessed PG's pre-petition claims on these patents as "extremely weak," thus, ascribing them a *de minimis* 1% settlement value for advocating reasonableness of the $158.5 million settlement. Even if a portion of PG's claim could be attributed to those patents, all those patents were issued pre-IPO and are, therefore, included in the warranties in the ATA and IPA. Thus, Weyerhaeuser's argument that damages should be reduced is without merit.

### (c) PG released its Motion for Contempt

163. The PG Settlement Approval Order references value Paragon received from PG for dismissing its motion to have Paragon held in contempt of the Delaware injunction. PG brought its contempt motion in the Delaware litigation to enforce the ILG patent injunction, contending Paragon's new ULG diaper still infringed its Lawson and Dragoo patents. This motion,

---

**63.** Quoting the order entered August 6, 1999, approving Debtor's motion to approve the settlement agreement with KC.

if pursued successfully,[64] could have shut down Paragon's business completely. That Paragon was at risk of being shut down for selling its primary product with the only design Paragon's engineers had devised postpetition to try to avoid PG's ILG patents illustrates both the severity of the patent vise in which Paragon found itself as a result of holding no licenses from PG, and the necessity for settlement of the PG claims. Any loss Paragon incurred from the contempt proceedings is directly traceable to its insufficient intellectual property on formation, and is compensable as caused by Weyerhaeuser's breach of warranties. Accordingly, no reduction in damages for PG's release of claims sought in its Motion for Contempt is appropriate.

### 2. KC–Related Losses Arising From Inadequate Intellectual Property

#### a. The Delaware Judgment was a proximate cause of Paragon incurring KC-related losses

164. The Delaware Judgment's impact as a primary factor in causing Paragon to settle with KC cannot be ignored. As found in the KC Settlement Approval Order entered August 6, 1999, "[e]ssential to understanding the underpinnings of the [KC] Settlement is familiarity with the patent litigation between [PG] and [Paragon] in Delaware." The Delaware Judgment was a substantial factor in persuading Paragon that the likelihood of prevailing against KC was relatively low.

165. Paragon had suffered a devastating loss to PG, and Paragon management and counsel assessed KC's claims as much stronger than PG's. The Delaware Court had rejected the most relevant prior art that Paragon intended to offer to invalidate the problematic Enloe III generic patent covering all ILGs. Thus, the Delaware Judgment, from Paragon's perspective, eviscerated its principal invalidity defense to Enloe III, and Paragon did not have a fallback non-infringement (as opposed to an invalidity) position.

166. KC's Enloe I claim to "fluid pervious" ILG materials was equally problematic, as it allowed a much greater range of equivalents than the equivalents for Lawson's "impermeable" ILG patent that Paragon had been held to infringe. Paragon's ILG was admittedly pervious to a degree. This Enloe I quandary, together with Paragon's lack of a non-infringement defense to Enloe III's generic claims covering all ILG diapers, left Paragon in potentially more patent trouble from KC than from PG. These considerations resulted in Paragon assessing, conservatively, that it was more likely than not (60% likely) that KC would prevail.

167. Additionally, as a result of the Delaware Judgment, Paragon's business was in trouble. Even if the likelihood of success for Paragon against KC had been higher, Paragon could not afford the cost, risk, distraction and loss of customers that further litigation over ILG patent rights would entail. As with PG, Paragon had no alternative product design for retreat if KC prevailed on its claims and obtained an injunction.

168. The frank reality of the Delaware Judgment was integral to the significant

---

**64.** Paragon arguably was not protected from this motion by the automatic stay of 11 U.S.C. § 362, but also, arguably, it was protected as being based on prepetition events and claims because it was rooted in actions mandated by the prepetition conversion agreement and prepetition judgment. Nevertheless, PG did not actively pursue the motion, leaving a question about why PG filed it, but it was resolved in settlement.

risk Paragon reasonably believed it faced for KC's Enloe infringement claims. Paragon entered into the KC settlement negotiations to obtain licenses to complete a clear path to market its ILG product, which was necessary for its business to remain viable. Paragon's need to enter into the KC Settlement Agreement, and the reasonableness of its terms, was previously litigated at length during the KC settlement motion hearings, at which Weyerhaeuser had a full and fair opportunity to participate. Weyerhaeuser raised no objection to Paragon's settlement with KC. Instead, as with the PG Settlement Agreement, the Creditors' Committee advocated the necessity for Paragon to enter into the KC Settlement Agreement while Weyerhaeuser remained silent. Evidence offered in this adversary proceeding confirmed that Paragon exercised sound business judgment in seeking approval for and entering into the KC Settlement Agreement in order to continue operating and to reorganize. For Paragon to enter into the KC Settlement Agreement to obtain a license to use the ILG feature under KC's Enloe patents was both reasonable and necessary.[65]

169. The types of losses Paragon incurred resulting from its KC patent insufficiency are largely the same as those it experienced from the PG patents insufficiency. They include "royalty-related"

losses and KC's agreed $110 million unsecured claim and its agreed $5 million administrative claim. Paragon incurred these and its other "KC-related losses" on or before the effective date of its confirmed Plan, January 28, 2000, and the sums were liquidated by then. Before further assessing Paragon's KC-related losses, however, Weyerhaeuser's argument that the post-settlement *Tyco* decision precludes an award for Paragon's KC-related losses merits review.

**b. The *Tyco* decision does not limit Paragon's KC-related losses**

170. Thirteen days after the October 30, 2002 Summary Judgment Order, Weyerhaeuser moved for reconsideration. A principal ground for the motion was a new theory Weyerhaeuser had failed to assert at any time during the 21 months that elapsed from the original filing of the summary judgment motions through issuance of the Summary Judgment Order. According to this theory, proof that Paragon *actually infringed* KC's Enloe patents must be established before Paragon's intellectual property at the time of the IPO could be found to be inadequate or insufficient. In support of this new theory, Weyerhaeuser, for the first time, raised the Federal Circuit Court's February 2001 *Tyco* decision.[66] Weyerhaeuser argued that it did not breach its warranties with

**65.** Weyerhaeuser attempts to impeach Plaintiff's position about the reasonableness and necessity of the KC Settlement Agreement through evidence of Plaintiff's current trial counsel's prior arguments, made while representing a different client, that the settlement was unreasonable. During the litigation in Paragon's main bankruptcy case, Andrews & Kurth represented the Equity Committee, a different entity than the Paragon Estate. Andrews Kurth currently represents the Litigation Representative for the Paragon Estate. The admissibility of evidence against Paragon

in this action is not dependent on the identity of its current counsel. The question of whether to settle has been decided, and the decision is final. Paragon's prior settlements, which Weyerhaeuser supported, are important history, but the critical issue now is assessing the losses Paragon incurred from holding insufficient intellectual property.

**66.** *Kimberly–Clark Corp. v. Tyco Int'l (US), Inc.,* 4 Fed.Appx. 946 (Fed.Cir.), *cert. denied,* 534 U.S. 890, 122 S.Ct. 204, 151 L.Ed.2d 144 (2001).

respect to KC's Enloe patents because the *Tyco* decision established for purposes of this case that Paragon's ILG feature did not infringe KC's Enloe patents.

171. Based upon the failure to raise the *Tyco* arguments earlier, the order denying Weyerhaeuser's motion for reconsideration of the Summary Judgment Order found that the new arguments—that actual patent infringement must be proven before a breach of warranty can be found, and that the *Tyco* decision proves no such actual infringement liability arose with respect to KC's Enloe patents—were waived. These arguments were available to Weyerhaeuser long before the Summary Judgment Order was entered. The *Tyco* decision issued 19 months before entry of the Summary Judgment Order and 15 months before oral argument on the summary judgment motions. The *Tyco* decision is not an intervening change in law nor is it controlling law regarding breach of warranty or damages. Weyerhaeuser knew of the November 1999 decision by the Wisconsin trial court in *KC v. Tyco,* which the Federal Circuit affirmed February, 2001, in all material respects, because Weyerhaeuser cited to it in an earlier pleading in this adversary proceeding. As a member of the Creditors' Committee, Weyerhaeuser had notice of the trial court's decision in *KC v. Tyco* during the main bankruptcy case when the Equity Committee brought that decision to the court's attention shortly after it issued, and served the Creditors' Committee with a copy of the decision. Weyerhaeuser remained silent until November, 2002.

172. The argument that actual patent infringement liability must be shown before a breach of warranty can be found, and that the *Tyco* decision precludes any such finding with respect to KC's Enloe patents, is no more persuasive in the context of a trial on damages than it was as a basis for reconsideration of the finding of liability in the Summary Judgment Order. Nevertheless, whether the *Tyco* decision should affect the calculation of damages respecting KC's Enloe patents is facially compelling.

173. Weyerhaeuser's argument assumes incorrectly that the warranties are nothing more than "anti-infringement" warranties, which can be deemed breached only if it can be shown that Paragon's products actually infringed patents of third parties. While demonstrable infringement of a third party's patents would undoubtedly prove a breach of warranty, the existence of substantial claims of infringement against Paragon—claims so substantial and so threatening to the viability of Paragon's business as to justify specific but understated mention in the IPO Prospectus by Weyerhaeuser and, later, a significant settlement—likewise would show that the intellectual property assets that Weyerhaeuser transferred to Paragon were inadequate for continuation of the Business as conducted at time of the IPO.

174. The Summary Judgment Order determined that Paragon's need to license the Lawson, Dragoo and Enloe patents confirmed that Paragon did not receive sufficient or adequate intellectual property to operate the Business. A decision of another court that an unrelated company's similar diaper did not infringe Enloe's patents—a decision based on an unexpected change in the law which imported limitations from the original Enloe patent specification into the later Enloe patent claims—does not roll back the clock and erase the PG judgment, Paragon's Chapter 11 and its need to settle and enter into the license contracts in 1999 based on the reality it then confronted.

175. Plaintiff's patent law expert, Mr. Arnold, testified credibly that the claim limitations that later emerged from the *Tyco* decision were based on a changing approach in the law of the Federal Circuit that allowed the court to read limitations from the original Enloe patent specification into the Enloe patents' claims. Most skilled patent lawyers in the country could not have anticipated this result with confidence at the time Paragon made its decision to settle. Neither Paragon's skilled patent counsel, retained after the Delaware Judgment nor the patent counsel for the Creditors Committee anticipated this defense at the time of settlement. The Equity Committee, which employed a skilled patent law expert to vigorously contest approval of the KC settlement, also did not anticipate or argue this defense. Neither Weyerhaeuser's in-house or outside patent counsel anticipated that Enloe III could be limited in this fashion once it issued.

176. If it were true that the warranties themselves or the law required a finding of actual liability before a breach could be established, Paragon would have been forced to litigate both the PG and KC claims to finality before a breach of warranty claim could exist. As construed in the Summary Judgment Order, the warranties do not support such a theory. Inclusion of "settlements" in the ATA's definition of indemnifiable "Losses" for breach of warranty is also inconsistent with Weyerhaeuser's theory. If Weyerhaeuser were correct, inclusion of settlements as a recoverable loss in the ATA would be rendered meaningless. Requiring proof of actual infringement liability as a predicate for finding breach of the warranties would be contrary to Washington's strong public policy, as stated by the Supreme Court of Washington, to encourage settlements and not to allow a party's "reasonable" settlement to undermine its right to later pursue claims based on that decision. *City of Seattle v. Blume,* 134 Wash.2d 243, 947 P.2d 223, 230 (1997) (*en banc*). *See also Hydro–Air Equip., Inc. v. Hyatt Corp.,* 852 F.2d 403, 406 (9th Cir.1988) (upholding indemnity right where party settled based on good faith belief that it was necessary to settle the case to protect its own interests).

177. In its motion to approve the KC settlement, Paragon assigned a 40% chance of prevailing against KC, and the consideration it paid in the settlement reflected a compromise over the uncertainty of the ultimate outcome. By compromising issues of liability and damages, Paragon eliminated what was then a very substantial risk of injunction from selling its primary product. It also avoided the risk of a substantial damages award. If the *Tyco* decision had issued in KC's favor, Paragon would not have owed KC *more* money or been forced to stop selling its ILG products until KC obtained a judgment against Paragon. Similarly, Paragon was bound to its settlement obligations notwithstanding the actual outcome of the *KC v. Tyco* case. Damages flowing from a settlement agreement do not vaporize if a party's pre-settlement position is vindicated by someone else in later litigation. *See Hemstreet v. Spiegel, Inc.,* 851 F.2d 348, 350 (Fed.Cir.1988); *Union Pac. Corp. v. Wengert,* 79 Cal.App.4th 1444, 95 Cal. Rptr.2d 68, 71 (2000); *Gulf, Colo. & Santa Fe Ry. v. McBride,* 159 Tex. 442, 322 S.W.2d 492, 498 (1958). The KC-related losses for which Plaintiff seeks to recover damages became liquidated for Paragon upon Plan confirmation. Those losses were incurred despite the subsequent *Tyco* decision, which aided only Reorganized Paragon's fortune. The KC-related losses

were fixed and payable regardless of whether a later judicial determination revealed that Paragon had a defense to KC's claims of infringement.

178. The extensive hearings on Paragon's proposed settlement with KC were conducted in the context of the substantial risks then confronting Paragon. The facts substantiating the reasonableness and necessity of the settlement are well-documented here and in the order approving the KC Settlement Agreement. Paragon faced a risk of liability in two lawsuits by KC then pending in a federal district court in Texas. In the Proof of Claim KC filed in the Chapter 11 case, KC claimed damages, including lost profits, of as much as $2.3 billion. Paragon had no known non-infringement position against the Enloe III patent. The prior art/invalidity argument (based on the Japanese Utility Model) had been rejected in the Delaware litigation, and had been considered by the PTO before it issued the generic ILG claims to KC in the Enloe III patent. Winning would have required Paragon to overcome the presumption of patent validity by clear and convincing evidence. Paragon had determined that if it did not license the Enloe patents as it did in 1999, it faced a 60% probability that it would not only incur substantial damages but also jeopardize its business operations by entry of an injunction against using the key ILG feature on its primary product. An intellectual property portfolio that presents a 60% chance of such jeopardy is neither "sufficient" nor "adequate."

179. After evaluating the substantial risks Paragon faced, Paragon's settlement with KC was approved as a reasonable and necessary business decision. That conclusion was reached after extensive hearings, with full notice to Weyerhaeuser.

Weyerhaeuser had the opportunity to oppose the settlement by raising the same novel legal theory used by Tyco to prevail in its suit with KC, or otherwise demonstrate that Paragon's decision to settle was premature or unwarranted. Weyerhaeuser did nothing, despite knowing that it faced the possibility of breach of warranty claims stemming, in part, from Paragon's need to license the Enloe patents.

180. Tyco's ability to contest KC's claims through an emerging legal principle was superior to Paragon's. Tyco is a large, multi-national conglomerate whose diaper business was a small component of its overall business activities. Also, Tyco had sold a fraction of the number of the diapers sold by Paragon and over a much shorter period of time, so that Tyco's exposure to damages for past infringement was much smaller than that which confronted Paragon.

181. For the reasons set forth above, the *Tyco* decision has no preclusive effect upon Plaintiff's breach of warranty claim against Weyerhaeuser, nor does it restrict the damages flowing from the breaches that Plaintiff may recover.

### c. KC royalty-related cost to cure losses

#### (1) Royalties paid before Plan confirmation

182. The KC License obligated Paragon, commencing January 1, 1999 through Plan confirmation, to pay KC a 2.5% royalty on net sales of all diapers and a 5% royalty on training pant products containing the ILG feature. Paragon paid KC approximately $9.9 million in pre-Confirmation royalties pursuant to the KC License. This loss was incurred to cure or as a proximate consequence of the falsely

warranted condition of Paragon at closing of the IPO. Accordingly, Plaintiff is entitled to recover this $9.9 million as part of a cost to cure measure of damages.

### (2) Loss attributable to KC royalty obligation after Plan confirmation

183. The analysis for determining the loss Paragon suffered based on its post-Plan confirmation royalty obligations to KC is the same as the analysis for the loss Paragon suffered based on post-Plan confirmation royalty obligations to PG. Paragon suffered a loss equal to reduced sale proceeds realized from its sale to Wellspring attributable to the future KC royalty obligation; $33.8 million is a fair estimate of the loss. Paragon incurred the future royalty payment obligation resulting in this loss to cure, or as a proximate consequence of, the falsely warranted condition that Paragon had the right to use the ILG feature the Business was using at the time of the IPO. Accordingly, Plaintiff is entitled to recover $33.8 million as part of a cost to cure measure of damages.

### (3) Should the KC royalty-related cost to cure damages be reduced for royalties attributable to products not utilizing the ILG feature on the IPO date?

184. Weyerhaeuser argues, as it did respecting the PG royalty-related damages, that the KC royalty-related cost to cure damages should be reduced for a portion of the damages fairly attributable to Paragon's training pant, Economy, and Supreme diapers. For the reasons set forth respecting the PG royalty-related damages, no such deductions are appropriate. Similarly, for the reasons set forth rejecting deductions to PG royalty-related cost to cure damages for Canadian sales, such deductions regarding the KC royalty-related cost to cure damages, are also rejected.

### d. Cost to cure damages attributable to KC's $110 million unsecured claim and $5 million administrative claim

185. As in the settlement negotiations with PG, KC would not grant Paragon the Enloe license unless Paragon agreed to pay an appropriate sum for past Enloe infringement consistent with standard patent damages. Without paying for past infringement, Paragon could not have obtained the Enloe license. Accordingly, the cost to cure measure should include costs Paragon incurred to satisfy the alleged past infringement liability. KC agreed to accept a $110 million unsecured claim and a $5 million administrative claim against Paragon's Estate to satisfy such past infringement liability. The Paragon Estate suffered a loss on account of these obligations payable to KC. The KC claim was satisfied, in part, through cash paid at Plan confirmation and promissory notes issued under the Plan that were payable by Reorganized Paragon. Debtor's confirmed plan provides that a portion of the recovery received in any of the Litigation Claims will be allocated to the holders of unsecured claims, including KC. Therefore, the remaining unpaid portion remains due from the Paragon Estate.

### (1) Cash payment

186. Upon Plan confirmation, Paragon paid KC $37.5 million on account of its unsecured claim and $5 million on account of its administrative claim. Those amounts are part of the cost to cure measure of damages for Weyerhaeuser's breach of warranties.

### (2) Promissory note obligations

187. For its allowed unsecured claim, KC received a five-year, $42.9 million

promissory note bearing simple 11.25% annual interest, payable by Reorganized Paragon. As with PG's note, KC's promissory note resulted in further loss to Paragon based on the reduced Paragon sale value it caused. Paragon suffered a loss of $37.5 million caused by the $42.3 million KC note, which is the present value, as of the effective date of Paragon's confirmed Plan, of the future principal and interest payments under the KC note, using the Blackstone 15% discount factor.

### (3) Unpaid portion of KC's unsecured claim

188. After Plan confirmation, the portion of KC's unsecured claim not satisfied through cash or Reorganized Paragon's promissory note, including interest allowed under the KC Settlement through the date of confirmation, was $34.6 million. As Paragon's confirmed plan provides that a portion of the recovery received from this and other of the Litigation Claims will be allocated to the holders of unsecured claims, including KC, the unpaid portion of KC's unsecured claim remains a liability of Paragon's Estate. This amount constitutes an additional loss Paragon incurred to cure its inadequate intellectual property condition. Alternatively, it was a liability Paragon incurred as a consequence of the falsely warranted condition of its intellectual property. Had Paragon been vested with sufficient intellectual property on formation, this loss would not have been incurred. Accordingly, Plaintiff is entitled to recover $34.6 million due as of Plan confirmation.

### (4) Deductions to KC unsecured claim-related cost to cure damages attributable to non-Ultra diaper products

189. The allegations of KC's pre-petition Complaints against Paragon were not specific as to what Paragon "products" infringed Enloe patents. KC's Proof of Claim was also not specific enough to ascertain whether its pre-petition damage claims were based on products other than the Ultra diaper. The KC Settlement Approval Order, however, found that KC in its Original Complaint had alleged that Paragon's Ultra and training pant diapers containing the ILG infringed Enloe. The Court assessed the reasonableness of the $110 million unsecured claim based, in part, on a royalty payable for training pant infringement. For the reasons set forth *supra* at page 895, ¶ 184, no deductions to the KC unsecured claim-related cost to cure damages are appropriate for any ILG royalties due on Paragon's training pant or Economy diaper.

### e. Deductions to KC royalty-related and unsecured claim-related cost to cure damages attributable to settlement of KC's SAP patent infringement claims?

190. During the KC settlement negotiations, KC alerted Paragon to its potential infringement of its SAP (super-absorbent polymer) patents, Kellenberger, Melius and Good. Paragon subsequently determined that indeed the SAP it was using did infringe these patents. KC refused to license these patents, but it did offer to provide Paragon a "safe harbor" to develop a different SAP design and to forgive Paragon's prior SAP infringement as part of globally settling the Enloe patent claims. As part of the KC Settlement Agreement, Paragon changed its SAP to fit within the safe harbor, and was released from any liability to KC for past SAP infringement.

191. Weyerhaeuser contends some of the KC-related damages should be re-

duced by an amount fairly attributable to KC releasing its SAP patent infringement claims. No evidence was presented, however, to suggest that the royalty rate Paragon agreed to pay for the Enloe patents or the amount of the unsecured claim granted KC were influenced by KC's waiver of its SAP infringement claims. The royalty Paragon ultimately negotiated for Enloe was less than the royalty KC offered Weyerhaeuser for the Enloe patents before the IPO. Paragon's methodology in its settlement motion to justify the KC unsecured claim amount attributed no portion of the claim to KC's SAP patents. Weyerhaeuser offered no evidence that could provide a reasonable basis to conclude that the KC claim amount included value for SAP patent infringement; similarly, Weyerhaeuser offered no evidence from which to estimate a fair deduction.

192. Additionally, KC's Kellenberger patent (one of the SAP patents) originally issued before the IPO, in September 1992. Weyerhaeuser's in-house patent counsel was aware of this patent and a need to design around it. If Paragon suffered a loss from this SAP patent, it is entitled to indemnity from Weyerhaeuser for the loss. No deduction to the KC royalty-related or unsecured claim-related cost to cure damages is appropriate based on KC's release of Paragon from claims of SAP infringement.

**f. Deductions to KC royalty-related and unsecured claim-related cost to cure damages because the Enloe II and III patents issued post-IPO**

193. Before the IPO, Weyerhaeuser knew that an amended version of the Enloe patent would issue after the IPO and that it would include the generic ILG claims originally granted to Lawson before the IPO. Paragon's lack of Enloe patent rights, together with the lack of the PG Lawson/Dragoo patent rights, made the intellectual property Paragon received from Weyerhaeuser inadequate for the "continuation" of the Business after the IPO closing. The absence of rights under the expected-to-be-issued amended Enloe patent (which later issued as Enloe III) was one reason for the conclusion in the Summary Judgment Order that Weyerhaeuser breached its sufficiency of asset warranties. The evidence offered during the damages trial is consistent with that conclusion and Weyerhaeuser's argument that the KC-related damages attributable to the Enloe II and III patents should be excised from the award has no merit.

**g. SAP compliance costs**

194. The $9.3 million cost to Paragon to alter its SAP to conform to the safe harbor KC offered was part of the cost Paragon incurred to obtain the Enloe license. Additionally, that cost is compensable based on Paragon's known SAP inadequacy as of the IPO closing *vis-a-vis* KC's Kellenberger patent. Accordingly, it is properly part of the cost to cure measure of damages.

**3. The Cost To Cure Damages Were Foreseeable**

 195. In breach of contract cases, damages are recoverable only for losses that were reasonably foreseeable by the party to be charged when the contract was made. *Larsen v. Walton Plywood Co.*, 65 Wash.2d 1, 390 P.2d 677, 681 (1964). An injury is foreseeable if it is one that follows the breach in the usual course of events. *Id.* at 683. Neither the specific injury nor the amount of harm must be

foreseen. *Id. See also Barnard v. Compugraphic Corp.*, 35 Wash.App. 414, 667 P.2d 117, 120 (1983). Whether a type of damage objectively was foreseeable is a question of fact. *Larsen*, 390 P.2d at 682. Weyerhaeuser contends it was not foreseeable that, when PG and KC sued Paragon, Paragon would pursue a "high-risk strategy" to litigate the PG and KC lawsuits rather than settle them and obtain licenses. Weyerhaeuser argues it should not be held responsible for the difference between the higher settlement costs resulting from the "high-risk strategy" and the lower settlement costs available to Paragon in 1996, before the PG trial commenced.

■ 196. Weyerhaeuser's position is disingenuous and contradicts itself, however, in arguing that Paragon should not have pursued a "high-risk strategy" of taking PG to trial, when Weyerhaeuser had stalled even responding to PG and KC royalty demands pre-IPO so that it could close the IPO with very limited disclosure. On the one hand, Weyerhaeuser faults Paragon for having settled with KC instead of litigating the Enloe claims all the way to the Federal Circuit in hopes of obtaining a result like that reached in the novel *Tyco* decision and, on the other hand, faults Paragon for following a "high risk" litigation strategy in the beginning. Weyerhaeuser's argument is unpersuasive. Paragon's course of action in dealing with the PG and KC ILG patent issues was foreseeable under Washington's foreseeability standards, in part because it was the path that Weyerhaeuser itself followed pre-IPO charted for Paragon and counseled Paragon to follow thereafter.[67]

197. Weyerhaeuser contends that *the amount of harm* to Paragon was not foreseeable. Weyerhaeuser essentially admits that the *outcome*—the necessity of Paragon's purchase of licenses from PG and KC to solve the known patent insufficiency—was foreseeable.[68] That Paragon was required to settle by paying *more* for the licenses because the claims were tested in litigation does not render the actual outcome unforeseeable under Washington law. *See Barnard*, 667 P.2d at 120.

198. Additionally, Paragon's decision to litigate followed by settlements was a course of events foreseeable by a reasonable person in Weyerhaeuser's position. Paragon pursued the same course of action concerning these claims that Weyerhaeuser had pursued before the IPO. Weyerhaeuser chose not to settle the claims, rejected PG's and KC's settlement demands for 2 to 2.5% royalties and proceeded as quickly as possible to close the IPO. Paragon inherited the same legal defense team Weyerhaeuser had assembled and Paragon was staffed by the pre-IPO managers of the Weyerhaeuser diaper business, without Pat Coogan, who nevertheless continued to strategize with Paragon. Paragon's decision to follow the same approach after the IPO that Weyerhaeuser had followed before was foreseeable by a reasonable person in Weyerhaeuser's position. Indeed, the logical inference is that the course Paragon followed was orchestrated by Weyerhaeuser and Weyerhaeuser's protestations now to the contrary are weak, and if not also disingenuous, specious.

**67.** Weyerhaeuser could not expect to both pay the royalties demanded pre-IPO *and* receive a premium price for Paragon's stock in the IPO.

**68.** *See* Weyerhaeuser Trial Brief at 15 ("The evidence will instead show that the foreseeable path was that Paragon would obtain licenses and pay royalties. Indeed, *this outcome was specifically foreseen* in the Paragon prospectus and other transaction documents.") (emphasis added).

199. Paragon's rejection of settlement demands shortly after the IPO, demands that would have required it to pay a 2% royalty to PG and another 2.5% royalty to KC ($20 to 25 million per year total), and another approximate $50 million for past infringement, was particularly foreseeable by a reasonable person in Weyerhaeuser's position because the Prospectus launching Paragon, drafted by Weyerhaeuser, promised that "the Company believes that any outcome" of these claims would be immaterial to Paragon's financial condition. A 4 to 4.5% royalty on future sales of a business with a 6 to 7% profit margin facing ongoing industry price cuts, plus a $50 million payment, would certainly have been material and adverse. Weyerhaeuser would have known that Paragon's acceptance of the PG and KC royalty demands after the IPO would likely have resulted in securities actions against Paragon or Weyerhaeuser or both. Weyerhaeuser's own expert witness admitted that agreeing to pay such royalties would have resulted in a "field day" for the securities class action lawyers. Hence, based on the representations in the Prospectus, Paragon's refusal so soon after the IPO to adopt an action that would have had a material adverse impact on its financial position was foreseeable, especially by one with Weyerhaeuser's intimate understanding of the circumstances.

200. Paragon's choice to litigate the claims rather than settle them shortly after being sued was also foreseeable by a reasonable person in Weyerhaeuser's position based on Weyerhaeuser's own conduct when faced with similar litigation in its past. In 1985, Weyerhaeuser chose to litigate to verdict, rather than settle, PG's patent infringement lawsuit over the Buell '003 patent. Weyerhaeuser rejected PG's settlement offers before the 1985 trial and did so even though it faced large damage exposure. Weyerhaeuser also chose to litigate to verdict at least one other patent infringement action it defended. It lost that lawsuit at trial also, but apparently was able to prevail on appeal.

201. The totality of the other circumstances renders foreseeable, under Washington law, the damages Paragon actually incurred when it entered the agreements with PG and KC to obtain licenses for the ILG feature.

### 4. Total Cost To Cure Damages

202. The total damages Plaintiff is entitled to recover under a cost to cure measure (not including consequential damages) is $377.4 million, itemized at page 138. While this amount is the appropriate measure of damages for Plaintiff, an analysis of damages recoverable under a "difference in value" measure, both as an alternative measure and as a benchmark to judge whether the cost to cure amount is disproportionate to the loss measured by difference in value is appropriate.

### G. Difference In Value Measure

203. As discussed above beginning at page 65, ¶ 122, the cost-to-cure measure is the proper measure of damages in this proceeding. An analysis of the damages recoverable if a difference-in-value measure of damages were used provides a useful comparison, however. This method measures the difference between the market value of the property, as warranted, on the date of sale and its actual value on that date, with the defect. *Lyall,* 711 P.2d at 360. When the warranted property sold is a business, as it is in this case, the measure compares the market value of the business as warranted to the

actual worth of the business as a result of the breach of warranty. *See Vigortone AG Products, Inc. v. AG Prods., Inc.,* 316 F.3d 641, 648 (7th Cir.2002). Under this measure, the difference in these two values would constitute damages Plaintiff would be entitled to recover, plus any consequential damages not inherently included in this measure. *Lyall,* 711 P.2d at 360.

204. The value of the Business "as warranted" is represented by the market value of Paragon's stock issued in the IPO at close of trading on February 2, 1993. The value of the Business as warranted equals the closing price of the stock on that day times the number of shares sold, or $284,625,000.

205. Without attempting to appraise the market value of Paragon on the IPO date with its actual deficiencies (as opposed to its "as warranted" condition), Weyerhaeuser's expert argued that the difference in value should consist of nothing more than the hypothetical cost to Paragon of obtaining licenses from PG and KC for the ILG feature. Weyerhaeuser argues that this hypothetical cost is the measure of difference in value as warranted and actual value as delivered. This approach, however, is comparable to treating difference in value as nothing more than an amount of lost profits sustained by a plaintiff as a result of breach of warranty, which is an approach that has been criticized by other courts addressing difference in value arising from breach of warranty. *See Teca, Inc. v. WM–TAB, Inc.,* 726 So.2d 828, 829, 830 (Fla.Dist.Ct. App.1999); *Appleyard v. Douglass,* No. 97–1844, 1998 WL 104680, at *5 (1st Cir. Mar.6, 1998) (unpublished); *First Fin. Mgmt. Corp. v. Home Fed. Savs. & Loan Ass'n of Elgin, Ill.,* No. 90–C–1623, 1992 WL 107291, at *5 (N.D.Ill. May 14, 1992).

Weyerhaeuser's approach is incorrect for determining the diminution in Paragon's value that resulted from its breach of warranties at the time of the IPO.

206. Furthermore, the method that Weyerhaeuser suggested should be used to derive the hypothetical cost to Paragon of obtaining ILG licenses as of the date of the IPO is unreliable and seriously flawed, even if that cost were to equal the diminution in Paragon's market value stemming from the breach of warranties. Weyerhaeuser's expert's methodology is based on the impact of hypothetical royalties payable to PG and KC for ILG licenses as of the asset transfer date on Paragon's profits. That methodology, however, is divorced from reality; the assumptions underlying it are unsupported in view of the events and market conditions confronting Paragon as of the IPO date.

207. Weyerhaeuser's economist, Dr. Putnam, *theorized* that Paragon could have negotiated ILG licenses with PG and KC, effective as of February 2, 1993, with royalty rates equal to those that Paragon eventually agreed to pay in the 1999 PG and KC Settlement Agreements. Then, relying on the so-called "Lerner Markup Rule," he argued that if Paragon had entered into such licenses, PG and KC would have raised their diaper prices by the percentage of additional costs they jointly would have imposed on Paragon's business through the assumed royalty payments. The assumption that PG and KC would have raised prices once Paragon entered into hypothetical ILG licenses as of the asset transfer date is critical. As a private-label manufacturer, Paragon was a price follower, not a price leader. Paragon was able to attempt price increases only after price increases were initiated by PG and KC, the leading branded manufactur-

ers, and only as long as a price increase did not cause Paragon to lose market share to its discount-priced competitors. According to Dr. Putnam's theory, price increases by PG and KC would have prompted Paragon, and all of Paragon's private label competitors, to raise their prices by the same percentage, and its price increases would have permitted Paragon to significantly offset the royalty cost through higher sale revenues.

208. To determine the effect of his presumed price increase on Paragon's costs and revenues, Dr. Putnam used an elasticity of demand factor of–.6 to determine the effect of a price increase on Paragon's sales. He conceded that this was a calculation of industry-wide elasticity of demand, not Paragon's own elasticity of demand, and further conceded that demand for Paragon's own products would have been significantly more elastic. He agreed that using an industry-wide elasticity of demand to determine the impact of a price increase on Paragon's sales would be appropriate only under the assumption that the entire industry raised prices following Paragon's licensing of ILG patents from PG and KC. In determining the financial impact of the royalties under such conditions, Dr. Putnam assumed that Paragon's royalty-chargeable revenues would increase by 3.9% per year, that its fixed costs would remain at $70 million, that its costs of goods sold would remain at 80% of net sales, and that those latter costs would all be variable costs. Under these and other assumptions, Dr. Putnam theorized that the hypothetical ILG licenses would have produced a total negative impact on the business's profits of $41.1 million. Discounting $41.1 million to present value (using an 11.6% discount rate) as of February 2, 1993, Dr. Putnam testified that the "asset insufficiency" represented by Paragon's lack of ILG licenses diminished the value of Paragon's business by only $21.7 million.

209. Most of Dr. Putnam's assumptions, however, are unpersuasive or contradicted by the evidence. Dr. Putnam's critical assumption that PG and KC would have raised their prices equal to the percentage royalty costs they would have imposed on Paragon through the hypothetical licenses is highly improbable. At the time of the IPO, PG and KC were engaged with each other in a fierce, well-publicized battle for market share. In their fight over market share, they were aggressively lowering prices. As of the IPO, Weyerhaeuser expected that this climate of falling prices would continue, and it did, for years after the IPO. Raising prices would have been contrary to the business strategy that PG and KC were actually and actively pursuing, especially as such a price increase would allow Paragon and the other private-label, discount-priced competitors, who had been also taking market share from brand leaders PG and KC, to retain share and enhance profits.

210. Dr. Putnam admitted that the "Lerner Markup Rule," on which he relied so heavily for his critical assumption about price increases, applies, if at all, only where a firm with market power is engaged in short-term profit maximization. The rule would have no application where the industry's *two* price leaders were in fact pursuing objectives other than short-term profit maximization. Furthermore, according to Dr. Putnam's estimate, overall market-wide demand for disposable diapers was inelastic. That fact suggests that neither PG nor KC expected the other, or their private label competitors, to necessarily follow price increases. If the market were as cooperative in pricing behavior

as Dr. Putnam's opinions suggest, market-wide price levels would have risen until overall market demand became elastic. In this industry during the relevant time period, the implication of inelastic demand is that the dominant firms could expect that their competitors might seek to earn more money by keeping their prices lower rather than following price increases. For example, even if PG and KC had expected the imposition of royalties on Paragon to cause Paragon to raise prices, they would not necessarily have expected a shift in demand from Paragon's private label products to their own branded diapers. The more likely outcome would have been a shift in demand by Paragon's customers to other private label producers.

211. Dr. Putnam's reliance on the Lerner Markup Rule is flawed for other reasons. The notion that experienced business people at Paragon should have used the equivalent of a Lerner Markup theory to predict that, had Paragon licensed the ILG patents, PG/KC would have raised prices—despite the substantial industry experience indicating that they would not—is implausible. The Lerner Index purports to be a measure of monopoly power in equilibrium, rather than a predictor of behavior in a complex oligopoly market. The suggestion that it is a theory that can be relied upon to predict the pricing behavior of firms in the baby diaper market, which Dr. Putnam characterized as an oligopoly, is not persuasive. Indeed, the credible evidence at trial demonstrated that variability in industries, markets, economic conditions, and dimensions of competition mean that no single theory can accurately predict how competitors in oligopoly markets will respond in their pricing behavior to events such as the hypothetical ILG licenses.

212. No evidence was offered at trial that anyone familiar with Weyerhaeuser's or Paragon's competitive situation, or the market in which they operated at the time, thought that if Paragon had licensed the PG and KC patents, the royalty expense would have been greatly offset by a resulting industry-wide price increase. No witness, including Mr. Abraham, a highly regarded economic planner for Weyerhaeuser and later Paragon, saw this scenario as a realistic possibility. Ms. Hasbrouck testified Paragon did consider price increases as a means of helping to finance royalty costs, but she also testified that Paragon management "never felt that [price increases] was a viable option." When Paragon did ultimately enter into the licenses with PG and KC, it did so with no expectation that it could raise prices to cover the royalty costs.[69] None of the arguments Paragon and the Creditors' Committee advanced to support approval of the PG and KC Settlement Agreements included an argument that Paragon would institute price increases to offset the costs of the royalties. Such an argument would not only have been highly relevant to determining the reasonableness of the settlement terms but would also likely have made the settlement hearings less contested and much shorter in duration. Mr. Arnold, a skilled and experienced patent lawyer with over 50 years experience in real-life licensing negotiations, testified he had never observed a potential licensor counting on a price increase to cover its royalty costs.

---

**69.** Hasbrouck, Tr. (Oct. 31) 375 ("To the contrary, we were very, very concerned that [PG and KC] would lower prices to further squeeze us out of the market and hurt our financial condition.").

213. In offering his opinions, Dr. Putnam largely ignored the constraints on Paragon that resulted from competition by other private label producers. At the time of the IPO, Paragon competed with several private-label companies, and the industry suffered excess capacity. The already competitive private-label segment of the market was growing even more competitive at the time of the IPO, with the addition of two new, well-positioned entrants, Drypers and ConFab, who priced their products aggressively.[70] The easiest way for Paragon's private-label competitors to gain sales, and hence profits, was to take retail customers away from Paragon's business. Because private-label manufacturers, such as Drypers and ConFab, need retail outlets for their products, these competitors had an obvious incentive to take Paragon's sales through lower prices, and they did. Competition was especially stiff at the time of the IPO, when known excess manufacturing capacity in the industry was expected to keep prices depressed. Thus, Dr. Putnam's assumption that Paragon's private-label competitors would have allowed Paragon to increase prices to pay for the cost of PG/KC royalties without seeking to achieve some competitive advantage by either not following the price increase or by further lowering their own prices is unrealistic. Paragon did not have sufficient pricing power in the market, at or after the time of the IPO, to raise its prices to cover the cost of ILG royalties. All testimony from those with actual knowledge about the business rejected the notion that Paragon had independent pricing power. Dr. Putnam's opinion that PG

and KC would have raised prices after licensing their ILG patents to Paragon at the time of the IPO is hypothetical, unsupported by actual experience in that market to date, and, therefore, is unconvincing.

214. These conclusions are not altered by the fact that Paragon was able to raise prices by 3.5% in 1999, after the national brands initiated a 5% price increase late in 1998. The evidence at trial demonstrated that market conditions had significantly changed between the IPO period and 1999. For example, during the four years following the IPO, the national brands had lowered prices by 15 to 22%, despite the fact that raw material costs were increasing. Dr. Putnam assumed that the national brands increased prices by 5% in late 1998 because they had succeeded in negotiating ILG licenses with Paragon, and therefore would have done the same thing if they had been offered acceptable license terms in 1993. Probative evidence showed that the PG and KC price increases were likely prompted by factors other than the Paragon's license agreements. Although PG and KC announced their price increases in October, 1998, which was near the time they reached oral agreements with Paragon on the economic terms for their license agreements, the price increase also coincided with expectations of sharply increasing costs for key diaper raw materials, wood pulp and polypropylene. The testimony of those who actually ran Paragon's business support a conclusion that PG and KC probably increased their prices in response to predictions of rising raw material costs, not simply as a result of imposing

---

70. Before the IPO, ConFab was an independent broker who marketed and sold the Weyerhaeuser's diaper products to retail customers but that relationship ended in August 1992. ConFab announced that it planned to enter the diaper business, either as a manufacturer or as a broker for another company. Drypers was a national private label diaper manufacturer formed in 1992 by the merger of several regional private label diaper manufacturers.

higher costs on Paragon through the license agreements.

■■■■■ 215. Expert testimony may be disregarded if based on facts not supported by the record. *See, e.g., United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1040 (11th Cir.1988). " 'It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion.' " *Schubert v. Nissan Motor Corp. in U.S.A.,* 148 F.3d 25, 31 (1st Cir.1998) (quoting *Damon v. Sun Co.,* 87 F.3d 1467, 1474 (1st Cir.1996)). *See also Browder v. Gen. Motors Corp.,* 5 F.Supp.2d 1267, 1283–84 (M.D.Ala.1998); *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1184 (5th Cir.1988). Dr. Putnam's theoretical analysis may be disregarded because it is premised on assumptions about the market and about pricing behavior that are contrary to the reality of the competitive market in which Paragon operated.

216. Substantial and credible evidence, including Weyerhaeuser's own valuation of the Business and the testimony of the executives who actually ran the Business for Weyerhaeuser and then Paragon, showed this: If the Paragon business had been required to pay royalties for the key ILG feature in the range of the combined 5.5% rates demanded by PG and KC at the time of the IPO, then the value of the Business as an on-going enterprise would have been eliminated. A combined 5.5% royalty would have cut the Business's average historical 6% profit margin down to virtually nothing. While the Business might have been left a sliver of profit on paper, that profit would have been insufficient to fund future capital improvements. The capital needs of the Business were known, were described at length in the IPO prospectus, and included $75 million in machinery and plant expansion, $56 million in manufacturing improvements, and $52 million in maintenance and feature enhancement capital. With such a sharply lowered profit margin, the Paragon business would have been unable to fund product and quality improvements to keep up with product innovations by the brands, or to lower the Business's cost structure to keep pace with rising raw material costs and sharp diaper price declines that were anticipated to, and did in fact, continue in the years following the IPO. Testimony from those who actually ran the Business established these major investments were necessary for Paragon to remain viable and competitive.

217. PG and KC ultimately agreed to running royalty rates when Paragon was in bankruptcy that were lower (3.5 to 4.5% in total, based on volume) than they had demanded at the time of the IPO, but no evidence was offered to prove that they would have negotiated these same rates in 1993. The competitive dynamics of the diaper market had changed by 1999. Paragon was a debtor in a Chapter 11 bankruptcy case in 1999, and its ability to pay, if not its survival, was in doubt. All known third party licenses by PG and KC for the ILG technology through 1999 were at royalty rates of at least 2% each. Even a combined royalty of 3.5%, however, would have eviscerated the profits of the Business at the time of the IPO based on both the cash out of pocket costs and the needed capital investments that could not be made. The valuation conducted by Weyerhaeuser's own IED department shortly before the closing of the IPO showed that a single 2.5% royalty would have reduced the value of the Business to zero. Weyerhaeuser was well aware of this troubling (and undisclosed) fact before the IPO and the knowledge not only did not prevent

Weyerhaeuser from pushing the IPO forward, but those facts and the surrounding circumstances may be *why* Weyerhaeuser pushed the IPO to completion.

218. The Business could have avoided paying any royalties to PG and KC by simply removing the ILG feature, but without this technology, on which Weyerhaeuser had built the Business, the Business would have had little or no value as an on-going enterprise. Dropping the ILG would have led to price erosion and a substantial loss in market share. The resulting substantial loss of market share, again according to Weyerhaeuser's own IED analysis, would have reduced the value of the Business to a negative figure.

219. Paragon operated as a price follower, with no independent ability to raise prices, in a brutally competitive market. The Business earned very small profit margins, and management dedicated every dollar of earnings to capital investments in order to remain competitive. No knowledgeable buyer would have reasonably concluded the Business had going concern value at the time of the IPO if it were paying the royalties demanded for the ILG technology, or had instead dropped the feature. *All* credible evidence was contrary. Weyerhaeuser had built the Business into what it appeared to be at the time of the IPO by infringing the ILG technology PG owned, and not paying for it. As the ILG patents were held by its competitors, Weyerhaeuser's infringement was potentially more expensive because it gave rise to damages for lost profits, which would be measured by the profits the two major branded competitors lost from infringing sales *and* the loss of the ability to price at a premium. *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978). PG had very high profit margins (30% or more) on the diaper sales it lost because of Weyerhaeuser's infringement.

220. As part of the IPO transaction, Weyerhaeuser required Paragon to assume all liabilities of the Business. Thus, the value of the Business as delivered in the IPO could also include a deduction for the cost to litigate and pay substantial claims for royalties and lost profits arising from Weyerhaeuser's past infringement of PG's and KC's ILG patents, or to pay the lump sum amounts to satisfy these claims as part of a license negotiation. As seen in the bankruptcy settlement hearings, PG and KC demanded substantial payments to settle past infringement as a condition to licensing their ILG rights. Any knowledgeable buyer of the Business would have imposed a heavy discount to the value of the Business based on these known liabilities, contrary to considering them immaterial as the Prospectus, prepared by Weyerhaeuser, said the Company believed they were.

221. No credible evidence suggested that PG, in particular, which had suffered the most substantial loss from the infringement, would have been willing on February 2, 1993, to waive its claims for past infringement as part of a hypothetical license negotiation. The series of settlement communications that took place a year *after* the IPO showed PG insisted on a payment for past infringement of $30 million, as a condition to a license. This $30 million offer was a settlement offer, not extant when the IPO closed. A conservative calculation as to how a knowledgeable and fully informed buyer would have realistically evaluated the potential exposure on these patent claims through the date of the IPO results in an expected liability, including lost profit damages and royalties, of at least $78.9 million.

222. Because the Business had no value as a going concern to a fully informed buyer at the time of the IPO, an estimate of the liquidation value of the Business at the time showed a value of $48.7 million. This valuation is aggressively high, however, based on Dr. Beyer's conservative assumptions, including the assumptions that receivables would be collected in full, that the Business would have no expenses of liquidation, and that property and construction in progress could be sold for full book value in an industry that had substantial excess capacity at the time. A reasonable estimate of the pre-IPO infringement liability that would have been made by a fully informed buyer exceeds, by a substantial amount, the Business's liquidation value at the time of the IPO.

223. Weyerhaeuser launched Paragon via an IPO and received more than $210 million in cash proceeds. The IPO Prospectus Weyerhaeuser drafted failed to disclose the amount of the huge pre-IPO royalty demands made by both PG and KC for the ILG technology, and failed to disclose that Weyerhaeuser had previously failed in negotiating with each of them to obtain the technology at royalty rates the Business could afford to pay. A fully informed buyer would have known the truth that Weyerhaeuser knew, but did not disclose, in the IPO Prospectus. A fully informed buyer would have known that Paragon ultimately would have to reorganize the Business either through licensing the technology or dropping the ILG feature. The Paragon diaper business as actually delivered at the time of the IPO, without the necessary rights to utilize the key ILG feature on its products, had no inherent value either as a liquidation candidate or as an ongoing business enterprise. Thus, the difference in value between the value of the Business as warranted on the date

of the IPO and its value on that date as actually delivered is at least $284,625,000. Plaintiff would be entitled to recover that amount as damages from Weyerhaeuser for breach of its warranties under a difference-in-value measure.

## H. Destruction Of Business Loss Measure

224. Plaintiff contends that another measure of damages is available in what is described as a "Destruction of Business" measure. Plaintiff asserts that, when a breach of contract results in complete destruction of a business enterprise, a proper measure of damages is the value of the business at time of destruction, citing *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d. Cir.1995) ("when the breach of contract results in the complete destruction of a business enterprise and the business is susceptible to valuation methods, such an approach provides the best method of calculating damages"); *True North Composites, LLC v. Trinity Indus., Inc.*, 191 F.Supp.2d 484, 524 (D.Del.2002) ("value of the company at the time it closed due to [defendant's] breach ... was undoubtedly" a correct measure of damages); 1 ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS, § 6.24, at 500–01 (5th ed. 1998) ("If a business has not been just injured, but has been destroyed, almost all of the few cases in point hold that lost profits damages are not recoverable at all. The measure of damages is said to be the market value of the business on the date of destruction.").

225. The destruction-of-the-business measure for damages is very similar to the difference-in-value method employed above, but it is employed calculating the loss of value as of the time it *actually* occurred [the date of the sale to Well-

spring] rather than as of the time the warranties were breached [the date of the IPO]. No Washington case directly applying or declining to apply this destruction of business value measure has been located. This destruction-of-business method for computing damages was offered by Plaintiff at the damages trial to illustrate another aspect of the loss suffered by Paragon by Weyerhaeuser's breach of the warranties. Plaintiff suggested that the value of Paragon's business when it was destroyed plus the negative equity remaining at the conclusion of the bankruptcy reorganization yields a destruction-of-the-business total of $558.3 million. Plaintiff's hypothetical destruction-of-the-business losses, as an illustration of Paragon's loss, is interesting but lacks support in Washington law and, thus, will not be considered in determining Plaintiff's damages.

## I. Consequential Damages

226. Washington courts recognize consequential damages are recoverable under both a difference in value and cost to cure measure, when those measures fail to make the injured party whole. *See Lyall*, 711 P.2d at 360. As with other damages, a consequential damage must be found to flow naturally and inevitably from the breach and to be so related to the breach that the type of loss would have been within the contemplation of the parties when they entered the contract. *Pettaway v. Commercial Automotive Service, Inc.*, 49 Wash.2d 650, 306 P.2d 219, 222 (1957) (*en banc*). Because consequential damages can be a severe remedy, however, Washington law additionally requires that it be within contemplation of the parties that the specific damages sought would probably result from a breach of the contract. *Dally v. Isaacson*, 40 Wash.2d 574, 245 P.2d 200, 203 (1952).

227. As later explained in *Larsen v. Walton Plywood Co.*, 65 Wash.2d 1, 390 P.2d 677, 681–2 (1964), however, the "true test" for whether such specific damages were within contemplation of the parties is not what actually was anticipated, but rather what reasonably could have been anticipated by the parties. *See also Olson v. Scholes*, 17 Wash.App. 383, 563 P.2d 1275, 1280 (1977). Damages for breach of contract are awarded "to compensate the injured party for harm done that ought to have been foreseen whether it was or not." Thus, "[d]amages, even though not general, which follow a breach because of special circumstances, are actionable so long as they are the direct and proximate consequence of the breach." *Larsen*, 390 P.2d at 682.

228. As a result of the Delaware trial and judgment, Paragon suffered immediate major disruptive consequences to the Business. Paragon suffered loss of stock value, bankruptcy, increased costs and lost profits. Plaintiff seeks recovery of four categories of consequential damages that it contends were directly and proximately caused by the breach of warranties. They are (1) costs Paragon incurred to re-design its primary product following the Delaware Judgment, (2) lost profits, (3) bankruptcy-related costs and fees, and (4) loss from Paragon's inability to increase its investment in Mabesa. As set forth in page 38, ¶ 70 above, the loss Plaintiff attributes to Mabesa is too speculative and remote to be allowed as an item of consequential damages. As set forth in page 44, ¶ 81, above, Plaintiff is entitled to prejudgment interest on the consequential damages, except damages awarded for lost profits.

### 1. Product re-design costs

229. The costs Paragon incurred to redesign its product following the Dela-

ware Judgment were within reasonable contemplation of Weyerhaeuser at the time of the IPO as damage Paragon would probably incur from a breach of Weyerhaeuser's warranties as to the sufficiency of Paragon's intellectual property. For months after launching its new ILG diaper, Weyerhaeuser itself had worked on altering the Ultra's design to avoid Lawson and Dragoo infringement. Therefore, Weyerhaeuser knew that design alteration would be costly because manufacturing a newly-designed diaper requires retrofitting the diaper production machinery and because start-up curves are encountered in launching any newly-designed product. Weyerhaeuser knew before the IPO that an injunction against the Ultra diaper was likely to occur, triggering the need for Paragon to expeditiously proceed with the costly process of re-designing its diaper to comply with the injunction. Re-design costs were a direct consequence of Weyerhaeuser's breach of the warranties.

230. Weyerhaeuser was no stranger to product re-design costs following infringement injunctions. It was forced into re-design following the injunction that issued in PG's 1985 Buell lawsuit. As was the case for Weyerhaeuser's diaper business after the Buell injunction, when a business, such as Paragon, is enjoined from making its principal product because one or more of the product's features infringes another's patents, it has no choice but to incur the costs to implement a different, non-infringing design to remain in business. Such costs have been recognized by Washington courts as appropriate consequential damages. *See Lyall,* 711 P.2d at 360 n. 4 (recognizing that consequential damages not inherent in the benefit of the bargain measure "might include expenses incurred 'in pursuance of reasonable efforts to avoid or minimize the damaging effects of another's wrong' ").

231. Therefore, Paragon's product re-design costs were within the reasonable contemplation of the parties as a probable cost that would be incurred if Paragon's intellectual property were found to be inadequate to produce its product as designed at time of the IPO. Paragon incurred $8,514,000 in costs to re-design its product to comply with the Delaware injunction. These costs were proximately caused by Weyerhaeuser's breach of warranties and Plaintiff is entitled to recover this amount from Weyerhaeuser as consequential damages.

## 2. Lost profits

232. Lost profits damages are recoverable if they (1) are within contemplation of the parties at the time the contract was made (*i.e.,* they were reasonably foreseeable), (2) were proximately caused by defendant's breach, and (3) are proven with reasonable certainty. *Milgard Tempering, Inc. v. Selas Corp. Of America,* 902 F.2d 703, 710 (9th Cir.1990). This first requirement for recovering lost profits is typically easily satisfied because most contracts are entered into with an expectation of future profits. *See Tiegs v. Watts,* 135 Wash.2d 1, 954 P.2d 877, 885–886 (1998); *Espresso America, Inc. v. Kelley's Personal Communications,* No. 36604–1–I, 1997 WL 65956, at *6 (Wash. Ct.App. Feb.18, 1997) (unpublished). In *Espresso America,* the court found that an answering service should have been aware that its inability to answer its client's calls soon after its client's television advertisement would cause the client to lose potential sales and profits. *Espresso America,* 84 Wash.App. 1106, 1997 WL 65956, at *6. *See also Barnard,* 667 P.2d at 120.

233. That Paragon would lose profits as a consequence of having inadequate in-

tellectual property to run the ILG diaper business was foreseeable. Paragon was launched from Weyerhaeuser by carving out a division into a publicly-traded company via incorporation and an IPO with expectation of profits, which is the reason investors purchased the stock. Weyerhaeuser knew the value of the ILG technology, and thus knew that an injunction against Paragon using the ILG feature would adversely affect the diaper's quality, leading to lower sales and profits. Additionally, after the 1985 litigation with PG involving the Buell patent, the injunction resulting from that litigation caused significant loss of profits for Weyerhaeuser. Accordingly, the first element for Plaintiff to recover lost profits is satisfied.

234. The second element, proximate cause, is satisfied because abundant evidence shows that the ILG patent deficiency, which led to Paragon's bankruptcy filing, together with the inferior product that the Delaware Judgment forced Paragon to retreat to selling, in fact, proximately caused Paragon to lose sales and profits.

235. The third element—reasonable certainty—is more concerned with the fact of damage than with the extent or amount of damage. *Milgard*, 902 F.2d at 711; *Barnard*, 667 P.2d at 120. A plaintiff "[is] not to be denied recovery because the amount of damage is not susceptible to exact ascertainment or apportionment between [defendant's] fault and other factors which may have contributed to the loss." *Barnard*, 667 P.2d at 120. Evidence of damage is sufficient if it is the best evidence and affords a reasonable ba-

sis for estimating the loss. Expert testimony alone can provide a sufficient factual basis for a lost profits award. *Milgard*, 902 F.2d at 711. If the opinion of an expert provides a reasonable basis for inference, the court is freed from the realm of uncertainty and speculation. *Id.* Expert testimony must be based upon tangible evidence rather than mere speculation or hypotheses. *Id.* When the fact of damage is proved, the trier of fact may exercise a large amount of discretion as to the amount. *Alpine Indus., Inc. v. Gohl*, 30 Wash.App. 750, 637 P.2d 998, 1002 (1981).

236. Plaintiff's expert estimated the profits Paragon lost in 1998 and 1999 by comparing Paragon's actual infant care net sales in those years with Paragon's August 1997 Mid–Term Plan base case projections for those years. The August 1997 Mid–Term Plan's projected net infant care sales for 1998 to 1999 is a reasonable basis from which to compute probable lost profits Weyerhaeuser's breach caused Paragon during 1998 and 1999. *See, e.g., Milgard*, 902 F.2d at 710–11 (proper to use the first year after the 21–month damage period as benchmark to calculate probable lost profits for prior years).[71]

237. To compute Paragon's 1998 and 1999 lost profits from lost sales, Plaintiff's expert used Paragon's 22.3% gross profit margin for 1997, the year immediately preceding the lost profit period. Weyerhaeuser criticizes using this percentage because it is the Business's second highest gross profit percentage. The margin was higher than in most prior years because Paragon had just invested millions on productivity

---

**71.** In this case, using the first post-Plan confirmation period, similar to the plaintiff in *Milgard* using the first "post-breach period" as the benchmark, would result in an inflated lost profits calculation because, by 2000, Par-

agon had been afforded the ability to raise prices twice, 3.5% and 5%, respectively. Raising prices was not projected in the August 1997 Mid–Term Plan.

upgrades that would naturally yield better profit margins. No evidence suggests 22.3% was disproportionate to reasonable future expectations. The use of a 22.3% gross profit margin to calculate lost profits is fair and appropriate.[72] Multiplying 22.3% by the difference between Paragon's actual infant care net sales in 1998 and 1999 and the projected infant care net sales for those years yields lost profits in 1998 and 1999 of $6.7 million and $15.3 million, respectively.

238. Weyerhaeuser contends these lost profits should not be attributed to conditions its breach caused. In support of its contention, Weyerhaeuser argues that in the first report by Plaintiff's expert, Dr. Beyer declined to estimate Paragon's lost sales due to design changes, saying "[q]uantifying the magnitude of lost sales to these [diaper-quality factors] (as distinguished from other causes) is more problematic, and therefore I have declined to incorporate them in my measures of economic damages." Weyerhaeuser also argues its point is substantiated by Paragon's 10K filing for the year 1999, in which Paragon attributed its depressed 1999 sales to "a number of reasons."[73] Weyerhaeuser asserts Plaintiff's failure to segregate profits lost due to factors not tied to its breach renders the lost profits Plaintiff seeks not proven with reasonable certainty and therefore not recoverable.

239. When the fact of lost profit damages has been established, the court, as the trier of fact, has a great deal of discretion to determine the amount. *Alpine Industries*, 637 P.2d at 1002. Plaintiff should not be denied recovery because the lost profits are not susceptible to exact ascertainment or apportionment between Weyerhaeuser's fault and other, unidentified factors. *Barnard*, 667 P.2d at 120. Weyerhaeuser's use of Dr. Beyer's earlier reluctance to quantify the lost sales to each potential factor is not persuasive as a basis for denial of lost profit recovery. Plaintiff established that Paragon did in fact lose sales and profits as a result of filing a bankruptcy petition and as a result of selling the inferior ULG product; the evidence is sufficient to afford a reasonable basis for estimating lost profits Paragon suffered from Weyerhaeuser's breach of warranties. Plaintiff is entitled to recover lost profits damages for 1998 in the amount of $6.7 million and for 1999 in the reduced amount of $11.0 million.

240. Attributing all of 1998's $6.7 million in lost profits to Weyerhaeuser's breach is consistent with the evidence and not mere speculation. Paragon's 1998 10K filing states that its 1998 sales decline "was primarily due to uncertainties related to the Company's Chapter 11 proceeding and the temporary discontinuation of shipments to a customer during the second

---

72. Weyerhaeuser also suggests 22.3% is too high because it fails to account for the royalties, an expense item. This criticism lacks merit because the lost profits exercise is one of calculating the lost profit impact to Paragon *of lost revenue*. It is not a calculation comparing the *projected* overall 1998 and 1999 profit to Paragon's *actual* lower overall profits those years, on which the royalties did have an impact.

73. In addition to factors fully attributable to Weyerhaeuser's breach of warranty, in its

1999 10K, Paragon cited as a factor in its decreased net sales the competition from branded and "value segment" competitors. Even this factor is circumscribed by Weyerhaeuser's breach because the conditions which made Paragon susceptible to its competitors—the customer uncertainties resulting from its filing bankruptcy, re-design of its product to one with increased leakage, disappointing customers—resulted from its lack of adequate intellectual property.

half of the year due to product design issues associated with a new product roll-out"—the ULG. These factors were caused by Weyerhaeuser's breach.

241. Only a portion of the lost profits from sales declines in 1999 are attributable to Weyerhaeuser's breach. Paragon's 10K filing for 1999 identified six factors for the further sales decline in 1999. At least three of the listed causes for 1999's further sales declines were product performance or bankruptcy-related causes that can be attributed to Weyerhaeuser's breach. Paragon attached great importance to returning to the ILG-designed diaper and to the need to emerge from bankruptcy to stem the tide of its declining sales. Assigning at least one-half of Paragon's 1999 $8.6 million further decline in sales and profits to Weyerhaeuser's breach is reasonable. Thus, $11 million is the lost profits damages Plaintiff is entitled to recover for Paragon's 1999 lost profits resulting from Weyerhaeuser's breach.[74]

### 3. Bankruptcy-related costs

■ 242. Paragon's bankruptcy, and its attendant additional employee bonus and professional fee costs were proximately caused by the Delaware Judgment and the PG ILG patent insufficiency. Accordingly, Weyerhaeuser's breach of warranties proximately caused Paragon to incur such bankruptcy costs. At the time of the IPO, Weyerhaeuser could reasonably contemplate that a bankruptcy filing by Para-

gon would result if Paragon's intellectual property deficiency led to an injunction against selling its principal product. Hence, the bankruptcy costs Paragon incurred to rehabilitate itself from Weyerhaeuser's breach are recoverable as consequential damages. Plaintiff is entitled to recover the $4 million Court-approved retention bonuses Paragon paid to retain key employees during the bankruptcy and the $22.9 million in professional fees Paragon incurred in the course of administration of its Chapter 11 case.

### 4. Prejudgment Interest

243. Prejudgment interest[75] on the 1998 product re-design costs of $5,940,000 accrues beginning January 1, 1999, through the date of judgment ($4,458,-417.64) and interest on the 1999 product re-design costs of $2,574,000 accrues from July 1, 1999, through the date of judgment ($2,010,138.74). Prejudgment interest on the $4,000,000 of 1998 bankruptcy retention bonuses accrues from January 1, 1999 through the date of judgment ($3,002,301). Interest on all other out-of-pocket bankruptcy fees and cost components accrues from January 29, 2000 through date of judgment ($17,873,293).

### J. Mitigation

■ 244. The doctrine of mitigation of damages imposes a duty on an injured party to use reasonable means to avoid or minimize damages. *Smith v.*

---

**74.** Eleven million dollars is the sum of the starting point of $6.7 million from 1998 (100% attributed to Weyerhaeuser's breach) and one-half of the additional $8.6 million of profits lost in 1999.

**75.** The rate used in Washington for prejudgment interest is 12%. *Mahler v. Szucs*, 135 Wash.2d 398, 957 P.2d 632 (Wash.1998) (*en banc*) (citing Wash. Rev.Code § 19.52.020

(1999) for 12% rate); *Smith v. Olympic Bank*, 103 Wash.2d 418, 693 P.2d 92 (Wash.1985) (*en banc*) (noting the statutory rate guiding prejudgment interest was changed in 1981 from 6% to 12%); *State v. Trask*, 98 Wash. App. 690, 990 P.2d 976 (Wash.Ct.App.2000) (citing 12%).

*King,* 106 Wash.2d 443, 722 P.2d 796, 801 (1986) (*en banc*); *Young v. Whidbey Island Bd. of Realtors,* 96 Wash.2d 729, 638 P.2d 1235, 1237 (1982) (*en banc*). Whether the plaintiff's actions at the time were reasonable is judged solely from the plaintiff's perspective at the time the mitigation allegedly should have occurred. *Hogland v. Klein,* 49 Wash.2d 216, 298 P.2d 1099, 1102 (1956). A wide latitude of discretion is allowed a person who, by another's wrong, has been forced into a predicament and faces the probability of injury or loss. *Kubista v. Romaine,* 14 Wash.App. 58, 538 P.2d 812, 816 (1975). "If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than another is chosen." *Kloss v. Honeywell, Inc.,* 77 Wash.App. 294, 890 P.2d 480, 485 (1995) (per curiam). Mitigation is not to be addressed from a hindsight perspective:

> [T]he party injured is not under any obligation to use more than ordinary diligence. Prudent action is required, but 'not that action which the defendant, upon afterthought, may be able to show would have been more advantageous to him.' The amount of care required is not to be measured by 'ex post facto wisdom'; and the plaintiff is not bound at his peril to know the best thing to do. 1 SEDGWICK ON DAMAGES 415 (9th ed.), § 221.

*Hogland,* 298 P.2d at 1102.

■ 245. Because mitigation is an affirmative defense, the breaching party has the burden to prove that a reasonable alternative was open to the injured party and should have been pursued rather than the course actually taken. *Federal Signal Corp. v. Safety Factors, Inc.,* 125 Wash.2d 413, 886 P.2d 172, 183–84 (1994) (*en banc*). The doctrine prevents the injured party from recovering those damages that could have been avoided through exercising such reasonable means. *Kloss,* 890 P.2d at 485; *Bernsen v. Big Bend Electric Coop., Inc.,* 68 Wash.App. 427, 842 P.2d 1047, 1051 (1993).

■ 246. The mitigation doctrine applies in contract cases, and Washington courts have been liberal in extending the doctrine's applicability to other types of cases. *See Bernsen,* 842 P.2d at 1051 (doctrine applies in both contract and tort cases, extending the doctrine to rate discrimination cases); *Federal Signal,* 886 P.2d at 184 (extending principles to cases under Washington version of article II of Uniform Commercial Code). No Washington authority was found that specifically extended the doctrine to common law breach of warranty claims or to contractual indemnity claims under clauses similar to ATA Section 11.02(b), but it is reasonable to conclude that Washington law would impose a duty on Paragon to have used reasonable means to avoid or minimize the damages Plaintiff seeks to recover under the common law "cost to cure" and "destruction of business value" measures and under the ATA's Section 11.02(b) remedy.[76]

■ 247. Weyerhaeuser suggests, indirectly,[77] that Paragon should have accepted PG's and KC's license demands outstanding at time of the IPO, or that Paragon, shortly after the IPO, should have vigorously negotiated lower royalty demands and agreed to pay the royalties that were finally agreed upon in the 1999

---

**76.** Mitigation has no application for a difference in value measure.

**77.** In no brief or argument has Weyerhaeuser made this contention directly.

settlements.[78] Through its expert, Dr. Putnam, Weyerhaeuser argues that Paragon's damages should be limited to the cost of licensing PG's and KC's patents as of the IPO date. Dr. Putnam hypothesized that Paragon *could* have negotiated royalty rates at that time equal to or lower than those which were reflected in the 1999 Settlements, but he stopped short of offering the opinion that Paragon *should* have done so, or that Paragon's failure to do so was unreasonable under the circumstances confronting it at the time. Dr. Putnam conceded that Weyerhaeuser's breaches put Paragon in a position of having to make difficult choices about how to manage its infringement risks, but he opined that because Paragon and not Weyerhaeuser made those choices, Paragon should bear all the risks and costs of those decisions regardless of whether the choices were reasonable under the circumstances. As questions of law are the province of the court, however, Mr. Putnam's opinion on this issue can be disregarded as incorrect.

248. Where a defendant's wrong puts the plaintiff in a position of having to make difficult choices about how to address the consequences of that wrong, the defendant is responsible for the resulting damages (measured according to controlling legal principles) unless the defendant carries its burden of showing that the plaintiff acted unreasonably in failing to pursue an alternative course of action that would have reduced or eliminated the claimed damages. Paragon's failure to negotiate a settlement with PG and KC, either at the time of the IPO or at some later time preceding the Delaware Judgment, was reasonable under the circumstances.

249. If Paragon had agreed to pay the royalties to PG and KC, Paragon's action would undoubtedly have invited a flood of securities fraud lawsuits against both Paragon, the just-birthed company whose stock was issued under the IPO Prospectus, and Weyerhaeuser, the party who controlled the IPO and the pre-IPO Business, who wrote the Prospectus, and who received most of the cash. Paragon's stock had been sold to the public based upon a Prospectus containing representations written by Weyerhaeuser that "the Company believes that any outcome with respect to [the PG and KC ILG infringement claims] will have no material adverse effect on its financial position or its results of operations." Accepting royalties in the range of 4% of sales, however, would have eliminated two-thirds or more of Paragon's profits. That alone would have flatly contradicted the Prospectus's representations. The Business needed those profits to fund its planned and long overdue (and underfunded by Weyerhaeuser) five-year capital expenditure program to enable the Business to withstand pricing and other competitive challenges that were expected and did come in the post-IPO years. Accepting PG's and K–C's settlement demands at or near the time of the IPO was not a reasonable option for Paragon.[79]

250. The alternative course Weyerhaeuser most directly argues Paragon should have taken was to have accepted the best offers PG and KC submitted be-

---

78. Weyerhaeuser does not suggest Paragon should have taken any course of action other than the settlement option, such as dropping the ILG feature, to mitigate its damages.

79. The reasonable inference is that Weyerhaeuser not only knew those facts but had positioned Paragon to act exactly as it did: spending funds for corporate improvements rather than royalties.

tween the IPO and Delaware Judgment. In letters from PG in January and July 1996, PG offered to grant Paragon a license for Lawson and Dragoo in return for Paragon paying $30 million for past infringement and a 2% royalty on all future net sales of Paragon ILG products. *See* page 853, ¶ 41.

251. Weyerhaeuser does not identify the best KC post-IPO settlement offer Paragon should have accepted.[80] The evidence demonstrated only one such KC offer. On October 27, 1995, KC sent Paragon a signed license agreement under which KC would license its Enloe patents to Paragon in return for a 2.5% royalty on all net sales of Paragon's ILG diapers and adult incontinence products, a 5% royalty on net sales of Paragon's ILG training pant diapers, and lump sum payments equal to 1.75% of Paragon's ILG diaper and adult incontinent product sales and 3.75% of its training pant product sales between January 1, 1993 and May 16, 1995. This October 27, 1995 offer was the only post-IPO offer from KC that Paragon could have accepted to satisfy its alleged mitigation duty.

252. Accepting both PG's and KC's best post-IPO, pre-Delaware Judgment settlement offers (the "best pre-Delaware Judgment offers") would have obligated Paragon to pay about $50 million in cash,[81] plus future royalties of 4.5% of its net sales of diapers, 2.5% of its adult incontinent products, and 5% of its training pant products. At $500 million annual sales, the running royalties would have cost about $22.5 million per year for the approximately ten years left until the Lawson, Dragoo and Enloe patents expired. The total cost to Paragon, including the $50 million paid up front, could have been as high as $275 million. As large as that cost might have been, it may have been less than the ultimate cost Paragon suffered as a result of litigating rather than settling with PG. To determine whether rejecting the best pre-Delaware Judgment offers was reasonable, however, and not in derogation of Paragon's mitigation duty, Paragon's decision must be considered in light of the circumstances it faced at that time, and a wide latitude of discretion must be given to Paragon's choice.

253. Paragon's decision to reject the settlement option was greatly influenced by the advice of Paragon's outside counsel concerning the merits of PG's case. Paragon's counsel advised that its chances of prevailing against PG were as high as 80%, and that even if Paragon lost on PG's claims, it likely would win more on its "Pieniak counterclaim" than it would owe PG. Based on this advice, Paragon's decision to try the case rather than settle at substantial cost to itself cannot accurately be characterized as unreasonable. Indeed, in light of such advice, accepting PG's offer could have been considered imprudent.

254. Paragon's rejection of PG's best offer was also influenced by its belief that it could not afford to pay the demanded amounts, in part because those royalty rates could become precedent for a royalty payable to KC for licensing its Enloe pat-

---

80. In none of Weyerhaeuser's briefs does it identify which KC settlement offer Paragon should have accepted. A search of the testimony and arguments from Weyerhaeuser's counsel fails to reveal which KC offer Weyerhaeuser contends Paragon should have accepted.

81. $50 million is the sum of PG's $30 million demand and the approximate $20 million resulting from the KC lump sum demands.

ents, which Paragon perceived, and was advised, were even stronger and more defensible than PG's patents. Weyerhaeuser seeks to undermine the reasonableness of Paragon's judgment by pointing to conclusions by Judge Longobardi in his opinion in the Delaware litigation. Judge Longobardi rejected Paragon's argument that, given the possibility of having to pay KC a royalty equal to that paid PG, Paragon could not afford to pay PG the 2% royalty it demanded. *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F.Supp. 547, 614 (D.Del.1997). Weyerhaeuser also points out that Paragon, once it did agree to settle with PG and KC during the Chapter 11 case, was able to pay lump sum amounts and royalties that were equal to or greater than the amounts demanded in the best pre-Delaware Judgment offers. That result, however, was achieved and achievable only by discharging debt and obtaining an infusion of capital: results available only in a Chapter 11 reorganization.

255. In the context of mitigation analysis, Weyerhaeuser's reliance on Judge Longobardi's holding is fundamentally flawed for several reasons. First, Judge Longobardi's analysis assigned little weight to the possibility that Paragon would have to pay a similar 2% royalty to KC in the hypothetical license negotiation he addressed. *Id.* He considered only one Enloe patent: the Enloe I "fluid pervious" ILG patent. The Enloe III patent, which both Weyerhaeuser and Paragon expected would ultimately issue to KC from the PTO with the problematic generic claims

encompassing all ILGs, issued the *day after* the Delaware trial started. Enloe III does not appear to have been considered by Judge Longobardi in his analysis. The reality that confronted Paragon in the real world in which it operated were claims of potential infringement under all three Enloe patents.

256. Second, Judge Longobardi's hypothetical analysis rested on his assumption that Paragon's concerns over paying KC royalties similar to those payable to PG could have been assuaged by including a clause in its license agreement with PG similar to one purportedly in the license agreement ConFab entered with PG in November 1996, providing that no royalties would be payable to PG if a court of competent jurisdiction concluded the Ultra diaper infringed Enloe.[82] This part of the hypothetical analysis was contrary to reality, and at least not supported by evidence in this case. No evidence was offered to show that PG would *actually* have agreed to such a clause in 1996, and indeed extant evidence suggests that it would not. The actual license agreement Paragon and PG entered in 1999 did not include such a clause, despite the fact that Paragon bargained as hard as it could in the bankruptcy settlements to minimize its double jeopardy exposure. Furthermore, the ConFab/PG license agreement of which Judge Longobardi spoke appears to contain no such clause.

257. Third, Judge Longobardi's finding concerned only whether Paragon could have afforded to pay a 2% royalty to PG; it did not address whether Paragon could

---

**82.** Apparently, it was assumed that Paragon could not logically infringe on both the PG and the KC patents because they were opposite: PG was fluid impermeable and KC was fluid pervious. Thus, Paragon would not be required to pay both PG and KC, given their patents' opposing ILG natures as to fluids. When Enloe III issued, however, the vise for Paragon was tight: Enloe III was the generic ILG patent, making it completely possible for a court to find Paragon infringed the ILG patents of *both* PG and KC.

have afforded to pay the additional lump sum payment demands. And by his decision, a single 2% royalty would have wiped out one-third or more of Paragon's profit margin. A second royalty, payable to KC, plus the lump sum payments demanded, would have wiped out most or all of the rest. Weyerhaeuser presented no evidence that Paragon realistically could have afforded to pay such amounts.

258. The hypothetical license negotiation findings in the Delaware decision are entitled to little weight for purposes of analyzing whether Paragon satisfied its mitigation duty. Paragon's fear of duplicating with KC the amounts PG was demanding, and its inability to pay both, were, even in a hindsight comparison with the bankruptcy settlements, justified and prudent concerns which reasonably supported the decision not to settle on the terms PG demanded in its best pre-Delaware Judgment offer. Under Washington law, if settlement of the PG claims entailed greater financial burden and risk than Paragon could manage at the time, its failure to pursue that course is not unreasonable, and does not preclude recovery. *See Smith v. King*, 106 Wash.2d 443, 722 P.2d 796, 801 (1986) (*en banc*); *Federal Signal*, 886 P.2d at 185 n. 7 (injured party need not undertake undue risk or burden in its effort to mitigate); *cf. Barnard*, 667 P.2d at 120 ("We decline to adopt a rule requiring the injured party to purchase additional devices so that the machine would operate as originally warranted, particularly when there was a clear risk

that the part would not eradicate the problems encountered.").

259. Equally unavailing is Weyerhaeuser's argument that because Paragon was ultimately able to afford the PG and KC settlements, it could have afforded to settle on similar terms earlier. Paragon's settlements with PG and KC actually wiped out Paragon's shareholders' equity, leaving Paragon with more than $100 million in negative equity. Reorganized Paragon was able to succeed financially only after taking advantage of the bankruptcy shield against enforcement of substantial debts remaining to PG, KC and others, and the occurrence of several favorable post-Confirmation future events that were unforeseeable to Paragon at the time Weyerhaeuser argues that Paragon should have settled. Paragon's duty to mitigate did not compel it to settle for such a high price as a means of resolving litigation it was advised it would win. Reorganized Paragon's post-Confirmation financial performance is entitled to very little or no weight for purposes of assessing the reasonableness of Paragon's decision not to settle in the 1995–1997 time frame.

260. Weyerhaeuser failed to carry its burden of proving that Paragon failed to mitigate its damages by not settling with PG and KC before the Delaware Judgment. The decision not to settle was reasonable based on the circumstances existing and information known at the time.[83]

K. Attorneys' Fees

261. Before trial, the parties filed a stipulation providing that Plaintiff's attor-

---

**83.** Weyerhaeuser urges that *Knight v. American Nat'l Bank*, 52 Wash.App. 1, 756 P.2d 757 (1988), should lead to a different conclusion. In that case, however, the court stated that insufficient explanation appeared in the record to justify the plaintiff's refusal to accept an offer to buy its property, which it was prevented from developing due to defendant's

breach. The offer turned out to be higher than the price received at foreclosure. By contrast, in this case, the record, including consistent and credible management testimony during the Chapter 11 proceedings and this action about why management declined PG's offers, provides a sufficient and persua-

neys' fees and expenses (including expert witness fees, as later agreed by Weyerhaeuser) billed through September 30, 2003 in the amount of $3,017,210.07 are reasonable and should be included in any damages awarded in Plaintiff's favor. Based on the conclusion that Plaintiff is entitled to an award of damages, Plaintiff is also entitled to recover that stipulated additional sum of $3,017,210.07.

262. Pursuant to the Attorneys Fees Stipulation, this Court retains jurisdiction to resolve any disputes (not subject to appeal) concerning supplementation of the stipulated sum for Plaintiff's post-September 30, 2003 attorneys' fees and expenses, expert witness fees and expenses billed after September 30, 2003, and a portion of one of its expert witness's pre-September 30, 2003 fees and expenses inadvertently not included in the $3,017,210.07 sum (the "Post–September 30, 2003 Fees and Expenses"). Pursuant to the Attorneys Fees Stipulation, Plaintiff is entitled to reasonable Post–September 30, 2003 Fees and Expenses, so long as damages are awarded to Plaintiff. Resolution of these Post–September 30, 2003 Fees and Expenses shall not in any way affect finality of this order, for appeal, execution, or any other purpose.

**L. Post–Judgment Interest**

 263. Under 28 U.S.C.A. § 1961(a), interest is allowed on any money judgment in a civil case recovered in a district court. This statute applies to bankruptcy court judgments as well. *Pereira v. Private Brands, Inc. (In re Har-*

*vard Knitwear, Inc.),* 193 B.R. 389, 399 (Bankr.E.D.N.Y.1996); *Vic Bernacchi & Sons, Inc. v. Loxas (In re Vic Bernacchi & Sons, Inc.),* 170 B.R. 647, 656 (Bankr. N.D.Ind.1994). Unlike prejudgment interest, federal law governs post-judgment interest on judgments issued by federal courts despite the parties' choice of state law to govern remedies for breach. *See Maddox v. American Airlines, Inc.,* 298 F.3d 694, 699 (8th Cir.2002), *cert. denied* 537 U.S. 1192, 123 S.Ct. 1273, 154 L.Ed.2d 1026 (2003) (applying federal post-judgment interest statute despite parties' choice of Oklahoma law). Post-judgment interest is recoverable and shall be included in the Final Judgment in accordance with the rate provided by 28 U.S.C.A. § 1961(a) (West Supp.2003).

### IV. CONCLUSION

264. Based on the findings and conclusions stated above and in the Summary Judgment Order entered October 30, 2002, Plaintiff is entitled to recover damages from Weyerhaeuser for Weyerhaeuser's breach of its warranties in the ATA and IPA pursuant to a common law cost-to-cure measure of damages.[84] Under that measure, the amount Plaintiff is entitled to recover is as follows:

| PG Related Damages: | Amount |
|---|---|
| (i) "Conversion period" royalties: | $ 4,500,000 |
| (ii) Pre–Plan confirmation royalties: | 10,400,000 |
| (iii) Post–Plan confirmation royalties: | 43,400,000 |
| (iv) Administrative claim | 5,000,000 |
| (v) Unsecured claim cash payment: | 51,200,000 |
| (vi) Promissory note damages: | 54,100,000 |
| (vii) Remaining unpaid claim: | 50,500,000 |
| PG Subtotal: | $219,100,000 |

sive explanation of Paragon's decision not to settle.

84. Because the damages Plaintiff sought under the indemnity provisions of the ATA are the same as the damages sought under the common law cost-to-cure measure, it is unnecessary to address the indemnity damages separately.

| KC Related Damages: | Amount |
|---|---|
| (i) Pre–Plan confirmation royalties: | $ 9,900,000 |
| (ii) Post–Plan confirmation royalties: | 33,800,000 |
| (iii) Administrative claim: | 5,000,000 |
| (iv) Unsecured claim cash payment: | 37,500,000 |
| (v) Promissory note damages: | 37,500,000 |
| (vi) Remaining unpaid claim: | 34,600,000 |
| (vii) SAP costs | 9,300,000 |
| KC Subtotal: | $158,300,000 |

**Total of PG and KC Related Damages: $377,400,000**

265. Under the cost-to-cure measure, Plaintiff is entitled to recover the following additional consequential damages from Weyerhaeuser, plus the stated prejudgment interest amounts thereon:

| Consequential Damages: | Damages | Prejudgment Interest [85] | Total |
|---|---|---|---|
| (i) Product re-design costs: | $ 8,514,000 | $ 6,468,556 | $ 14,982,556 |
| (ii) Bankruptcy retention bonuses: | 4,000,000 | 3,002,301 | 7,002,301 |
| (iii) Bankruptcy fees and costs: | 22,900,000 | 17,873,293 | 40,773,293 |
| (iv) Lost profits | 17,700,000 | –0– | 17,700,000 |
| Consequential Damages Subtotal: | | | $ 80,458,150 |
| **Total cost-to-cure damages and consequential damages** | | | **$457,858,150** |

266. Based on the Attorneys Fees Stipulation, Plaintiff is entitled to recover from Weyerhaeuser the additional sum of $3,017,210.07 for Plaintiff's attorneys fees and expenses through September 30, 2003. Additional amounts may be awarded for Plaintiff's Post–September 30, 2003, Fees and Expenses, plus other pre-September 30, 2003 expenses, as set forth in the Attorneys Fees Stipulation.

267. Plaintiff is entitled to recover post-judgment interest on all sums awarded to Plaintiff.

268. For the reasons set forth above, judgment will be entered in favor of Plaintiff on Weyerhaeuser's counterclaim.

269. Judgment will be entered in accordance with this order.

---

85. Prejudgment interest is calculated through April 4, 2004.